## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

In re:

| | | |
|---|---|---|
| **HUFFY CORPORATION,** | ) | **Chapter 11** |
| **an Ohio corporation, *et al.*[1]** | ) | **Honorable Lawrence S. Walter** |
| **Debtors.** | ) | |
| | ) | **Case Nos. 04-39148 through 04-39167** |
| | ) | **Jointly Administered** |
| | ) | **04-39148** |

## DISCLOSURE STATEMENT FOR DEBTORS'
## FIRST AMENDED JOINT PLAN OF REORGANIZATION

**DINSMORE & SHOHL LLP**
Kim Martin Lewis, Esq.
John B. Persiani, Esq
Donald W. Mallory, Esq.
Attorneys for Debtors and
Debtors in Possession
255 East Fifth Street
Suite 1900
Cincinnati, Ohio 45202
513-977-8200

Dated: Cincinnati, Ohio
    August 15, 2005

---

[1] The Debtors are the following entities: Huffy Corporation, Huffy Risk Management, Inc., HUFCO-Ohio, Inc., HCAC, Inc., Hufco-Delaware Company, Huffy Sports, Inc., American Sports Design Company, Huffy Sports Washington, Inc., Huffy Sports Outlet, Inc., Huffy Sports Canada, Inc., Lehigh Avenue Property Holdings, Inc., Tommy Armour Golf Company, Lamar Snowboards, Inc., Huffy Sports Delaware, Inc., First Team Sports, Inc., Hespeler Hockey Holding, Inc., HUFCO-Georgia I, Inc., HUFCO-Georgia II, Inc., HUFCO-New Brunswick, Inc., and HUF Canada, Inc.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND APPENDICES HERETO RELATE TO THE DEBTORS' JOINT PLAN OF REORGANIZATION (AS IT MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED, THE "PLAN") AND ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON SUCH PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH 11 U.S.C. § 1125 AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF TITLE 11 OF THE UNITED STATES CODE §§ 101 ET. SEQ. (THE "BANKRUPTCY CODE").  NEITHER THE SECURITIES TO BE DISTRIBUTED NOR THIS DISCLOSURE STATEMENT HAS BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC APPROVED OR DISAPPROVED OF THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR POTENTIAL ACTIONS, THIS DISCLOSURE STATEMENT AND APPENDICES HERETO WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR

PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN THEIR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD-LOOKING PROJECTIONS AND FORECASTS BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE PROJECTIONS AND FORECASTS SET FORTH HEREIN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTORS OR WILL CONFER UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF OR THAT THE DEBTORS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND THEIR FINANCIAL ADVISORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE AT THE TIME THEY WERE MADE, MAY NOT BE ACHIEVED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

1176642_1.DOC

SEE ARTICLE VI. OF THIS DISCLOSURE STATEMENT, "IMPORTANT CONSIDERATIONS AND CERTAIN RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN RISK FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM OR IMPAIRED EQUITY INTEREST TO ACCEPT THE PLAN.

# I.
# INTRODUCTION

Huffy Corporation, an Ohio corporation ("Huffy"), and its wholly-owned subsidiaries Huffy Risk Management, Inc., HUFCO-Ohio, Inc., HCAC, Inc., Hufco-Delaware Company, Huffy Sports, Inc., American Sports Design Company, Huffy Sports Washington, Inc., Huffy Sports Outlet, Inc., Huffy Sports Canada, Inc., Lehigh Avenue Property Holdings, Inc., Tommy Armour Golf Company, Lamar Snowboards, Inc., Huffy Sports Delaware, Inc., First Team Sports, Inc., Hespeler Hockey Holding, Inc., HUFCO-Georgia I, Inc., HUFCO-Georgia II, Inc., HUFCO-New Brunswick, Inc., and HUF Canada, Inc., debtors and debtors in possession in these jointly administered Chapter 11 Cases (collectively with Huffy, the "Debtors"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated July ____, 2005, (as amended, supplemented or otherwise modified, the "Plan") filed by the Debtors with the United States Bankruptcy Court for the Southern District of Ohio, Western Division (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2005 at _____ __.m.  (Eastern Daylight Time).  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

## A.     General

Huffy and each of the other Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, on October 20, 2004.  Since that time, the Debtors have continued in the possession of their properties and in the management of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Huffy Sports Canada, Inc., Huffy Sports Outlet Inc., HUF Canada, Inc., and Hufco-New Brunswick, Inc. (collectively, the "Canadian Subsidiaries") are wholly-owned Canadian subsidiaries of Huffy; each of the Debtors including the Canadian Subsidiaries filed for a Recognition Order under the Companies' Creditors Arrangement Act (the "CCAA") on October 20, 2004 in Toronto, Ontario.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides

that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the terms for satisfying claims against and interests in a debtor. Upon confirmation of a plan of reorganization, the plan is binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debts that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, holders of certain claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirement of section 1125 of the Bankruptcy Code.

Under the Plan, the Debtors will be reorganized on a stand-alone basis. Holders of Allowed Other Secured Claims will be paid in full or have their debt reinstated. Holders of Allowed Administrative or Priority Claims will be paid in full. Holders of Equity Interests in Huffy will have their interests cancelled and will receive no distribution under the Plan. Holders of Convenience Class Claims will receive twelve (12%) of their Allowed Claims in cash.

Holders of Allowed Sinosure Group Claims will receive their pro rata share of (i) one hundred percent (100%) of the issued New Class A Common Stock of Reorganized Parent which is equivalent to thirty percent (30%) of the aggregate New Class A Common Stock and New Class B Common Stock, subject to dilution by shares of New Class C Common Stock reserved for issuance in connection with the Management Incentive Plan, (ii) a Distribution Note A in the amount of its Pro Rata Share of the total $3 million amount of Distribution Notes A and (iii) their pro-rata interest (shared with the Allowed General Unsecured Claims) in the net proceeds of the Recovery Trust.

Holders of Allowed General Unsecured Claims will receive through the Unsecured Claims Trust their pro rata share of (i) one hundred percent (100%) of the issued New Class B Common Stock which is equivalent to seventy percent (70%) of the aggregate New Class A Common Stock and New Class B Common Stock of the Reorganized Parent, subject to dilution by shares of: (a) New Class C Common Stock to be issued in connection with the Management Incentive Plan and (b) additional New Class A Common Stock issued as Sinosure Performance Shares, (ii) their pro-rata share of the distribution of Distribution Note B and (iii) their pro-rata interest (shared with the Sinosure Group Claims) in the net proceeds of the Recovery Trust.

The Sinosure Group's ability to earn Sinosure Performance Shares will increase their overall percentage of ownership in the Reorganized Parent. If the Sinosure Group earns all the Sinosure Performance Shares as is made possible under the Plan, the New Class B Common

Stock shareholders' interest in the Reorganized Parent will be diluted over time to 49% of the aggregate equity interest of the entity while the Sinosure Group's interest will increase to 51%, in both cases subject to dilution by New Class C Common Stock distributed in connection with the Management Incentive Plan.

As holders of all outstanding New Class A Common Stock, the Sinosure Group will be able to elect a majority of the Board of Directors of the Reorganized Parent and to exercise control of the Reorganized Debtors. Other general unsecured creditors will receive all outstanding New Class B Common Stock and will have the right to elect two members of the Reorganized Parent's Board of Directors and other rights as set forth in detail in the Plan. In accordance with the Supply Principles constituting a part of the Plan, the Reorganized Debtors will place orders for the supply of bicycles and golf products from the Chinese market with members of the Sinosure Group and with other Chinese companies with the benefit of export credit insurance provided by Sinosure, and the Sinosure Group will be able to increase its shareholdings in the Reorganized Parent through the issuance of Sinosure Performance Shares in exchange for providing extended trade credit on favorable terms to the Reorganized Debtors which shall be fair and adequate consideration for the Sinosure Performance Shares.

## B.    Disclosure Statement Overview

Attached as exhibits to this Disclosure Statement are copies of the following:

- Exhibit A – The Plan;

- Exhibit B – Huffy Corporation et. al., Projected Financial Information;

- Exhibit C – Huffy Corporation, et al. Liquidation Analysis;

- Exhibit D – Term Sheet for Distribution Notes A;

- Exhibit E – Term Sheet for Distribution Note B;

- Exhibit F – Supply Principles; and

- Exhibit G – Order of the Bankruptcy Court Approving Disclosure Statement

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On _____, 2005, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity interest holders to make an informed judgment whether to accept or reject the Plan, and establishing certain procedures with respect to the solicitation of votes to accept or reject the Plan (the "Disclosure Statement Order"). A copy of the Disclosure Statement Order is being delivered with this Disclosure Statement. APPROVAL OF THIS DISCLOSURE STATEMENT

DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**C.      Holders of Claims and Equity Interests Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired within the meaning of section 1124 of the Bankruptcy Code ("Impaired") and are entitled to receive distributions under a proposed Chapter 11 plan are entitled to vote to accept or reject such plan. Classes of claims or equity interests in which the holders of such claims or equity interests are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of such claims or equity interests are Impaired and are not entitled to receive any distributions under a proposed Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under the Plan, holders of Allowed Claims in Class 3 (Convenience Claims), Class 4 (Sinosure Group Claims), Class 5 (General Unsecured Claims), and Class 6 (De Minimis Litigation Claims) (collectively, the "Voting Classes") are treated as Impaired and entitled to vote on the Plan. Holders of Claims in Class 8 (Subordinated Claims) and Class 10 (Old Parent Equity Interests), who will receive no distributions under the Plan, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote. Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), Class 9 (Subsidiary Equity Interest), Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not Impaired under the Plan and thus holders of Claims in such Classes and categories are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.

**D.      Voting Procedures**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you may receive separate Ballots which must be used for each separate Class of Claims. Please vote and return your Ballot(s) to:

**IF BY MAIL**

Huffy Corporation Vote Tabulation Center
c/o The Trumbull Group
P.O. Box 721
Windsor, CT 06095-0721

**IF BY HAND OR OVERNIGHT DELIVERY**

Huffy Corporation Vote Tabulation Center
c/o The Trumbull Group
4 Griffin Road North
Windsor, CT 06095-0721

**DO NOT RETURN YOUR SECURITIES WITH YOUR BALLOT**

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> NO LATER THAN 4:00 P.M., EASTERN DAYLIGHT TIME, ON _____, 2005.  ANY BALLOT RECEIVED BY TELECOPIER, FACSIMILE OR OTHER ELECTRONIC COMMUNICATION, INCLUDING BUT NOT LIMITED TO E-MAIL, SHALL NOT BE COUNTED.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

The Bankruptcy Court entered an order setting _____, 2005 as the record date for voting on the Plan.  Accordingly, only holders of record as of _____, 2005 that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call the Trumbull Group at 860-687-7567.

**E.      Vote Required for Acceptance; Binding Effect**

The Bankruptcy Code defines acceptance of a plan by an Impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class that actually cast ballots.  The Bankruptcy Code defines acceptance of a plan by an Impaired class of equity interests as acceptance by holders of at least two-thirds in amount of the equity interests of that class that actually cast ballots.  The vote of a holder of a claim or interest may be disregarded if the bankruptcy court determines that the acceptance or rejection was not solicited or procured in good faith.

In addition, the Bankruptcy Code requires that (i) a plan of reorganization be accepted by at least one Impaired class of claims and (ii) that the plan of reorganization is in the "best interests" of creditors and stockholders that are Impaired under the plan in that it provides the

1176642_1.DOC

holder with at least as much value on account of the claim or interest as it would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Further, if a class or equity interests that is Impaired rejects the plan of reorganization, the plan may still be confirmed if the bankruptcy court finds that the plan "does not discriminate unfairly" and is "fair and equitable" as to such rejecting Impaired class.

Confirmation of the Plan will make the Plan binding upon the Debtors, holders of Claims against and Equity Interests in the Debtors, and other parties in interest regardless of whether they have accepted the Plan, and such holders of Claims and/or Equity Interests will be prohibited from receiving payment from, or seeking recourse against, the Reorganized Debtors or any assets that are distributed to other holders of Claims and/or Equity Interests under the Plan.  In addition, confirmation of the Plan will enjoin creditors and equity interest holders from taking a wide variety of actions on account of a debt, claim, liability, interest or right that arose prior to the Confirmation Date.  As of the Effective Date of the Plan, confirmation will also operate as a discharge of all Claims against, and Equity Interests in the Debtors, to the fullest extent authorized by section 1141(d) of the Bankruptcy Code.

## F.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2005 at ____ p.m. (Eastern Daylight Time), before the Honorable Lawrence S. Walter, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of Ohio, Western Division, 120 West Third Street, Dayton, Ohio 45402.    The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before __, 2005 at ____ p.m. (Eastern Daylight Time) by (i) Dinsmore & Shohl LLP, 255 E. 5th Street, Suite 1900, Cincinnati, Ohio 45202, attention: Kim Martin Lewis, Esq., and Donald W. Mallory, Esq., counsel for the Debtors, (ii) McDonald Hopkins Co., LPA, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114, attention: Sean Malloy, Esq., counsel for the Official Committee of Unsecured Creditors, (iii) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York, attention: Daniel F. Fiorillo, Esq., counsel to the DIP Loan Agent, (iv) Coudert Brothers LLP, 1114 Avenue of the Americas, New York, New York 10036, attention: Barry Metzger, Esq. and Edward H. Tillinghast, III., Esq., counsel for the Sinosure Group, and (v) the United States Trustee for this district, MaryAnne Wilsbacher, Office of the United States Trustee, Region 9, 170 North High Street, Suite 200, Columbus, Ohio 43215. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing.

## G.    Effective Date

The Plan will not be consummated immediately upon confirmation, but only upon the Effective Date.  The Effective Date will not occur unless various conditions to confirmation and consummation are satisfied (or waived pursuant to, and in accordance with, the terms of the Plan).  Certain of the conditions may only be waived with the consent of the Sinosure Group and the Creditors' Committee.  The Confirmation Order may be vacated if the conditions to the Effective Date are not timely met or waived.

1176642_1.DOC

Because of the conditions to the Effective Date provided in the Plan, a delay may occur between confirmation of the Plan and the Effective Date. There is no assurance that the conditions to the Effective Date will be fulfilled, or that any condition that is not fulfilled will be waived.

## II.
## OVERVIEW OF DISTRIBUTIONS UNDER THE PLAN[1]

The following briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | Administrative Expense Claims | $31,000,000 | Unimpaired. Except as set forth in Section 2.2 of the Plan, and except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession (including, without limitation, trade credit outstanding on the Effective Date provided by members of the Sinosure Group on 60 day trade | 100% |

---

[1] This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. The estimated recoveries for Classes of Claims receiving New Common Stock are based upon the mid-point of the range of the estimated equity value of the Reorganized Debtors set forth in Article VII, "Valuation of the Reorganized Debtors," hereof. To the extent that the actual value of the New Common Stock varies from the amounts estimated, the recoveries of holders of such Claims may be higher or lower. See Article VII. "Valuation of Reorganized Debtors." Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | | | credit terms in respect of products shipped prior to the Effective Date) or liabilities arising under loans or advances to or other obligations incurred by the Debtors in Possession, shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business consistent with past practices and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. | |
| | DIP Lender Claims | $43,000,000 | Unimpaired. The principal amount of, and all accrued and unpaid interest, fees and expenses in connection with the loans and all other credit and financial accommodations outstanding under the DIP Credit Facility, shall be indefeasibly paid in full in Cash on the Effective Date; all DIP Letters of Credit shall either (x) be (i) returned to the issuer undrawn and marked cancelled on or prior to the Effective Date, or (ii) cash collateralized with Cash in an amount equal to 110% of the undrawn face amount of the DIP Letters of Credit, or (y) the issuer will be provided with back-to-back letters of credit in an amount equal to 110% of the undrawn face amount of the DIP Letters of Credit, and in form and substance and from a financial institution acceptable to the issuer and the DIP Loan Agent. Upon indefeasible payment and satisfaction in full of all Obligations (as such term is defined in the DIP Financing Order) under the DIP | 100% |

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|
| | | | Credit Facility and the DIP Financing Order in accordance with the terms thereof and Section 2.1(a) of the Plan, all Liens and security interests granted in the Collateral to secure such Obligations shall be terminated and shall be of no further force and effect. | |
| | Priority Tax Claims | $2,000,000 | Unimpaired.  At the sole option of Reorganized Debtors, either (i) paid in full, in Cash, or (ii) paid over a period through a date not later than the sixth anniversary of the date of assessment as provided in section 1129(a)(9)(C) of the Bankruptcy Code (commencing on the first anniversary of the Effective Date) with interest payable at a fixed annual rate equal to the rate applicable to underpayments of federal income tax on the Effective Date determined pursuant to section 6621 of the Internal Revenue Code, without regard to subsection (c) thereof. | 100% |
| 1 | Other Priority Claims | Immaterial | Unimpaired.  On the Initial Distribution Date, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, release and exchange for such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. | 100% |
| 2 | Other Secured Claims | Immaterial | Unimpaired.  On the Initial Distribution Date, except to the extent that a holder of an Allowed | 100% |

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|--------|--------|-----------|--------|
| | | | Secured Claim agrees to a different treatment, at the sole option of the Reorganized Debtors, (i) each Allowed Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Secured Claim to demand or receive payment of such Allowed Secured Claim prior to the stated maturity of such Allowed Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Secured Claim shall receive Cash payments having a present value equal to the amount of such Allowed Secured Claim, including any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) the Collateral securing the Lien of a holder of an Allowed Secured Claim shall be returned to such holder. Notwithstanding the foregoing, each such holder receiving the treatment specified in clause (ii) or (iii) of the preceding sentence shall have a General Unsecured Claim in Class 5, as applicable, for the amount by which the Allowed Claim exceeds the value of its Collateral, except to the extent such holder agrees to waive any such General Unsecured | |

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | | | Claim. | |
| 3 | Convenience Claims | $3,000,000 | Impaired. On the Class 3 Distribution Date (which the Debtors estimate to be on or about March, 2006), each holder of an Allowed Convenience Claim shall receive, in full satisfaction, release and exchange for such Claim, a payment in Cash in an amount equal to twelve percent (12%) of the amount of such Allowed Convenience Claim. | 12% |
| 4 | Sinosure Group Claims | $50,000,000[2] | Impaired. Each holder of an Allowed Sinosure Group Claim shall receive in full satisfaction, release and exchange for such Claim: (i) such holder's Pro Rata Share of the New Class A Common Stock constituting thirty percent (30%) of the aggregate New Class A Common Stock and New Class B Common Stock issued by the Reorganized Parent on the Effective Date (representing all of the New Class A Common Stock then outstanding), subject to subsequent dilution from any distribution of New Class C Common Stock and/or Sinosure | 26.4%[3] |

---

[2] On the basis of claims reconciliation work through August 7, 2005, the Company has confirmed that, of the $49,886,217.99 of non-duplicative claims filed by members of the Sinosure Group, $48,430,670.95 of such claims should be allowed. The Company is continuing to work with members of the Sinosure Group to reconcile the remaining variance of $1,455,547.04 and claims of the Sinosure Group remain subject to the review of the Creditors' Committee. The final amount allowed will be set forth in the Plan Supplement.

[3] This estimated percentage represents the average return assuming the maximum number of Sinosure Performance Shares are earned by the Sinosure Group. Individual percentages may vary among the members of the Sinosure Group following the provision of trade support by members of the Sinosure Group in accordance with the Supply Principles, depending upon allocation of the Sinosure Performance Shares within the Sinosure Group. On the Effective Date, before earning and receiving any allocation of the Sinosure Performance Shares, the Sinosure Group creditor recovery is approximately 18%. For the purpose of such estimates, no control premium has been assigned to the New Class A Common Stock to be received by members of the Sinosure Group. Likewise, no discount has been applied to the New Class B Common Stock to reflect Class B Common Stock shareholders lack of control of the Reorganized Parent.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|
| | | | Performance Shares; (ii) a Distribution Note A in the amount of its Pro Rata Share of the total $3,000,000 amount of Distribution Notes A; and (iii) such holder's Pro Rata Share of net proceeds of the Recovery Trust Assets (calculating the amount of Claims in the Pro Rata Share calculation, for purposes of the Recovery Trust Assets only, to include the General Unsecured Claims and the Sinosure Group Claims).   Any and all potential preference and other improper transfer claims, pre-Effective Date breach of contract claims and all other Claims against the holders of Class 4 Claims shall be and hereby are waived and released.

On the Initial Distribution Date, the Reorganized Debtors shall distribute to the Sinosure Group Agent, as agent of and for the benefit of the holders of Allowed Sinosure Group Claims:   (i) the New Class A Common Stock; and (ii) the Distribution Notes A.  Pursuant to distribution provisions of the Plan, as soon as reasonably feasible after the Sinosure Group Agent's receipt of such New Class A Common Stock and Distribution Notes A, the Sinosure Group Agent will distribute to holders of Allowed Sinosure Group Claims their Pro Rata Shares of New Class A Common Stock and their respective Distribution Note A as indicated in Sections 4.4(c)(i) and (ii) of the Plan.   In addition, distribution of proceeds of Recovery Trust Assets will be made to holders of  Allowed  General  Unsecured | |

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|
| | | | Claims and Allowed Sinosure Group Claims as indicated in Section 4.5(c) of the Plan.<br><br>Holders of Allowed Sinosure Claims shall be eligible for the issuance and distribution of Sinosure Performance Shares in accordance with Section 5.17 of the Plan. | |
| 5 | General Unsecured Claims | $100,000,000 | Impaired. Each holder of an Allowed General Unsecured Claim shall have the option to elect on its Ballot to permanently and irrevocably reduce the aggregate amount of all of its Allowed General Unsecured Claims to $25,000 and receive a distribution pursuant to Class 3 (Convenience Claims) of the Plan. Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, release and exchange for such Claim: (i) such holder's Pro Rata Share of the New Class B Common Stock constituting seventy percent (70%) of the aggregate New Class A Common Stock and New Class B Common Stock issued by the Reorganized Parent on the Effective Date (representing all of the New Class B Common Stock then outstanding), subject to subsequent dilution from any distribution of New Class C Common Stock and/or Sinosure | 18.8%[4] |

---

[4] Assumes dilution by maximum number of Sinosure Performance Shares earned by the Sinosure Group. At emergence, before consideration of the Sinosure Performance Shares, the Class 5 General Unsecured Creditors recovery is 23%. For the purpose of such estimates, no control premium has been assigned to the New Class A Common Stock to be received by members of the Sinosure Group. Likewise, no discount has been applied to the New Class B Common Stock to reflect Class B Common Stock shareholders lack of control of the Reorganized Parent.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|

Performance Shares; (ii) such holder's Pro Rata Share of distributions from Distribution Note B; and (iii) such holder's Pro Rata Share of net proceeds of the Recovery Trust Assets (calculating the amount of Claims in the Pro Rata Share calculation, for purposes of the Recovery Trust Assets only, to include General Unsecured Claims and Sinosure Group Claims).

On the Initial Distribution Date, the Reorganized Debtors shall distribute to the General Unsecured Claims Trust for the benefit of holders of Allowed General Unsecured Claims: (i) the New Class B Common Stock; and (ii) Distribution Note B. Pursuant to the distribution provisions of the Plan, on the Class 5 Distribution Date and/or Subsequent Distribution Dates, the General Unsecured Claims Trust Trustee will distribute to holders of Allowed General Unsecured Claims their Pro Rata Share of New Class B Common Stock and proceeds of the Distribution Note B as indicated in Sections 4.5(b)(i) and (ii) of the Plan. In addition, on the Initial Distribution Date, the Recovery Trust Causes of Action will vest in the Recovery Trust and the Reorganized Debtors shall distribute the Recovery Trust Funds to the Recovery Trust, each for the benefit of holders of Allowed General Unsecured Claims and holders of Allowed Sinosure Group Claims, pro rata. Pursuant to the distribution provisions of the Plan, on the Class 5 Distribution Date (which the Debtors

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | | | estimate to be on or about March, 2006) and/or Subsequent Distribution Dates (the 180th day after the Class 5 Distribution Date, and every six months thereafter) the Recovery Trust Trustee will distribute to holders of Allowed General Unsecured Claims and Allowed Sinosure Group Claims their Pro Rata Share of proceeds of Recovery Trust Assets as indicated in Section 4.5(b)(iii) of the Plan. | |
| 6 | De Minimis Litigation Claims | $250,000 | Impaired. On the Class 6 Distribution Date (meaning the Effective Date of the Plan or as soon thereafter as is practicable, but no later than 30 days after the Effective Date), each holder of an Allowed De Minimis Litigation Claim shall receive, in full satisfaction, release and exchange for such Claim, a payment in Cash in an amount equal to the amount agreed to between Huffy and the holder of such Claim pursuant to the terms and conditions of the De Minimis Litigation Order.<br><br>Pursuant to the De Minimis Litigation Order, (1) each individual Claim in this class is limited to a maximum value of $5,000 per each respective Claim and per each respective claimant and (2) the aggregate amount of all De Minimis | 100%[5] |

---

[5] The estimated recovery is based on the Claimant receiving 100% of the reduced claim amount to which all parties have agreed in accordance with the De Minimis Litigation Order. As noted, pursuant to the De Minimis Litigation Order, (1) each individual Claim in this Class is limited to a maximum value of $5,000 per each respective Claim and per each respective Claimant and (2) the aggregate amount of all De Minimis Litigation Claims in this class is capped at $250,000. For the avoidance of any doubt, Claimants in this class are not receiving 100% of any proof of claim filed in these Chapter 11 cases but only 100% of the settled claim amount which cannot exceed $5,000.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | | | Litigation Claims in this class is capped at $250,000. | |
| 7 | Intercompany Claims | Unknown | Unimpaired. On the Effective Date, each holder of an Allowed Class 7 Intercompany Claim shall receive, in full satisfaction, release and exchange for such Claim the following treatment: (i) the legal, equitable and contractual rights of each holder's Allowed Class 7 Intercompany Claim shall remain unaltered by the Plan or (ii) such other treatment agreed to in writing between such holder and the Debtors or Reorganized Debtors, as applicable. | 100% |
| 8 | Subordinated Claims | Unknown | Impaired. The holders of Subordinated Claims will not receive or retain any property on account of such Claims. | 0% |
| 9 | Subsidiary Equity Interests | Unknown | Unimpaired. The holders of Allowed Subsidiary Equity Interests shall retain ownership of their Subsidiary Equity Interests in each of the Reorganized Subsidiaries. | 100% |
| 10 | Old Parent Equity Interests | Unknown | Impaired. The holders of Old Parent Equity Interests will not receive or retain any property on account of such interest and such Old Parent Equity Interests shall be cancelled. | 0% |
| 11 | Government Agency Settled Environmental Claims | $1,278,000 | Impaired. Each holder of a Government Agency Settled Environmental Claim is entitled to vote to accept or reject the Plan, notwithstanding that at the time of voting the EPA and DTSC Settlement Agreement may not yet have been fully-executed or have | 23.3% |

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|-------|----------------------------------|-------------------|-----------|--------------------|
| | | | received approval of the Bankruptcy Court.<br><br>On the later of (i) thirty (30) days after the entry of a Final Order of the Bankruptcy Court approving the EPA and DTSC Settlement Agreement or (ii) the Initial Distribution Date, each holder of an Allowed Government Agency Settled Environmental Claim shall receive in full satisfaction, release and exchange for such Claim, a payment in Cash from the Government Agency Environmental Assets of approximately $300,000 in accordance with the terms and conditions of the EPA and DTSC Settlement Agreement. | |
| 12 | BPOU CR Group Settled Environmental Claim | $13,100,000[6] | Impaired.  Each holder of a BPOU CR Group Settled Environmental Claim is entitled to vote to accept or reject the Plan.<br><br>Each holder of an Allowed BPOU CR Group Settled Environmental Claim shall receive in full satisfaction, release and exchange for such Claim: (i) such holder's pro rata share of a $13,000,000 Class 5 General Unsecured Claim and be entitled to the treatment set forth in Section 4.5 of the Plan for such Claim; and (ii) such holder's Pro Rata Share of the net proceeds of the BPOU Trust Assets.  Any and all potential preference claims against the holders of Class 12 Claims shall be waived and released upon the | Class 5 treatment of 18.8% for $13,000,000 plus approximately $100,000. |

---

[6] Of this amount, $13,000,000 is treated as a Class 5 General Unsecured Claim and is included in the estimate of aggregate Class 5 General Unsecured Claims set forth above.

| Class | Type of Claim or Equity Interest | Estimated Amounts | Treatment | Estimated Recovery |
|---|---|---|---|---|
| | | | entry of a Final Order approving the BPOU CR Group Settlement Agreement.

On the later of (i) the Initial Distribution Date or (ii) thirty (30) days after the entry of a Final Order of the Bankruptcy Order approving the BPOU CR Group Settlement Agreement, the Reorganized Debtors shall assign the BPOU Trust Assets to the BPOU Trust for the benefit of holders of Allowed BPOU CR Group Settled Environmental Claims. | |

**III.**

**GENERAL INFORMATION**

**A.      Description and History of the Debtors and Certain Pre-Petition Claims**

**1.      Pre-Petition Organizational Structure of the Debtors**

Huffy Corporation has twenty subsidiaries, nineteen of which are Debtors in the Chapter 11 Cases before the Bankruptcy Court. Further, four of the subsidiaries are also the subject of ancillary bankruptcy proceedings in Canada. The following chart depicts, as of the Petition Date, the organizational structure of Huffy Corporation and its subsidiaries and the percentage ownership of each subsidiary by its parent.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**



**HUFFY CORPORATION**
* Corporate
* Huffy Bicycle Company

.5% of Class A

Huffy Risk Management, Inc. (OH)

99.5% of Class A

Hufco-Ohio, Inc. (OH) (FKA: Huffy Service Solutions, Inc. and Huffy Service First, Inc.)

HCAC, Inc. (OH) (Shell) (FKA: TTH)

Hufco-Delaware Company (DE) (Shell) (FKA: GBPC)

Huffy Sports, Inc. (WI) (Shell) (FKA: GWPC)

American Sports Design Company (OH)

Huffy Sports Delaware, Inc. (DE) (FKA: Gen-X Sports Inc.)

Hufco-Georgia I, Inc. (GA) (FKA: McCalla Company)

Huffy Sports Canada Inc. (New Brunswick) (FKA: Gen-X Sports Canada, Inc.)

Lehigh Avenue Property Holdings, Inc. (IL) (Shell)

Tommy Armour Golf Company (WA) (Shell)

Lamar Snowboards Inc. (MO) (Shell)

Huffy Sports Washington, Inc. (WA) (FKA: Gen-X Sports Ltd.)

First Team Sports, Inc. (MN)

Hufco-New Brunswick, Inc. (New Brunswick) (FKA: Creative Retail Services (Canada), Inc.)

Hufco-Georgia II, Inc. (GA) (FKA: Creative Retail Services, Inc.)

Huffy Sports Sàrl (Switzerland)

Huffy Sports Outlet Inc. (New Brunswick) (FKA: Gen-X Sports Outlet, Inc.)

Hespeler Hockey Holding, Inc. (MN) (Shell)

HUF Canada, Inc. (New Brunswick)

* ALL STOCK OWNERSHIP IS 100% UNLESS NOTED OTHERWISE.

1176642_1.DOC

2.      **Overview of the Debtors' Business**

The Debtors commenced these cases by the filing of voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 20, 2004. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their businesses and managing their affairs as debtors in possession. On November 1, 2004, the Office of the United States trustee appointed a committee of unsecured creditors pursuant to section 1102(a) of the Bankruptcy Code. As of the date hereof, no trustee or examiner has been appointed in any of these Chapter 11 cases.

Huffy was formed as an Ohio corporation in 1928. Huffy has been a leading distributor of bicycles and other wheeled products. During the course of its history, and partly to offset the somewhat seasonal nature of bicycle sales, Huffy expanded into numerous other markets, including, but not limited to, sales of golf, skiing and hockey equipment, snowboards and related accessories, garden tools and implements, baby products, in-line skates, and basketball backboards and other sports accessories. Huffy also entered the retail services industry, providing its customers with marketing and display assembly services, inventory counting, and retail product assembly.

Huffy operates its primary business of selling bicycles through Huffy; its other businesses are operated by numerous subsidiaries. Currently, Huffy has the following subsidiaries in the United States: Huffy Risk Management, Inc., Hufco-Ohio, Inc., HCAC, Inc., Hufco-Delaware, Inc., Huffy Sports, Inc., American Sports Design Company, Huffy Sports Delaware, Inc. ("Huffy Sports Delaware"), Hufco-Georgia I, Inc., Lehigh Avenue Property Holdings, Inc., Tommy Armour Golf Company, Lamar Snowboards, Inc., Huffy Sports Washington, Inc., First Team Sports, Inc., Hufco-Georgia II, Inc., Hespeler Hockey Holding, Inc. (collectively, the "U.S. Subsidiaries"). In Canada, Huffy operates its businesses through the following subsidiaries: Huffy Sports Canada Inc. ("Huffy Sports Canada"), Huffy Sports Outlet Inc., HUF Canada, Inc., and Hufco-New Brunswick, Inc. (collectively, the "Canadian Subsidiaries"). Huffy also owns a Switzerland subsidiary, Huffy Sports Sàrl ("Huffy Sàrl"), which is not a debtor in these bankruptcy proceedings.

In 1999, Huffy closed its last United States manufacturing plant for bicycles. Huffy contracted with suppliers located in China (collectively, the "Chinese Suppliers") for the manufacture of bicycles, other wheeled products and many of its other sports products. Since 1999 the Chinese Suppliers have manufactured the products and shipped them by ocean cargo. The total transit time of the product shipments from China to the port in California is anywhere from 10 to 14 days. The shipments are then moved into Huffy's Carson, California warehouse for delivery to customers. Some Huffy customers prefer to make their own shipping arrangements and have product delivered directly to their own warehouses, bypassing Huffy's Carson facility.

Huffy currently manages its affairs from its corporate offices in Miamisburg, Ohio and utilizes a warehouse and storage facility in Springboro, Ohio. Huffy maintains distribution and warehouse facilities in Carson, California and Monroe, Ohio.

1176642_1.DOC

In September 2002, Huffy purchased the Gen-X Sports business in order to expand Huffy's presence in the general sporting goods market. Huffy's subsidiary, Huffy Sports Canada, purchased the stock of Gen-X Sports, Inc., an Ontario, Canada corporation ("Gen-X Canada") and another of Huffy's subsidiaries, Huffy Sports Delaware, merged with Gen-X Sports, Inc. ("Gen-X US"). Through the share purchase and subsequent merger of Gen-X Canada and the merger of Gen-X US, Huffy also indirectly acquired the stock of the following companies: Huffy Sàrl; Huffy Sports Outlet Inc., Tommy Armour Golf Company, Lehigh Avenue Property Holdings, Inc., Lamar Snowboards, Inc., Huffy Sports Washington, Inc., First Team Sports, Inc., and Hespeler Hockey Holding, Inc., (collectively, the "Gen-X Operations"). The Gen-X Operations supplied and distributed golf equipment, hockey equipment, snowboards, in-line skates and skateboards in the United States, Canada and Europe under brand names including Tommy Armour® and Ram® golf equipment, Lamar® snowboards, Hespeler® hockey equipment, Ultra Wheels® in-line skates and Volant® skis and accessories. The Gen-X Operations maintained operations and warehouse facilities in Toronto, Canada, warehouse facilities in Anoka County, Minnesota and Bax, the Netherlands, as well as a direct retail outlet in Canada for its excess inventory. Soon after the acquisition, the Gen-X Operations began to suffer significant losses which were funded by Huffy's other operations.

In 2004, Huffy decided to consolidate its management, sales, marketing, procurement, logistics and customer service functions into one sporting goods platform. As part of this process, the administrative offices in Toronto were closed, and its operations consolidated at Huffy's office in Miamisburg, Ohio and at the office of Huffy Bicycle Company then located in Springboro, Ohio. All warehouse and distribution facilities in Canada were likewise closed with all functions being transferred to Huffy's leased warehouses in Carson, California. The majority of assets and liabilities (if any) of Huffy Sàrl, including the intellectual property rights held by that company, were transferred to a wholly-owned subsidiary of Huffy Sàrl, HUF Canada, Inc., a New Brunswick, Canada corporation.

Huffy has decided to focus its efforts on its core business of bicycles, other wheeled products and golf equipment. It has either sold or discontinued all other non-core business segments. Huffy sold its businesses relating to child safety seats, gardening tools and equipment and inventory counting services several years ago.

Within the year preceding the bankruptcy filing, Huffy also sold certain sporting goods assets and retail service segments in order to more efficiently focus the company's resources on building the business and profitability of its core brands and to increase the company's liquidity. In December 2003, Huffy Sports Canada sold certain assets comprising its Volant® ski products business to Amer Group, PLC. In March 2004, Huffy sold the Gen-X Opportunity business (a liquidation business) to 1294506 Ontario Limited, an Ontario Canada corporation. In April 2004, Huffy sold substantially all the assets of its Huffy Service Solutions business, which assembled products for retailers, to National Product Services, Inc. In July 2004, Huffy sold substantially all the assets of its Huffy Sports Company division, which manufactured and marketed basketball backboards and related products, to Russell Corporation. The proceeds of such sales were used primarily to reduce the amount of outstanding indebtedness on the Debtors' pre-petition credit facility, as well as to continue to fund operations.

Huffy continued to suffer losses throughout 2003 and 2004. In 2004, the company announced that it was taking a write-off of deferred tax assets and intellectual property. The company also determined that certain accounting entries primarily related to customer deductions, credits and reserves for inventory valuation and doubtful accounts receivable for certain of the Gen-X Operations were more properly reflected in the fiscal year ended December 31, 2003. As a result, the company has announced that it will be restating its financial statements for that fiscal year unless it can obtain a waiver for doing so from the United States Securities and Exchange Commission. The company further has been unable to file its Forms 10-Q for the first, second and third quarters of 2004, its Form 10-K for the year ended December 31, 2004, or its Forms 10-Q for the first and second quarters of 2005, and will be unable to do so until it restates its 2003 financial statements.

Huffy's common stock historically has been listed on the New York Stock Exchange ("NYSE"). In July 2004 Huffy received official notice from the NYSE that it was no longer in compliance with the NYSE's continued listing criteria and in August 2004, the NYSE suspended trading in Huffy's common stock and delisted the common stock from the NYSE. Huffy's common stock is now trading in the over-the-counter market by way of the pink sheets under the symbol HUFC.PK.

## 3.      Customers, Sales and Marketing

(a)      Core Business Line -  Bicycle Products

Huffy maintains strong relationships with the leading mass retailers. Huffy has a significant market share in the mass retailer arena through such customers as Wal-Mart and Kmart. International business continues to grow with important customers such as Kmart Australia (unrelated to Kmart/USA) and Wal-Mart/Canada, as well as other international customers.

Huffy maintains a sales and marketing team of approximately 14 employees as well as a product development team of 4 employees. As to its sales function, Huffy oversees a network of third-party sales representatives for its core business line of bicycles. The use of the sales representatives allows Huffy the flexibility to adapt to changing retail dynamics in each category in which it competes, while leveraging its scale to negotiate competitive commission rates. Certain of the sales representatives also maintain a staff of merchandisers that provide inventory and display management services to key retailers. Certain key accounts such as Wal-Mart, are managed by in-house personnel without the use of external sales representatives.

As for marketing, consumer "takeaway" is driven primarily by brand recognition, product performance and innovation, as well as promotional programs run by retailers to draw in consumers. Huffy invests in retailer co-op advertising programs through promotional flyers and customer allowances.

(b)      Core Business Line - Golf Products

Huffy's line of golf products consist of four brands: Tommy Armour®, RAM®, Teardrop® and Zebra®. The merchandising of the golf products vary from the "green grass"

retailers to specialty retailers, sporting goods chains to the mass retailer. The determination of what products go to which type of retailing concern depend on brand and distribution strategies. For example, Tommy Armour® is a premium brand focused on the golf specialty stores and green grass stores, while RAM® is a recreational brand distributed largely to mass retailers.

Huffy's golf sales, marketing and customer service team is composed of 21 employees who manage independent third-party representatives who sell to mass, sporting goods, golf specialty and green grass/off-course dealers.

Advertising for the golf products utilizes the promotional vehicles of print advertisements which run in major golf publications such as Golf Digest, Golf, Golf World, Golf Week, Links, Golf for Women and Travel & Leisure and on the Golf Channel for Tommy Armour® products. Further, numerous articles and product evaluations have created a positive selling environment for Huffy's golf products.

Further, Huffy also takes a "hands-on" approach in promoting its golf product line. Over 700 elite golf accounts and 50 top media outlets will be visited by Tommy Armour golf senior and middle management in the coming year. In addition, Huffy is scheduled to conduct 900 golf product demonstrations from the period commencing in June, 2005 through November, 2005 at 900 retail locations in 30 sales territories.

## 4.    Competition

(a)    <u>Bicycles</u>

In the high volume retailer wheeled products business, Huffy bicycle products have numerous competitors in the United States market, two of which are major competitors. Even though competition in the bicycle industry is intense, Huffy Bicycle Company believes that following its transformation from a single brand manufacturer of bicycles to a multi-brand design, marketing and distribution company, it is cost competitive in the high volume retailer wheeled products market and that its decision to import, rather than manufacture, its wheeled products allows it to profitably maintain a leading market position. Huffy's ability to provide customers with low cost, innovative new products and high customer service levels has enabled it to maintain its market position despite reduced profit margins imposed by the mass retailers and intense global competition.

(b)    <u>Golf</u>

In general, the U.S. golf market consists of four major industry giants: TaylorMade®, Calloway®, Titleist® and Nike®. The combined sales of these entitles is in the hundreds of millions of dollars.

Tommy Armour® golf products are a leader in the second tier or mid-market with a strong heritage based on the world's best selling irons, the 845®. Tommy Armour® products maintain their competitive position by offering its customers high quality, innovative products with above average margins for its retailers. The dual brand business model uses Tommy Armour® and RAM® products to compete in an unusually broad range of golf markets. Tommy

Armour® serves golf segments such as "green grass" and golf specialty while RAM® serves primarily sporting goods and mass market channels.

**5.     Employees**

As of June 1, 2005, the Debtors employed, in the aggregate, approximately 130 employees in Ohio.  The Debtors have no employees covered by a collective bargaining agreement.

**6.     Real Property**

The Debtors' real property assets consist of the lease and ownership of certain non-residential real property as summarized on the chart below:

| Warehouses Leases | Approximate Square Footage |
|---|---|
| 18420 Harmon Avenue<br>Carson, CA  90746<br>Warehouse and distribution | 173,000 |
| 901 Pleasant Valley Drive<br>Springboro, Ohio  45066<br>Office/Warehouse/R&D | 36,400 |
| **Office Space Leases** | |
| 225 Byers Road<br>Miamisburg, Ohio  45342<br>Corporate Offices<br>Note: Debtors are parties to two separate leases which compromise the subject property. | 49,415 |
| 2906 Bella Vista Way<br>Bella Vista, AR  72714<br>Office space for sales staff | 1,000 |
| **Owned Property** | |
| Harrisburg, PA | Approx. 16.4 acres |

**7.     Patents, Trademarks and Licenses**

The Debtors own various patents, trademarks and licenses with regards to its core business lines of golf products and bicycles.  Certain trademarks such as Huffy®, RAM® and Tommy Armour® are material to the operation of the Debtors' businesses.  Additionally, certain of the Debtors' licenses are deemed material to the operation of the businesses.

**8.     Pre-petition Credit Facility Obligations**

The significant pre-petition debt of the Debtors generally consists of obligations under a certain pre-petition credit facility.

Prior to the Petition Date, the Huffy Corporation, American Sports Design Company, Huffy Sports Delaware, Inc., formerly known as Gen-X Sports, Inc., formerly known as HSGC, Inc., ("HSDI", together with Huffy and American, each individually, a "U.S. Borrower" and collectively, "U.S. Borrowers") and Huffy Sports Canada, Inc., formerly known as Gen-X Sports Canada, Inc., as successor by amalgamation with HSGC Canada, Inc. (the "Canadian Borrower") were party to the Second Amended and Restated Loan and Security Agreement, dated as of September 19, 2002, by and among the Debtors and Congress Financial Corporation (Central), an Illinois corporation ("Agent"), in its capacity as agent pursuant to an existing loan agreement acting for itself and on behalf of the financial institutions which are parties to the loan agreement and the financial institutions from time to time parties to the loan agreement as lenders (the "Lenders"), as amended by Amendment No. 1 to Second Amended and Restated Loan and Security Agreement, dated as of November 20, 2002, Amendment No. 2 to Second Amended and Restated Loan and Security Agreement, dated as of December 31, 2002, Amendment No. 3 to Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2003, Amendment No. 4 to Second Amended and Restated Loan and Security Agreement, dated March 14, 2003, Amendment No. 5 to Second Amended and Restated Loan and Security Agreement, dated May 2, 2003, Amendment No. 6 to Second Amended and Restated Loan and Security Agreement, dated May 9, 2003,  Amendment No. 7 to Second Amended and Restated Loan and Security Agreement, dated as of July 7, 2003, Amendment No. 8 to Second Amended Loan and Security Agreement, dated July 31, 2003, Amendment No. 9 to Second Amended Loan and Security Agreement, dated January 15, 2004, Amendment No. 10 to Second Amended Loan and Security Agreement, dated February 16, 2004, Amendment No. 11 to Second Amended Loan and Security Agreement, dated March 31, 2004, Amendment No. 12 to Second Amended Loan and Security Agreement, dated as of May 4, 2004, Amendment No. 13 to Second Amended Loan and Security Agreement, dated as of July 16, 2004, and Amendment No. 14 to Second Amended Loan and Security Agreement, dated as of October 19, 2004 (as the same has heretofore been amended, modified, supplemented, extended, renewed, restated or replaced, the "Prepetition Loan Agreement").

The Prepetition Loan Agreement consisted of a Revolving Loan Facility from Congress which entitled the U.S. Borrowers and the Canadian Borrower to borrow up to a combined $69 million, subject to the borrowing base defined therein and certain reserves, as well as a Term Loan from Abelco Finance, LLC ("Abelco") to the Canadian Borrower in the original amount of $15 million.  The obligations of the U.S. Borrowers were guaranteed by all of the Debtors' U.S. subsidiaries and HUF Canada.  The obligations of the Canadian Borrower were guaranteed by all other Debtors.  Borrowings of the Debtors under the Prepetition Loan Agreement were secured by a first priority lien upon and security interest in favor of Lenders in all of the assets of the Debtors including all inventory, accounts receivable, and the intellectual property rights of the Debtors.  As of October  20, 2004, Lenders were owed the aggregate principal amount of not less than $39,623,054.71 plus C$219,793.69.   All pre-petition obligations owing by Debtors under the Pre-Petition Loan Agreement and all other related agreements, documents and instruments have been ratified, approved, incorporated into and made a part of the Obligations owing by Debtors to DIP Loan Agent and DIP Lenders under the DIP Credit Facility and the DIP Financing Order.

9.    **The Sinosure Group**

Among Huffy's strategic assets is a set of long-standing relationships with suppliers of bicycles in the China market.  When Huffy began to encounter financial difficulties in 2004, these suppliers and the Chinese government's export credit insurance agency, China Export & Credit Insurance Corporation (generally known as "Sinosure") agreed to continue to provide trade credit to Huffy on favorable terms during Huffy's bankruptcy reorganization.  Such suppliers and Sinosure, in their dealings with Huffy, are often referred to as the "Sinosure Group."

The suppliers which are members of the Sinosure Group are Bailey Cycle Service Ltd. (including Everich Bicycle Co. Ltd.); Clubik Co. Ltd. (including Clubik (J Ann J) Jermany Company Ltd. and Clubik 2 Jermany Company, Ltd.); Kenton Bicycle Holding (H.K.) Ltd. (including Kenton Bicycle Holding Factory, (Harley) Kenton Bicycle, HuiYang Kenton Bicycle Company Ltd. and HuiZhou Harley Industry Ltd.); Goodbaby Child Products Co. Ltd.; Oyama Bicycles (Taicang) Co., Ltd.; Startech Trading Ltd.; Ramiko Co., Ltd.; Acetrikes Bicycles (Taicang) Co. Ltd. (including Acetrikes Industrial Co. Ltd. (Taiwan)); Li Chen Machinery International Co. Ltd. (Taiwan) (including Zhejiang Crown King Bicycle Co. Ltd.); Shanghai Atem Rubber & Plastics Ind. Co. Ltd. (including Far Great Plastics Industrial Co. Ltd.); Shanghai Phoenix Import & Export Co. Ltd.; Shenzhen BoAn Bike Co. Ltd. and Top Image International Inc. (including Top Image (Boan) (Taiwan)).

Sinosure is also a member of the Sinosure Group and has served as representative of the other members of the Sinosure Group in negotiating the Plan with the Debtors and the Creditors' Committee.  Sinosure is a specialized export credit insurance company owned by the Chinese government with RMB 4 billion ($482 million) of registered capital, insuring Chinese exporters against political and commercial risks in their dealings with customers outside China.

In accordance with the Supply Principles constituting a part of the Plan (see Exhibit F hereto), following the Effective Date of the Plan, Huffy will place orders for the supply of bicycles and golf products from the Chinese market with members of the Sinosure Group and with other Chinese companies with the benefit of export credit insurance provided by Sinosure, provided Sinosure's underwriting guidelines are satisfied.  Upon the Effective Date of the Plan, the Sinosure Group will be able to elect a majority of the Board of Directors of Huffy through its ownership of New Class A Common Stock of the Company and, through such Board representation, will be able to exercise control of Huffy and its Subsidiaries.  Its shareholdings at such time will represent 30% of the outstanding share capital of the Company.  Through the provision of trade credit on favorable terms to Huffy and its Subsidiaries in accordance with the Supply Principles, the Sinosure Group will also be able to increase its ownership in Huffy over time through the issuance of additional New Class A Common Stock issued as Sinosure Performance Shares, until the Sinosure Group owns a majority of the Company's outstanding share capital.

The Supply Principles set forth the contemplated working arrangements between Huffy and the Sinosure Group for the provision of supplies and trade credit to Huffy upon its emergence from bankruptcy.  The Supply Principles do not, however, constitute a legal obligation of the Sinosure Group to provide expert credit insurance or trade credit to Huffy and

1176642_1.DOC

its Subsidiaries, though it is expected by Huffy that such export credit insurance and trade credit will be provided as contemplated by the Supply Principles over the period 2005-2010.

The Debtors also have certain other pre-petition trade credit obligations owed to parties who are not members of the Sinosure Group.

### 10.    Huffy Corporation Retirement - Plan Termination Claims

The Pension Benefit Guaranty Corporation ("PBGC") has asserted Claims against the Debtors in the amount of $86,000,000 (the "PBGC Claim"). The PBGC Claim is premised upon the PBGC's calculation of Huffy's unfunded obligation under the Huffy Corporation Retirement Plan (the "Pension Plan"). The Debtors dispute the value of the asserted PBGC Claim.  However, the Debtors may be subject to liability on some portion of the PBGC Claim. To the extent that the PBGC is awarded a claim against the Debtors for pre-petition obligations, such claim shall be a Class 5 General Unsecured Claim and receive treatment under the Plan for such class.

### 11.    Environmental Matters

Generally

The Debtors may be subject to various federal, state and local environmental laws and regulations which regulate, among other things, air and water emissions and discharges and the storage, transportation or disposal of solid and hazardous substances and waste.  The current cost of compliance with such laws and regulations may have a material adverse effect upon the Debtors.  The Debtors are subject, with respect to their past operations, to fines or penalties assessed for alleged breaches of environmental laws and to claims and litigation brought by federal, state or local agencies and to private parties seeking remedial or other enforcement action under environmental laws or damages relating to alleged injuries to health or to the environment, including claims with respect to certain waste disposal sites and the remediation of sites formerly operated by the Debtors.

The Baldwin Park Operable Unit Site

Huffy operated a bicycle manufacturing facility at 1120 West Foothill Boulevard, Azusa, California (the "BPOU Site") from 1958 through the beginning of 1983.  In March 1983 Huffy closed on the sale of the BPOU Site to Price Company.  Price Company demolished the buildings on the BPOU Site and erected a Price Club store.  That store was later converted to a CostCo store, which continues to operate on the BPOU Site today.

It has been alleged that as a result of Huffy's former bicycle manufacturing operations, the soil at the BPOU Site, and the groundwater beneath and adjacent to the BPOU Site, was contaminated with certain volatile organic compounds ("VOCs"), such as PCE and TCE.  TCE, and later PCE, were used by Huffy at the BPOU Site in connection with degreasing operations.

In or before 1988, the United States Environmental Protection Agency ("EPA") discovered that the groundwater in the Azusa, California area (an area later designated by the EPA as the "Baldwin Park Operable Unit" or "BPOU") was contaminated with TCE, PCE and other VOCs.  In or about April 1988, the EPA sent requests for information, pursuant to 42

1176642_1.DOC

U.S.C. §9604, to Huffy and a number of other companies operating in the BPOU area. Huffy was one of 19 companies that the EPA decided to name, pursuant to 42 U.S.C. §9601 et. seq. (the "Comprehensive Environmental Response, Compensation and Liability Act" or "CERCLA") as potentially responsible parties ("PRP") with respect to the cleanup of the contaminated groundwater in the BPOU area.

On March 31, 1994, the EPA published an initial cleanup plan for the BPOU in a Record of Decision ("ROD"). The ROD identified 17 chemicals of concern (including TCE and PCE), all of which were VOCs. In January 1995, the EPA formally identified Huffy as a PRP with respect to VOC contamination of the groundwater in the BPOU.

In May 1997, the EPA issued a Special Notice Letter pursuant to CERCLA formally requesting that Huffy and 18 other PRPs participate in negotiations with the EPA regarding the remedial design and remedial action for the BPOU. In June 1997, a new chemical, perchlorate, was discovered in the BPOU groundwater. Soon afterwards, nitrosodimethylamine or "NDMA" was also discovered in the groundwater. The discovery of these chemicals changed the scope of the remedial program the EPA had presented in the ROD, since these chemicals required additional, more expensive treatments than would otherwise be necessary to remediate VOC contamination. Huffy never used perchlorate or NDMA at the BPOU Site.

In May 1999, the EPA issued an Explanation of Significant Differences ("ESD"), purporting to amend the ROD so as to include cleanup of the new chemicals. The EPA identified Aerojet General Corporation ("Aerojet") as the main contributor of the perchlorate and NDMA. In September, 1999, Huffy and 10 other PRPs including Aerojet (the "Initial Offering Parties"), submitted a revised Good Faith Offer ("GFO") to the EPA whereby the Initial Offering Parties committed to begin specific design and planning work for the cleanup while continuing to negotiate in good faith to finalize a consent decree and pay $4 million in costs that the EPA had then incurred with respect to the BPOU. The EPA initially accepted the GFO on September 10, 1999 and the Initial Offering Parties attempted to negotiate a consent decree, but reached an impasse in June 2000. On June 30, 2000, the EPA instead issued a Unilateral Administrative Order ("UAO") to Huffy and the other PRPs requiring the remediation of the BPOU Site.

In March 2002, Huffy entered into a global settlement with the EPA, certain water authorities involved in the BPOU (collectively, the "Water Entities"), and seven other PRPs: Aerojet General Corporation, Azusa Land Reclamation, Fairchild Holdings Corporation, Hartwell Corporation, Oil & Solvent Process Co., Reichhold, Inc. and Wynn Oil Co. (collectively, the "Offering Parties"). Under the global settlement (the "BPOU Settlement Agreement Project Agreement"), the Offering Parties have agreed to fund, for a fifteen-year period, a joint groundwater cleanup/drinking water supply project. The Offering Parties provided (and except for Huffy are continuing to provide) such funding pursuant to an interim allocation, which is subject to final re-allocation amongst the Offering Parties. In exchange for the Offering Parties' funding, the EPA deemed the Offering Parties in compliance with the UAO, and the Water Entities dismissed lawsuits they had filed against the Offering Parties.

The EPA and the Offering Parties current estimates for the cost of the interim BPOU cleanup/water supply project going forward is approximately $300 million, including additional capital and operating and maintenance costs through the year ending 2017. In addition, it is

anticipated that additional measures may be required by the EPA and made a part of their final remedy for the BPOU Site. The EPA and the State of California also seek recovery of past costs totaling some $25 million.

On February 15, 2005, the Bankruptcy Court issued an order approving the Debtors' rejection of the BPOU Settlement Agreement Project Agreement. Numerous parties, including the EPA, have filed several claims in connection with the rejection of the BPOU Settlement Agreement Project Agreement. Huffy has been negotiating with such parties over the validity and estimated value of such claims, and has reached tentative settlements in principle, subject to official review and approval, with respect to same. with respect to same.

Also with respect to the BPOU Site, the California Regional Water Quality Control Board, Los Angeles Region (the "LA Water Board") issued Cleanup & Abatement Order No. 99-118 (the "Cleanup Order") to Huffy in December 1999. In July 2000, the LA Water Board issued a Revised Cleanup & Abatement Order, No. 99-118R (the "Revised Cleanup Order"), to Huffy. Both the Cleanup Order and the Revised Cleanup Order required Huffy to fund the assessment and cleanup of contamination located on the BPOU Site. Huffy funded and completed the assessment phase of the work, and was still funding, through the time of filing a petition for relief under Chapter 11 of the Bankruptcy Code in October 2004 (the "Petition"), the cleanup of the BPOU Site. As of October 2004, Huffy spent in excess of $1 million cleaning up the BPOU Site, and had received estimates and budgets from its environmental consultant that the cleanup should be completed within six months at a cost not to exceed $175,000. The last report submitted by Huffy to the LA Water Board in October 2004 states that PCE concentrations at the BPOU Site had been reduced by as much as 99.9% and TCE concentrations reduced by as much as 99.6%.

The Lammers Site

Huffy operated a manufacturing facility in Celina, Ohio from 1955 to 1999. In connection with that operation, the EPA named Huffy as a PRP with respect to the contamination of a waste disposal site known as Lammers Barrel Superfund Site (the "Lammers Site"). The Lammers Site, located in Ohio, was operated from approximately 1953 to 1969. The EPA and other PRPs named by the EPA in connection with the Lammers Site (collectively, the "Lammers Steering Committee" ) have filed claims in connection with the cleanup of the Lammers Site. Such claims estimate that the costs of cleanup going forward is $8 million. Huffy is currently negotiating with such parties over the validity and estimated value of such claims and has reached tentative settlements in principle, subject to official review and approval, with respect to same.

The Harrisburg, Pennsylvania Site

Further, Huffy's owned property in Harrisburg, Pennsylvania (the "Harrisburg Property") contains materials identified as residual wastes by the Pennsylvania Department of Environmental Protection ("PaDEP"). Residual wastes include, but are not limited to, concrete rubble, scrap steel, and foundry slag. The portion of the Property that contains residual wastes was leveled and covered with top soil with approval from the City of Harrisburg. An "oil seep" was identified on the portion of the Property that is leased to True Temper Ames/Jacuzzi Brands.

Huffy reported the "oil seep" to PaDEP and provided analytical data supporting a "no further action" determination. PaDEP requested additional groundwater sampling and analysis from the "oil seep" area and the former underground storage tank area. The additional sampling and analysis has not been approved by the tenant, True Temper Ames and the prior owner, Jacuzzi Brands. The Debtors are currently exploring their options to abandon or otherwise dispose of the Harrisburg Property prior to the Effective Date.

<u>Tentative Settlements</u>

The Debtors have recently entered into tentative settlement agreements, subject to official review and approval, with certain of the large Environmental Claim Claimants; namely, (1) the EPA, DTSC, and BPOU CR Group, and Winco Enterprises, formerly known as Wynn Oil Company, in relation to the BPOU Site and (2) the Lammers Steering Commmitee in relation to the Lammers Site (the "Environmental Settlements"). The Debtors shall seek Bankruptcy Court approval of the Environmental Settlements. If the Bankruptcy Court does not approve the Environmental Settlements, the claims originating from the Environmental Settlements, currently designated as Class 11 and Class 12 claims under the Plan, will be treated as unliquidated disputed claims to be resolved in accordance with the Plan.

Further, the Debtors have entered into tentative settlement agreements, subject to Bankruptcy Court approval, with two environmental insurance carriers, namely, American International Group Domestic Claims, Inc., as authorized claims handling agent for American Home Assurance Company (the "American Policy Agreement") and Fireman's Fund Insurance Company (the "FFIC Agreement"). The American Policy Agreement and the FFIC Agreement are referred to collectively as the "Environmental Insurance Settlement Agreements." The Environmental Insurance Settlement Agreements will provide the Debtors' with $300,000 which shall be utilized exclusively to fund, in full, the EPA and DTSC Settlement Agreement and thereby, the distribution to the Class 11 Claims.

## 12.      Pre-petition Litigation Claims

The Debtors are defendants in a number of lawsuits in which the plaintiffs allege among other things, contractual claims, indemnification obligations and that certain of their injuries were caused by products and/or services of the Debtors.

While uncertainties are inherent in the final outcome of the matters set forth above, management believes, after consultation with legal counsel, that the disposition of these proceedings should not have a material adverse effect on the Debtors' financial position, results of operations or liquidity. No assurance can be given, however, that the disposition of one or more of such suits, claims or actions in a particular reporting period will not be material in relation to the reported results for such period.

The Debtors intend to file a Motion with the Bankruptcy Court seeking approval of an Alternative Dispute Resolution Procedure which, if approved, will provide an organized mechanism for settling litigation claims.

### 13.    Other Pre-petition Claims

In the ordinary course of their businesses, and other than as previously set forth above, the Debtors incurred obligations for goods and services used in day to day operation of the businesses and through divestment of numerous business units over the past ten years. Such ordinary course obligations arise from (but are not limited to) contractual obligations, indemnification obligations, executory contracts and non-residential real property leases. Additional pre-petition general unsecured claims will arise from the rejection of certain of the Debtors' executory contracts and unexpired leases and from claims relating to former employees compensation plans.

### B.    Events Leading to the Commencement of the Chapter 11 Cases

The losses created by the Gen-X Operations combined with the low profit returns from several of its other product lines created an economic rift that was felt throughout Huffy's operations. As a consequence, Huffy was unable to meet certain financial covenants set forth in the Prepetition Loan Agreement. While Huffy was able to negotiate for the waiver and/or removal of such covenants, Huffy's debt to its Chinese suppliers increased dramatically. As a result, the Chinese suppliers began shipping on payment terms that required payments in advance of shipment. These terms were virtually impossible for Huffy to meet. Facing an inability to fill orders for the upcoming 2004 holiday season and following negotiations with its secured lenders and its suppliers, Huffy, Sinosure and certain of the Chinese suppliers established a non-binding arrangement which provided for payment to such suppliers upon delivery of new shipments of bicycles to Huffy in the United States and payment within 60 days from date of shipment after the filing of the within bankruptcy petitions, so that such suppliers' payments could enjoy priority as an administrative expense.

Due to significant liquidity issues and for the reasons otherwise stated herein, Huffy and its subsidiaries filed petitions for bankruptcy both in the United States and Canada. A motion for joint administration of all United States cases has been filed in this and all companion proceedings. The Canadian entities have filed an ancillary proceeding which allows the Canadian cases to be administered in the United States along with the United States entities.

### IV.
### EVENTS DURING THE CHAPTER 11 CASES

On October 20, 2004, the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as Debtors in Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The following is a brief description of the major events which have occurred during these Chapter 11 Cases.

### A.    Stabilization of Business

### 1.    Continuation of Business; Stay of Litigation

Following the commencement of the Chapter 11 Cases, the Debtors have continued to operate as Debtors in Possession with the protection and under the jurisdiction of the Bankruptcy Court. The Bankruptcy Court has certain supervisory powers over the Debtors' operations

during the pendency of the Chapter 11 Cases.  The Debtors are operating in the ordinary course of business; any transactions that are outside the ordinary course of business require Bankruptcy Court approval.

One immediate effect of the filing of the Bankruptcy Cases was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all litigation against the Debtors.  This injunction will remain in effect until the Effective Date unless modified or vacated by order of the Bankruptcy Court.  From and after the Effective Date, the Claims asserted by the parties prosecuting litigation against the Debtors will be subject to the terms and conditions of the Plan, including (without limitation) the discharge provisions of such plan and the injunction provided in the Plan.

On October 20, 2004 the Debtors were granted a Recognition Order under the Companies' Creditors Arrangement Act.   The Recognition Order has been extended by further orders, dated January 20, 2005, April 20, 2005, and July 19, 2005.

**2.      First Day Orders**

On the Commencement Date, the Debtors submitted to the Bankruptcy Court motions for the entry of certain "first day orders," along with supporting applications and affidavits.  All of the first day motions were granted by the Bankruptcy Court.  The first day orders included: (1) an order directing the joint administration of the Chapter 11 Cases, (2) an interim order authorizing the continued use of the Debtors' centralized cash management system and maintenance of existing checks, bank accounts and business forms; (3) an interim order authorizing the Debtors to pay certain prepetition obligations owed to foreign "supply-chain" companies; (4) an interim order authorizing Debtors to honor the obligations arising under product warranties in the ordinary course of business; (5) an interim order authorizing the Debtors to pay prepetition sales, use, and franchise taxes; (6) an interim order requiring utilities to maintain services to the Debtors and authorizing the Debtors to provide adequate assurance of future payment; (7) an interim order authorizing the continuation of certain of the Debtors' workers' compensation program and policies; (8) an interim order authorizing payment of prepetition wages, compensation and employee benefits; (9) an order extending the time to file schedules of the Debtors' assets and liabilities and statements of financial affairs; (10) an interim order approving a stipulation as to the Debtors' use of cash collateral; (11) an interim order adopting the Guidelines for Court-to-Court Communications in Cross-Border Cases, (12) an interim recognition order approving allowance of administrative expense priority for purchase of product from suppliers, (13) an interim order pursuant to Sections 105, 362 and 366 of the Bankruptcy Code (a) authorizing the Debtors to operate their businesses and (b) implementing the automatic stay, (14) an interim order authorizing Debtors to continue customer allowance programs and honor certain pre-petition obligations related thereto and (15) an interim order establishing certain special notice, scheduling and case management procedures.  All interim orders were made final orders pursuant to subsequent orders of the Bankruptcy Court.

**3.      DIP Facility and Trade Credit Terms**

Upon the commencement of the Chapter 11 Cases, the restoration of trade credit and support of both vendors and customers was of significant importance to the Debtors.  To

facilitate the establishment of normal vendor relations and to provide the Debtors with the cash and liquidity necessary to conduct their operations, the Debtors entered into a senior secured, super-priority $50,000,000 debtor in possession revolving credit facility with Congress, as agent for itself as lender and the other lenders party thereto (the "DIP Credit Facility").

The DIP Credit Facility was initially approved on an interim basis by an order of the Bankruptcy Court, dated October 21, 2004, and on a final basis by subsequent order, dated November 30, 2004. Pursuant to these orders, the Debtors' obligations and indebtedness under the DIP Credit Facility was granted super-priority administrative expense priority over other administrative expenses and the Debtors granted the DIP Lenders a super-priority lien on substantially all of the Debtors' assets.

The DIP Credit Facility was also approved under the Companies Credit Arrangement Act, and super-priority charges were granted in favor of the DIP Lenders by the CCAA Court orders, dated October 20, 2004 and December 3, 2004.

On March 29, 2005, the Bankruptcy Court entered an order authorizing the Debtors to amend the DIP Credit Facility to modify certain financial covenants and permit the Debtors to access certain proceeds from the sale of non-core assets.  Further, on June 27, 2005, the Bankruptcy Court entered an order further modifying the DIP Credit Facility which, among other things, (i) provided the Debtors with added liquidity by reducing certain reserves required to be maintained by the Debtors, and (ii) affirmed the expiration of the Creditors' Committee's right to investigate and/or challenge the pre-petition liens and claims of the DIP Loan Agent and the DIP Lenders, and of the release of DIP Loan Agent and DIP Lenders from all claims and causes of action arising at any time prior to the Petition Date.

As of June 4, 2005, there were approximately $22.9 million of borrowings outstanding under the DIP Credit Facility and outstanding letters of credit in the amount of $7.4 million.

Huffy, Sinosure and certain of the Chinese suppliers established a non-binding arrangement which provided for payment to such suppliers upon delivery of new shipments of bicycles to Huffy in the United States with payment to be made within 60 days from the date of shipment.  As of July 2, 2005, approximately $21.4 million was due and owing to the participating suppliers under the arrangement.

## 4.    Appointment of the Creditors' Committee

On November 1, 2004, the United States Trustee appointed the Creditors' Committee to represent the interests of the Debtors' unsecured creditors.  On March 9, 2005, the United States Trustee amended the membership of the original Creditors' Committee to reflect the resignations of Bailey Bicycle Services Limited and Jefferson Wells International and to add China Export and Credit Insurance Corporation.  The six current members of the Creditors' Committee are as follows:

  (i)     China Export and Credit Insurance Corporation, chair,

  (ii)    Cortina International,

(iii)     Richard L. Molen,

(iv)     Pension Benefit Guaranty Corporation,

(v)     Ramiko Co., and

(vi)     Shenzhen BoAn Bike Co. Ltd.

Creditors' Committee's Professionals

The Bankruptcy Court entered orders authorizing the Creditors' Committee to retain the following Professionals:

(i)     McDonald Hopkins Co., LPA, as counsel for the Creditors' Committee
            600 Superior Avenue, East
            Suite 2100,
            Cleveland, Ohio 44114
            Attn: Sean Malloy, Esq.

(ii)     PricewaterhouseCoopers Corporate Finance LLC, as financial advisors
            1177 Avenue of the Americas
            19th Floor
            New York, NY  10036
            Attn:  Sudhin Roy

(iii)     Coolidge, Wall, Womsley & Lombard Co., LPA, as local counsel for the Creditors' Committee
            33 West First Street, Suite 600
            Dayton, OH 45402
            Attn: Ronald S. Pretekin, Esq.

## 5.     Retention of Professionals

Following the Commencement Date, the Bankruptcy Court has entered orders authorizing the Debtors to retain the following Professionals: (i) Dinsmore & Shohl LLP, as bankruptcy counsel; (ii) Development Specialists, Inc., as financial advisor; (iii) Lazard Freres & Co., LLC, as investment bankers; (iv) The Trumbull Group, as claims, noticing and balloting agent; (v), Howrey Simon Arnold & White, LLP, as special litigation counsel; (vi) Ernst & Young LLP, as special tax consultant; (vii) O'Melveny & Myers LLP, as special pension plan counsel; (viii) Clark Schaefer & Hackett Co., as litigation support; (ix) Christensen, Miller, Fink, Jacobs, Glaser, Weil and Shapiro, LLC, as special environmental counsel; (x) Marcum & Kliegman LLP, as accountants and independent auditors and (xi) certain other professionals utilized in the ordinary course of business.

6. **Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines**

On December 20, 2004, the Debtors filed their Statements of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Lists of Equity Security Holders (collectively, and as the same may be amended or modified from time to time, the "Schedules").

On December 22, 2004, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code. Additionally, the Debtors have filed all monthly operating reports required by the Office of the United States Trustee.

Since the Commencement Date, the Debtors have filed various pleadings seeking extensions of time to, among other things, assume or reject leases of non-residential real property, file notices of removal of state court actions, and extend the exclusive periods for filing the Plan and soliciting acceptances thereof.

7. **Key Employee Retention and Severance Plan**

By amended order, dated June 15, 2005, the Bankruptcy Court approved the Debtors' adoption of an amended Key Employee Retention Plan ("KERP"), continuation of certain existing retention agreements, and modification of their Current Severance Plan with respect to certain employees (the "Retention Plan").

The Retention Plan for the Debtors' key management is divided into two categories: Level 1 Employees and Level 2 Employees. The maximum amount payable in retention and/or incentive payments to all Level 1 and Level 2 participants pursuant to this provision of the KERP is approximately $1,004,300. The Court also approved a severance plan which provides that in the event that any of Debtors' existing employees are terminated for reasons other than gross misconduct or are offered comparable employment with a successor employer, he or she will be eligible for a salary continuation severance payment with minimums based upon employee group, years of service and execution of Debtors' Waiver and Release, but not to exceed a maximum payment of severance for twelve (12) weeks. Pursuant to the terms of the KERP, parties covered by the agreement are not entitled to receive both the severance component and retention/incentive component. KERP participants will receive only a single payment equal to the higher benefit of either the severance component or the retention/incentive component.

8. **Sale of Certain Non-Core Assets**

During the course of these Chapter 11 cases, in furtherance of the Debtors' goal of restructuring their businesses around their core product lines of bicycles and golf, certain of the Debtors conducted sales of certain non-core assets. On November 30, 2004, the Court authorized the Debtors to sell certain of their non-core bulk inventory to the highest bidder. The sale of the non-core inventory relieved the Debtors of carrying inventory which was rapidly depreciating in value and provided the added benefit of reducing operating costs.

Further streamlining its organization around the bicycles and golf product lines, the Debtors sought to rid themselves of other non-core businesses such as snowboards, in-line

1176642_1.DOC

skates, skateboards, hockey equipment etc. On December 12, 2004, the Court authorized the sale of their snowboard business and related assets by Huffy Sports Canada, Inc., Huffy Sports Delaware, Inc., and HUF Canada, Inc., Lamar Snowboards, Inc. and Huffy Corporation to Collective Brands, Inc. (now known as Lifestyle Brands, Inc.). On December 12, 2004, the Court also entered an order authorizing HUF Canada, Inc., Huffy Corporation, Huffy Sports Canada, Inc., First Team Sports, Inc. and Huffy Sports Delaware, Inc., to sell their hockey equipment business and related assts to Forzani Group, Ltd.

Companion orders approving these sales were granted under the Companies Creditors Arrangement Act in Canada.

### 9.      Termination of Defined Benefit Plan

On July 5, 2005 the Debtors filed a motion in the Bankruptcy Court pursuant to section 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b), and section 4041 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1341, for an order determining that Debtors meet the requirements for a voluntary distress termination of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), and approving termination of the Plan.

The proposed date of the termination is August 31, 2005. A hearing on the Motion is scheduled for August 16, 2005. If the Motion is granted, the Bankruptcy Court will have determined that unless the Pension Plan is terminated, each of the Debtors will be unable to pay its debts when due and each of the Debtors will be unable to continue in business outside the chapter 11 process. The Bankruptcy Court's determination is one element in the "reorganization test" for distress terminations, as set forth in 29 U.S.C. 1341(c)(2)(B)(ii). Pursuant to 29 U.S.C. §1341(c), the PBGC must determine that the plan sponsor and each "controlled group member" (as defined in 29 U.S.C. § 1301(a)(14) satisfies each element of at least one of the four "distress tests" set forth in 29 U.S.C. §1341(C)(2)(B), and approve the distress termination of the Pension Plan.

If the PBGC approves termination under 29 U.S.C. § 1341, the PBGC will take over both the assets and liabilities of the Pension Plan, and will continue to pay the retirement benefits due under same in accordance with the insurance program administered by the PBGC. Under that program, it is anticipated that more than 99 percent of the participants and beneficiaries will be covered by the PBGC.

### 10.     Disclosure Statement/Confirmation Hearings

Accompanying this Disclosure Statement as Exhibit G, is a copy of the order of the Bankruptcy Court approving this Disclosure Statement and the Debtors' solicitation of votes, and setting the date for the hearing to consider confirmation of the Plan.

See Article VIII., entitled "CONFIRMATION OF THE PLAN."

**B.    Other Significant Court Orders**

**1.    Orders Authorizing Assumption of Certain Executory Contracts**

One of the essential assets of the Debtors' business is its license agreements with certain key licensors. The Debtors' rights to licensed material is very lucrative to the estates and provides increased marketability for the Debtors' products. In continuing its efforts to reorganize its business units around the core bicycle and golf lines, the Debtors caused the following license agreements to be assumed pursuant to orders of the Bankruptcy Court.

(a)    Disney Enterprises, Inc.

Under the terms of the Disney license agreement, Huffy is granted non-exclusive rights during the term and within a certain territory to reproduce and use certain intellectual property and manufacture and distribute certain articles to authorized customers. The intellectual property consist of the rights to utilize such characters as Disney's Winnie the Pooh®, Disney Princesses®, Power Rangers®, etc. in connection with the production of bicycles, scooters, wagons, tri-wheels and tricycles to be sold to authorized customers in a restricted territory.

The Debtors believe that the market popularity of the Disney products will continue to provide a demand for bicycles, tricycles, scooters, and other products bearing the aforesaid characters' image and/or association.

(b)    Those Characters From Cleveland, Inc. ("Cleveland"), a subsidiary of American Greetings Corporation and DIC Entertainment Corp ("Entertainment")

The Debtors assumed two executory contracts entered into by and between Huffy as licensee, Cleveland as licensor and Entertainment as agent; namely, (1) License Agreement entered into on or about June 13, 2003 for licensed property of name, trademark and logo of "Strawberry Shortcake®," Canadian territory and (2) License Agreement entered into on or about November 25, 2003 for licensed property of name, trademark and logo of "Strawberry Shortcake®," United States territory.

Under the terms of these license agreements, Huffy is granted a right and license to make, use, sell offer to sale and import certain licensed products with the Strawberry Shortcake® name, trademark and or logo in the respective territories of the United States and Canada.

(c)    MTV Networks, a Division of Viacom International, Inc.

Under the terms of the this license agreement, Huffy is granted an exclusive right and license to make, use, sell offer to sale and import certain licensed products bearing the SpongeBob SquarePants® name, trademark and logo and all names, trademarks and all likeness of characters contained in the MTVN Series "SpongeBob SquarePants"® on scooters authorized in the License Agreement in the territory of Canada.

(d)     Vanilla Gorilla, L.P.

Under the terms of the license agreement, Huffy is granted an exclusive right to use the West Coast Choppers®, CFL™ and Jesse James™ marks, patents and certain designs in the connection with the manufacture, sale, distribution, advertising and promotion of chopper style bicycles.

(e)     Caterpillar Inc.

The Debtors assumed the Caterpillar Trademark Merchandise License Agreement entered into by and between Huffy as licensee, and Caterpillar as licensor, executed on or about July 3, 2003 as subsequently amended by Amendment No. 1 on or about July 6, 2004.

Under the terms of the license agreement, Huffy is granted an exclusive right and license to make, use, sell offer to sale and import certain licensed products bearing the Caterpillar® mark on wheeled products.

## 2.     Orders Authorizing the Rejection of Leases

In connection with the reorganization of its businesses, the Debtors determined, in their business judgment, that certain of their leases were not conducive to the restructuring. Accordingly, pursuant to order of the Bankruptcy Code, rejected the following  non-residential real property leases:

(a)     The Watson Lease

On or about November 14, 2002, Huffy Corporation and Watson Land Company (a/k/a Watson Partners, L.P.) entered into a lease for the use of approximately 105,654 square feet of space located at 18601 South Wilmington Ave., Carson, California; the term of which was from February 1, 2003 through July 31, 2007.  Huffy entered into the lease in order to obtain a warehouse facility for the storage of the merchandise it received from its Chinese suppliers.  On or about February 11, 2003, Watson and Huffy entered into a "Lease amendment and Supplement for Additional Space" under the terms of which Huffy expanded its occupancy of the Original Lease space by a lease of an additional 68,149 square feet. The Debtors determined, in their business judgment, that the warehouse facility was no longer needed and subsequently rejected same.  The Bankruptcy Court entered the order rejecting the lease on December 14, 2004 and the rejection was effective as of December 31, 2004.

(b)     The NPSAC Sublease

The Debtors rejected a sublease between Huffy Service Solutions, Inc. (now know as Hufco-Ohio, Inc.) and National Product Services Acquisition Corporation ("NPSAC") comprising space located at 225 Byers Road, Miamisburg, Ohio.

Dayton Office Properties, LLC ("DOP"), as landlord, and Huffy Service Solutions, Inc. (now knows as Hufco-Ohio, Inc.) as tenant,  entered into a master lease on or about December 5, 2000, pursuant to which Huffy Service Solutions, Inc. leased certain premises comprising approximately 34,415 sq. ft. of space located at 255 Byers Road, Miamisburg, Ohio (the "Leased

Premises") for a period terminating on January 31, 2011 (the "Master Lease"). DOP transferred the Leased Premises to Byers Road, LLC on or about April 17, 2001 and assigned the Master Lease on the same date to Byers Road LLC. NPSAC desired to sublease from the Debtors approximately 34,415 sq. ft. of the Leased Premises that was the subject of the Master Lease. Accordingly, NPSAC and Huffy Service Solutions, Inc. (now know as Hufco-Ohio, Inc.) entered into the NSPAC Sublease on or about May 24, 2004 for a period beginning on May 24, 2004 through the remainder of the term set forth in the Master Lease.

The NSPAC Sublease was a sublease for a portion of the Miamisburg, Ohio building already partially occupied by the Debtors pursuant to the Master Lease. In their business judgment, the Debtors determined that it would be more cost-efficient to consolidate its business operations into one office location. In order to accomplish the aforenoted consolidation of its business space, the Debtors required the additional space which was the subject of the NSPAC Sublease. Accordingly, the Debtors rejected the NSPAC Sublease. The Bankruptcy Court entered the order rejecting the lease on May 3, 2005 with an effective date of no later than May 15, 2005.

      (c)      The Orfus Lease

On or about April 16th, 2001, Orfus Realty, as lessor, Gen-X-Sports, Inc. (an Ontario, Canada, Corporation, now known as Huffy Sports Canada, Inc.) and Gen-X-Sports Inc. (a Delaware Corporation, now known as Huffy Sports Delaware, Inc.) entered into a lease for space comprising approximately 39,998 sq. ft. located in a building situated at 36, 38, 38A and 38B Dufflaw Road, Toronto, Ontario, Canada. The lease provided for occupancy for the period of June 1, 2001 through May 31, 2011.

In its efforts to streamline its business operations, the Debtors determined, in their business judgment, that they no longer required the use of the facility. The facility formerly housed the Debtors' Canadian sales and administrative staff, all of which have either been eliminated or had their positions moved to the Springboro, Ohio facility in July, 2004. Accordingly, the Debtors rejected the lease. The Bankruptcy Court entered the order rejecting the lease on January 10, 2005 with an effective date of October 20, 2004.

      **3.**      **Orders Authorizing Assumption of Non-Residential Real Property Leases**

The Court entered an order on July 1, 2005, authorizing Huffy Corporation and Hufco-Ohio, Inc., two of the Debtors, to assume two non-residential real property leases with Byers Road, LLC, assignee of Dayton Office Properties, LLC ("Byers"), pursuant to section 11 U.S.C. § 365(a). The Debtors assumed these leases in order to accomplish the afore noted consolidation of their business space. As part of the planned agreement to assume the leases, the Debtors and Byers Road modified the terms of the leases in accordance with the provisions set forth in a supplemental letter agreement as was also approved by the Court. The supplemental letter agreement provided that modifications to the premises covered by the leases that were required to be performed in order to fully consolidate the Debtors' business operations into a single operational headquarters would be paid by Byers Road LLC up to $100,000. Further, the city where the property is located also provided the Debtors with a $100,000 incentive payment to increase and maintain employment at the location.

1176642_1.DOC

4.        **Rejection of Certain Executory Contracts**

As previously discussed in detail Article III, Section 8 above, Huffy operated a bicycle manufacturing facility at 1120 West Foothill Boulevard, Azusa, California (the "Site") from 1958 through the beginning of 1983.  As a result of that operation, it has been alleged that the soil at the Site, and the groundwater beneath and adjacent to the Site, was contaminated with certain volatile organic compounds.  With regard to same, Huffy entered into a global settlement pursuant to the BPOU Settlement Agreement. Huffy was a party to certain other BPOU Contracts in connection with the BPOU Settlement Agreement. On February 2, 2005, the Bankruptcy Court entered an order authorizing the Debtors' rejection of the BPOU Contracts.

C.        **Deadline for Filing Proofs of Claim**

By order, dated January 14, 2005 (the "Bar Date Order"), pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court fixed March 15, 2005 (the "Bar Date") as the date by which proofs of claim were required to be filed in the Chapter 11 Cases.  In accordance with the Bar Date Order, on or about January 14, 2005, a proof of claim form and a Notice of the Bar Date Order, the forms of which were approved by the Bankruptcy Court, were mailed to: (a) all persons or entities listed on the Debtors' Schedules as holding claims against the Debtors (the "Scheduled Parties"); (b) all parties on the Special Notice List established in these cases; (c) to the extent not otherwise included in (a) and (b) above, all of the following: (i) parties to litigation with the Debtors pending as of the Petition Date, (ii) taxing authorities with the power to levy taxes against the Debtors, (iii) parties to any contract or lease to which any of the Debtors is a party, (iv) entities that purport to hold liens against any of the Debtors' property, and (v) applicable local, state, and federal governmental agencies; (d) all parties listed on the Debtors' Creditors Matrix filed with the Court, as amended from time to time; and all equity holders and/or beneficial owners of record as of December 20, 2004.   The Debtors also published notice of the Bar Date in certain local and trade publications and a national newspaper in Canada.

As of March 15, 2005, a total of approximately 1,218 claims have been filed against the Debtors.  These include a number of duplicate claims and other claims which the Debtors dispute.  The Debtors estimate that the total amount of Allowed unsecured claims not entitled to priority, including the claims of the Sinosure Group, will be approximately $150,000,000.

V.

**THE PLAN OF REORGANIZATION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims receiving distributions under the Plan will obtain a greater recovery from the Estates of the Debtors than the recovery that they would receive if the assets of the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Debtors the opportunity to continue in business as a viable going concern, serving the interests of all of the Debtors' constituencies, including creditors, vendors, customers and employees, and preserving going concern value.

THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u> AND IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT.  THE SUMMARY OF THE PLAN SET FORTH

1176642_1.DOC

BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN.

## A.     Deemed Substantive Consolidation

The Plan is premised upon the deemed substantive consolidation of the Debtors for Plan treatment and distribution purposes only, and the Debtors intend to request as part of the Plan confirmation process that the Bankruptcy Court authorize substantive consolidation treatment of the Debtors and their estates for such limited purposes.

The substantive consolidation treatment of Claims proposed by the Debtors involves the pooling and merger of the Debtors' assets and liabilities and distributions to creditors based upon all pooled assets and liabilities, as if the Debtors were a single economic entity.  The purpose of this consolidation, with respect to all Debtors, is (i) to treat Claims against all Debtors in the same manner, (ii) to eliminate cross-corporate guaranties by one Debtor of the liabilities of other Debtors, and (iii) to eliminate duplicate Claims against more than one Debtor and Claims asserting joint and several liability by multiple Debtors.

The Debtors believe substantive consolidation is warranted in light of the degree to which the Debtors and their creditors depend upon the integration of the Debtors' collective operations and the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases.  For example:

- The officers of Huffy have served on the boards of its subsidiaries.  Corporate policy for all of the Debtors was established and implemented by Huffy's officers and board of directors.  Thus, the Debtors have operated under unified management, direction, and control with the goal of the unified profitability of the total enterprise, and without regard to the profitability of any individual legal entity in the corporate family.

- The Debtors operate under a consolidated cash management system, pursuant to which the Debtors' funds are collected and transferred on a daily basis to two main concentration accounts and funds required by the operating subsidiaries to cover disbursements and other operating expenses are transferred on a daily basis from the main concentration accounts to disbursement accounts.

- By reason of the interrelationship and dependency of the Debtors upon the operations of each other and Huffy, it is not realistic to expect that a feasible, confirmable plan of reorganization could be formulated unless the Plan encompassed all the Debtors as though they were a single economic unit.

As a result of the Debtors' integrated and interdependent operations, common officers, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit.

1176642_1.DOC

44

In view of the foregoing, the Debtors believe that creditors would not be prejudiced to any significant degree by the Debtors' substantive consolidation treatment which is consistent with creditors' having dealt with the Debtors as a single economic entity, and further believe that substantive consolidation will best utilize the Debtors' assets and potential of all of the Debtors to pay to the creditors of each entity the distributions provided under the Plan.

**B.      Classification and Treatment of Claims Against All Debtors**

The Plan classifies Claims and Equity Interests separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the Bankruptcy Code.  As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration based on the different rights of the holders of Claims in each Class.

**1.      Administrative Expense Claims**

Administrative Expense Claims are Claims constituting a cost or expense of the administration of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such Claims include all Obligations (as defined in the DIP Financing Order) arising under or in respect to the DIP Credit Facility, and the DIP Financing Order, any actual and necessary costs and expenses of preserving the Estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors in Possession, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendering of services, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330, 331 or 503 of the Bankruptcy Code, all costs associated with the cure of any executory contracts and unexpired leases between the Debtors and any Person, and any fees or charges assessed against the Estates of the Debtors under section 1930 of title 28 of the United States Code.

Except as set forth in Section 2.2 of the Plan, and except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession (including, without limitation, trade credit outstanding on the Effective Date provided by members of the Sinosure Group on 60 day trade credit terms in respect of products shipped prior to the Effective Date) or liabilities arising under loans or advances to or other obligations incurred by the Debtors in Possession, shall be paid in full and performed by the Reorganized Debtors in the ordinary course of business consistent with past practices and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; provided further, however, that on the Effective Date, (i) the principal amount of, and all accrued and unpaid interest, fees and expenses in connection with the loans outstanding under the DIP Credit Facility, shall be indefeasibly paid in full in Cash pursuant to the terms of the DIP Credit Facility

and the DIP Financing Order, and (ii) all DIP Letters of Credit shall either (x) be (i) returned to the issuer undrawn and marked cancelled on or prior to the Effective Date, or (ii) cash collateralized with Cash in an amount equal to 110% of the undrawn face amount of the DIP Letters of Credit, or (y) the issuer will be provided with back-to-back letters of credit in an amount equal to 110% of the undrawn face amount of the DIP Letters of Credit, and in form and substance and from a financial institution acceptable to the issuer and DIP Loan Agent. Upon indefeasible payment and satisfaction in full of all Obligations (as defined in the DIP Financing Order) under the DIP Credit Facility and the DIP Financing Order in accordance with the terms thereof and Section 2.1(a) of the Plan, all Liens and security interests granted in the Collateral to secure such Obligations shall be terminated and shall be of no further force and effect.

## 2.     Professional Fees and Expense Claims

On the Effective Date, the Debtors shall deposit in a separate account an amount equal to the professional fee carve out set forth in the DIP Financing Agreement (the "Professional Fee Reserve Account"). All professional fees and expenses that are Allowed as Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 327, 328, 330, 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code and pursuant to subsection (b) below (the "Professional Fees and Expenses") shall be paid out of the Professional Fee Reserve Account. If the amounts on deposit in the Professional Fee Reserve Account shall be insufficient to pay the amount of Professional Fees and Expenses awarded to any entity, the balance shall be paid by the Reorganized Debtors as an Allowed Administrative Expense Claim. After payment of all Allowed Professional Fees and Expenses, any balance remaining in the Professional Fee Reserve Account shall vest in the Reorganized Debtors.

Section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other entities making a "substantial contribution" to a reorganization case, and to attorneys for and other professional advisors to such entities. The amounts, if any, which may be sought by entities for such compensation, are not known by the Debtors at this time. Requests for compensation must be approved by the Bankruptcy Court after a hearing on notice at which the Debtors and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses. On the Effective Date, the Debtors shall deposit in a separate amount an amount equal to the professional fee carve out set forth in the DIP Financing Agreement. All professional fees and expenses that are Allowed as Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals pursuant to sections 327, 328, 300, 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code and pursuant to subsection (b) below (the "Professional Fees and Expenses") shall be paid out of the Professional Fee Reserve Account. If the amounts on deposit in the Professional Fee Reserve Account shall be insufficient to pay the amount of Professional Fees and Expenses awarded to any entity, the balance shall be paid by the Reorganized Debtors as an Allowed Administrative Expense Claim. After payment of all Allowed Professional Fees and Expenses, any balance remaining in the Reserve Account shall vest in the Reorganized Debtors.

All entities seeking an award by the Bankruptcy Court of Professional Fees and Expenses (i) shall file their respective final applications for allowance of compensation for services

rendered and reimbursement of expenses incurred through the Effective Date by the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and, (ii) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtors in Possession or, on and after the Effective Date, the Reorganized Debtors. The time for filing objections to applications for allowance and payment of Professional Fees and Expenses, and the date and time for a hearing in respect of such applications and the related objections, if any, shall be set forth in the Confirmation Order or other order of the Bankruptcy Court.

3.    **Priority Tax Claims**

Priority Tax Claims are Claims for taxes entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim (commencing on the first anniversary of the Effective Date), together with interest at a fixed annual rate equal to the rate applicable to underpayments of federal income tax on the Effective Date determined pursuant to section 6621 of the Internal Revenue Code, without regard to subsection (c) thereof, over a period through a date not later than the sixth anniversary of the date of assessment of such Allowed Priority Tax Claim, or upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

4.    **DIP Lender Claims**

The principal amount of, and all accrued and unpaid interest, fees and expenses in connection with the loans and all other credit and financial accommodations outstanding under the DIP Credit Facility, shall be treated as an Administrative Claim and shall be indefeasibly paid in full in Cash on the Effective Date in accordance with the terms of the DIP Financing Order and the DIP Credit Facility; all DIP Letters of Credit shall either (x) be (i) returned to the issuer undrawn and marked cancelled on or prior to the Effective Date, or (ii) cash collateralized with Cash in an amount equal to 110% of the undrawn face amount of the DIP Letters of Credit, or (y) the issuer will be provided with back-to-back letters of credit in an amount equal to 110% of the face amount of the outstanding DIP Letters of Credit, and in form and substance and from a financial institution acceptable to the issuer and DIP Loan Agent.  Upon indefeasible payment and satisfaction in full of all Obligations (as defined in the DIP Financing Order) under the DIP Credit Facility and the DIP Financing Order in accordance with the terms thereof and Section

2.1(a) of the Plan, all Liens and security interests granted in the Collateral to secure such obligations shall be terminated and shall be of no further force and effect.

**5.      Class 1 - Other Priority Claims**

Other Priority Claims are Claims which are entitled to priority in accordance with section 507(a) of the Bankruptcy Code (other than Administrative Expense Claims and Priority Tax Claims).  Such Claims include (i) unsecured claims for accrued employee compensation earned within 90 days prior to the Commencement Date to the extent of up to $4,650 per employee and (ii) contributions to employee benefit plans arising from services rendered within 180 days prior to the Commencement Date, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $4,650, less (b) the aggregate amount paid to such employees from the Estates for wages, salaries or commissions.

Pursuant to the Plan, On the Initial Distribution Date, each holder of an Other Priority Claim shall receive, in full satisfaction, release and exchange for such Claim, Cash in an amount equal to the amount of such Allowed Other Priority Claim on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

**6.      Class 2 – Other Secured Claims**

The Other Secured Claims are Claims, to the extent reflected in the Schedules or a proof of claim as a Secured Claim, the payment or performance of which is secured by a Lien on Collateral to the extent of the value of the Debtors' interest in such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, including, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount of such setoff.

On the Initial Distribution Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Reorganized Debtors, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim shall receive Cash payments having a present value equal to the amount of such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) the Collateral securing the Lien of a holder of an Allowed Other Secured Claim shall be returned to such holder. Notwithstanding the foregoing, each such holder receiving the treatment specified in clause (ii) or (iii) of the preceding sentence shall have a General Unsecured Claim in Class 5, as applicable, for the amount by which the Allowed Claim exceeds the value of its Collateral, except to the extent such holder agrees to waive any such General Unsecured Claim.

7.      **Class 3 – Convenience Claims**

Convenience Claims include any Claim against the Debtors which (a) would otherwise be an Allowed General Unsecured Claim, and (b) is in the principal amount of $25,000 or less, or as to which a Class 5 Claim holder elects on its Ballot to reduce the principal aggregate amount of any and all Class 5 Claims thereof to $25,000.

Pursuant to the Plan, On the Class 3 Distribution Date, each holder of an Allowed Convenience Claim shall receive, in full satisfaction, release and exchange for such Claim, a payment in Cash in an amount equal to twelve percent (12%) of the amount of such Allowed Convenience Claim.

8.      **Class 4 – Sinosure Group Claims**

The Sinosure Group Claims are the Claims relating to the pre-petition unsecured obligations of members of the Sinosure Group.  Pursuant to the Plan, the Allowed Sinosure Group Claims shall constitute Allowed Claims for purposes of this Plan in the aggregate amount of $50,000,000.[7]

Each holder of an Allowed Sinosure Group Claim shall receive in full satisfaction, release and exchange for such Claim:  (i) such holder's Pro Rata Share of the New Class A Common Stock constituting thirty percent (30%) of the aggregate New Class A Common Stock and New Class B Common Stock issued by the Reorganized Parent on the Effective Date (representing all of the New Class A Common Stock then outstanding), subject to subsequent dilution from any distribution of New Class C Common Stock and/or Sinosure Performance Shares; (ii) a Distribution Note A in the amount of its Pro Rata Share of the total $3,000,000 amount of Distribution Notes A; and (iii) such holder's Pro Rata Share of net proceeds of the Recovery Trust Assets (calculating the amount of Claims in the Pro Rata Share calculation, for purposes of the Recovery Trust Assets only, to include the General Unsecured Claims and the Sinosure Group Claims).  Any and all potential preference and other improper transfer claims, pre-Effective Date breach of contract claims and all other Claims against the holders of Class 4 Claims shall be and hereby are waived and released.

On the Initial Distribution Date, the Reorganized Debtors shall distribute to the Sinosure Group Agent, as agent of and for the benefit of the holders of Allowed Sinosure Group Claims: (i) the New Class A Common Stock; and (ii) the Distribution Notes A.  Pursuant to distribution provisions of the Plan, as soon as reasonably feasible after the Sinosure Group Agent's receipt of such New Class A Common Stock and Distribution Notes A, the Sinosure Group Agent will distribute to holders of Allowed Sinosure Group Claims their Pro Rata Shares of New Class A Common Stock and their respective Distribution Note A as indicated in Sections 4.4(c)(i) and (ii) of the Plan.  In addition, distribution of proceeds of Recovery Trust Assets will be made to holders of Allowed General Unsecured Claims and Allowed Sinosure Group Claims as indicated in Section 4.5(c) of the Plan.

---

[7] On the basis of claims reconciliation work through August 7, 2005, the Company has confirmed that of the $49,886.217.99 of non-duplicative claims filed by members of the Sinosure Group, $48,430,670.95 of such claims should be allowed.  The Company is continuing to work with members of the Sinosure Group to reconcile the remaining variance of $1,455,547.04.  The final amount allowed will be set forth in the Plan Supplement.

Holders of Allowed Sinosure Claims shall be eligible for the issuance and distribution of Sinosure Performance Shares in accordance with Section 5.17 of the Plan.

**9.      Class 5 – General Unsecured Claims**

The General Unsecured Claims are any Claims, including, without limitation, Claims arising from the rejection of executory contracts and unexpired leases, that are not Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, Sinosure Group Claims, Convenience Class Claims, Intercompany Claims, De Minimis Litigation Claims, Old Parent Equity Interest or Subsidiary Equity Interest. Such Claims include (i) Claims of the Debtors' trade vendors, suppliers and service providers, (ii) Claims in respect of the rejection of leases of non-residential real property and executory contracts, and (iii) Claims relating to personal injury, property damage or products liability or other similar Claims that have not been compromised and settled or otherwise resolved.

Each holder of an Allowed General Unsecured Claim shall have the option to elect on its Ballot to permanently and irrevocably reduce the aggregate amount of all of its Allowed General Unsecured Claims to $25,000 and receive a distribution pursuant to Class 3 (Convenience Claims) of the Plan.

Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction, release and exchange for such Claim: (i) such holder's Pro Rata Share of the New Class B Common Stock constituting seventy percent (70%) of the aggregate New Class A Common Stock and New Class B Common Stock issued by the Reorganized Parent on the Effective Date (representing all of the New Class B Common Stock then outstanding), subject to subsequent dilution from any distribution of New Class C Common Stock and/or Sinosure Performance Shares; (ii) such holder's Pro Rata Share of distributions from Distribution Note B; and (iii) such holder's Pro Rata Share of net proceeds of the Recovery Trust Assets (calculating the amount of Claims in the Pro Rata Share calculation, for purposes of the Recovery Trust Assets only, to include the General Unsecured Claims and the Sinosure Group Claims).

On the Initial Distribution Date, the Reorganized Debtors shall distribute to the General Unsecured Claims Trust for the benefit of holders of Allowed General Unsecured Claims: (i) the New Class B Common Stock; and (ii) Distribution Note B. Pursuant to the distribution provisions of the Plan, on the Class 5 Distribution Date and/or Subsequent Distribution Dates, the General Unsecured Claims Trust Trustee will distribute to holders of Allowed General Unsecured Claims their Pro Rata Share of New Class B Common Stock and proceeds of the Distribution Note B as indicated in Sections 4.5(b)(i) and (ii) of the Plan. In addition, on the Initial Distribution Date, the Recovery Trust Causes of Action will vest in the Recovery Trust and the Reorganized Debtors shall distribute the Recovery Trust Funds to the Recovery Trust, each for the benefit of holders of Allowed General Unsecured Claims and holders of Allowed Sinosure Group Claims, pro rata. Pursuant to the distribution provisions of the Plan, on the Class 5 Distribution Date and/or Subsequent Distribution Dates, the Recovery Trust Trustee will distribute to holders of Allowed General Unsecured Claims and Allowed Sinosure Group Claims their Pro Rata Share of proceeds of Recovery Trust Assets as indicated in Section 4.5(b)(iii) of the Plan.

1176642_1.DOC