**10. Class 6 – De Minimis Litigation Claims**

The De Minimis Litigation Claims are miscellaneous litigation actions or threatened litigation actions against the Debtors which would otherwise be either a General Unsecured Claim or a Disputed Claim in which the holder of such claim and such holder of the Claim have entered into an agreement pursuant to the De Minimis Litigation Order. Pursuant to the De Minimis Litigation Order, (1) each individual Claim in this Class is limited to a maximum value of $5,000 per each respective Claim and per each respective claimant and (2) the aggregate amount of all De Minimis Litigation Claims in this class is capped at $250,000.

Pursuant to the Plan, on the Class 6 Distribution Date, each holder of an Allowed De Minimis Litigation Claim shall receive, in full satisfaction, release and exchange for such Claim, a payment in Cash in an amount equal to the amount agreed to between Huffy or Reorganized Parent and the holder of such Claim pursuant to the terms and conditions of the De Minimis Litigation Order.

**11. Class 7 - Intercompany Claims**

Intercompany Claims are certain Claims of a Debtor against another Debtor.

On the Effective Date, each holder of an Allowed Class 7 Intercompany Claim shall receive, in full satisfaction, release and exchange for such Claim the following treatment: (i) the legal, equitable and contractual rights of each holder's Allowed Class 7 Intercompany Claim shall remain unaltered by the Plan or (ii) such other treatment agreed to in writing between such holder and the Debtors or Reorganized Debtors, as applicable.

**12. Class 8 – Subordinated Claims**

Subordinated Claims include any Claim that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code.

Pursuant to the Plan, the holders of Subordinated Claims will not receive or retain any property on account of such Claims.

**13. Class 9 – Subsidiary Equity Interests**

Subsidiary Equity Interests consist of certain shares of stock or other instruments evidencing a present ownership interest by certain of the Debtors in certain of the Subsidiaries, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

The holders of Allowed Subsidiary Equity Interests shall retain ownership of their Subsidiary Equity Interests in each of the Reorganized Subsidiaries.

**14. Class 10 – Old Parent Equity Interests**

The Old Parent Equity Interests consist of any share of preferred stock, common stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest.

Pursuant to the Plan, each holder of an Old Parent Equity Interests will not receive or retain any property on account of such Old Parent Equity Interests.

**15. Class 11 - Government Agency Settled Environmental Claims**

Class 11 is impaired by the Plan. Each holder of a Government Agency Settled Environmental Claim is entitled to vote to accept or reject the Plan, notwithstanding that at the time of voting the EPA and DTSC Settlement Agreement may not yet have been fully-executed or have received approval of the Bankruptcy Court.

On the later of (i) thirty (30) days after the entry of a Final Order of the Bankruptcy Court approving the EPA and DTSC Settlement Agreement or (ii) the Initial Distribution Date, each holder of an Allowed Government Agency Settled Environmental Claim shall receive in full satisfaction, release and exchange for such Claim, a payment in Cash from the Government Agency Environmental Assets of approximately $300,000 in accordance with the terms and conditions of the EPA and DTSC Settlement Agreement.

**16. Class 12 - BPOU CR Group Settled Environmental Claims**

Class 12 is impaired by the Plan. Each holder of a BPOU CR Group Settled Environmental Claim is entitled to vote to accept or reject the Plan.

Each holder of an Allowed BPOU CR Group Settled Environmental Claim shall receive in full satisfaction, release and exchange for such Claim: (i) such holder's pro rata share of a $13,000,000 Class 5 General Unsecured Claim and be entitled to the treatment set forth in Section 4.5 of the Plan for such Claim; and (ii) such holder's Pro Rata Share of the net proceeds of the BPOU Trust Assets. Any and all potential preference claims against the holders of Class 12 Claims shall be waived and released upon the entry of a Final Order approving the BPOU CR Group Settlement Agreement.

On the later of (i) the Initial Distribution Date or (ii) thirty (30) days after the entry of a Final Order of the Bankruptcy Order approving the BPOU CR Group Settlement Agreement, the Reorganized Debtors shall assign the BPOU Trust Assets to the BPOU Trust for the benefit of holders of Allowed BPOU CR Group Settled Environmental Claims.

## C. Provisions Regarding Voting and Distributions Under the Plan, Allowance of Certain Claims and Treatment of Disputed, Contingent and Unliquidated Claims

### 1. Voting of Claims

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to the Bankruptcy Code shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 2. Nonconsensual Confirmation

Pursuant to the Plan, Claims in Class 8 (Subordinated Claims) and Class 10 (Old Parent Equity Interests) will not receive or retain any property, and are thus deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Notwithstanding the deemed rejection of the Plan by such Classes, or that any impaired Class of Claims entitled to vote does not accept the Plan by the statutory majorities required by section 1126(c) of the Bankruptcy Code, the Debtors are requesting confirmation of the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### 3. Method of Distribution Under the Plan

Subject to Bankruptcy Rule 9010, and except as otherwise provided in Sections 5.3, 5.14, 5.15, and 5.16 of the Plan, all distributions under the Plan shall be made by either the Reorganized Debtors, the applicable Trustee or the Sinosure Group Agent to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date unless the Debtors, Reorganized Debtors, the applicable Trustee or the Sinosure Group Agent have been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that provides an address different from the address reflected on the Schedules.

Any payment of Cash made by the Reorganized Debtors or a Trustee pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer; provided that all distributions of Cash to the DIP Lenders shall be made by the Reorganized Debtors by wire transfer of immediately available funds.

Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

No payment of Cash less than fifty dollars ($50.00) shall be made by the Reorganized Debtors or a Trustee to any holder of a Claim unless a request therefore is made in writing to the Reorganized Debtors or applicable Trustee.

No fractional shares of New Common Stock or Cash in lieu thereof shall be distributed pursuant to the Plan. When any distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as

follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number and (ii) fractions of less than ½ shall be rounded to the next lower whole number. The total number of shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in Section 5.3(e) of the Plan.

Any distributions of Cash, New Common Stock, Distribution Notes A and Distribution Note B, or other property under the Plan that are unclaimed for a period of one year after the date on which such distribution was made shall be vested in Reorganized Parent, the applicable Trustee (for redistribution to other Trust Beneficiaries) or the Sinosure Group Agent (for redistribution to other members of the Sinosure Group), as the case may be, and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred. Nothing herein shall require the Reorganized Debtors, Trustees, or the Sinosure Group Agent to take affirmative steps to locate the holders of unclaimed distributions other than at the addresses provided for in Section 5.3(a) of the Plan.

Unless otherwise provided in the Plan, all initial distributions and deliveries to be made shall be made on the date set forth in this Plan. Notwithstanding the foregoing, distributions to be made on the Class 5 Distribution Date and subsequent distributions to be made on each Subsequent Distribution Date will be made in accordance with the terms set forth in the Plan unless the administrative costs of making such distributions would be excessive in comparison to the amounts to be distributed. In addition, nothing contained herein shall require the Recovery Trust Trustee to make any distributions that would impair the ability of the Recovery Trust to prosecute bona fide Recovery Trust Causes of Action by leaving the Recovery Trust with an unreasonably small balance while such Recovery Trust Causes of Action are outstanding. For the avoidance of doubt, the preceding two sentences shall not cause the Recovery Trust Trustee to defer any distributions once all bona fide Recovery Trust Causes of Action are resolved or abandoned.

As of the close of business on the Distribution Record Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtors, the Reorganized Debtors, the Trustees, the Sinosure Group Agent, and any Disbursing Agent shall have no obligation to recognize any transfer of any Claims occurring after the Distribution Record Date, provided that the foregoing will not be deemed to prohibit the sale or transfer of any Claim subsequent to the Distribution Record Date and prior to the Effective Date. The Debtors, the Reorganized Debtors, the Trustees, the Sinosure Group Agent, and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Distribution Record Date.

**4. Distributions Withheld for Disputed General Unsecured Claims**

(a) <u>Establishment and Maintenance of Reserves</u>.

Before making any distributions, on the Class 5 Distribution Date and each Subsequent Distribution Date, the Unsecured Claims Trust Trustee and the Recovery Trust Trustee shall reserve from the distributions to be made on such dates to the holders of Allowed General Unsecured Claims (and, in the case of the Recovery Trust Trustee, to holders of Allowed Sinosure Group Claims), an amount of Unsecured Claims Trust Assets or Recovery Trust Assets

equal to: (i) with regard to liquidated Claims, one-hundred percent (100%) of the distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of such dates if such Disputed General Unsecured Claims were Allowed Claims in their Face Amounts; and (ii) with regard to unliquidated Claims, one hundred percent (100%) of the distributions to which holders of unliquidated Disputed General Unsecured Claims would be entitled under the Plan as of such dates if such Disputed General Unsecured Claims were Allowed Claims in the amount reasonably estimated by the Debtors or Reorganized Debtors as the reasoned maximum amount of such holder's Claim that will ultimately be Allowed (the "Debtors' Unliquidated Claim Estimates" and, (i) and (ii) above, collectively, the "Disputed Claim Reserves.") In making any such reserves, the Unsecured Claims Trust Trustee and the Recovery Trust Trustee, as the case may be, may rely on the Debtors' Unliquidated Claim Estimates and will have no liability therefore, and in estimating the Debtors' Unliquidated Claim Estimates, the Debtors or Reorganized Debtors will have no liability therefore.

(b) Property Held in Disputed Claims Reserves.

Unsecured Claims Trust Assets and Recovery Trust Assets in the Disputed Claims Reserves (together with all dividends, interest or other accretions or distributions thereon) shall be held in trust by the Unsecured Claims Trust and Recovery Trust, as the case may be, for the benefit of the potential recipients of such Unsecured Claims Trust Assets and Recovery Trust Assets and shall not constitute property of the Reorganized Debtors. Any changes in the New Class B Common Stock, including by merger, recapitalization, split, reverse split, dividend or otherwise, shall result in an equitable adjustment for the New Class B Common Stock and any other consideration in the Disputed Claims Reserve as determined by the Unsecured Claims Trust Trustee in good faith.

(c) Distributions Upon Allowance of Disputed General Unsecured Claims.

The holder of a Disputed General Unsecured Claim that becomes an Allowed Claim subsequent to the Class 5 Distribution Date shall receive distributions of Unsecured Claims Trust Assets or Recovery Trust Assets, as the case may be, and any other consideration from the Disputed Claims Reserve from the Unsecured Claims Trust or the Recovery Trust, as the case may be, on the next Subsequent Distribution Date that is at least twenty (20) days following the date on which such Disputed General Unsecured Claim becomes an Allowed Claim pursuant to a Final Order. Such distributions shall be made in accordance with the Unsecured Claims Trust Agreement or Recovery Trust Agreement, as the case may be, based upon such holder's Pro Rata Share (which, in the case of the Recovery Trust only, shall be calculated inclusive of Allowed Sinosure Group Claims in the denominator), calculated as of such Subsequent Distribution Date.

(d) Surplus Distributions to Holders of Allowed General Unsecured Claims.

To the extent that a Disputed General Unsecured Claim is not Allowed or becomes an Allowed Claim in an amount less than the Face Amount or Debtors' Unliquidated Claims Estimate, as applicable, the excess of the Unsecured Claims Trust Assets and Recovery Trust Assets, as the case may be, and any other consideration in the Disputed Claims Reserves over the dollar value of the Unsecured Claims Trust Assets and any other consideration actually distributed on account of such Disputed General Unsecured Claim shall constitute surplus

available for distribution to holders of Allowed General Unsecured Claims (and, in the case of the Recovery Trust only, Allowed Sinosure Group Claims) (the "Surplus Distributions"). The Surplus Distributions shall be distributed to holders of Allowed General Unsecured Claims (and, in the case of the Recovery Trust only, Allowed Sinosure Group Claims) on each Subsequent Distribution Date and the Final Distribution Date.

(e) Expenses of Unsecured Claims Trust and Recovery Trust.

The reasonable and necessary expenses of the Unsecured Claims Trust and the Recovery Trust shall be paid from the Recovery Trust Funds.

**5. Procedures for Allowance or Disallowance of Disputed Claims**

(a) Objections to and Resolution of Administrative Expense Claims, Claims and Equity Interests

Except as specifically set forth herein and except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, the Recovery Trust Trustee, the Unsecured Claims Trust Trustee and the Sinosure Group shall have the exclusive right to make and file objections to Administrative Expense Claims, Claims and Equity Interests subsequent to the Effective Date. The Reorganized Debtor shall be primarily responsible for asserting objections to any Claim, provided, however, that such primary responsibility shall not preclude the Sinosure Group or the Trustees from asserting any objection to a Claim without the prior approval of the Reorganized Debtors or the Bankruptcy Court. Following the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any of their objections without approval of the Bankruptcy Court. The Reorganized Debtors shall bear all costs and expenses relating to the investigation and prosecution of Disputed Claims from and after the Effective Date for only such Disputed Claims that the Reorganized Debtors affirmatively investigate and prosecute. The Sinosure Group, the Recovery Trust Trustee, and the Unsecured Claim Trust Trustee shall have the right to (i) file an objection to any Claim and (ii) notice and an opportunity to object to any settlement of such Claims agreed to by the Debtors or Reorganized Debtors; provided however, the Debtors or Reorganized Debtors shall have the exclusive right to settle and compromise any Claim for an Allowed amount under $100,000 without notice to the Recovery Trust Trustee, the Unsecured Claim Trust Trustee and the Sinosure Group. Unless otherwise ordered by the Bankruptcy Court, the Debtors or the Reorganized Debtors, the Recovery Trust Trustee, the Unsecured Claims Trust Trustee and the Sinosure Group shall file all objections to Claims and Equity Interests and serve such objections upon the holder of the Claim or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than one hundred twenty (120) days after the Effective Date or such later date as may be approved by the Bankruptcy Court (the "Claims Objection Deadline"). The Debtors or the Reorganized Debtors, the Recovery Trust Trustee, the Unsecured Claims Trust Trustee, and the Sinosure Group reserve the right to object to Administrative Expense Claims as such claims arise in the ordinary course of business.

(b) Personal Injury Tort Claims

All personal injury Tort Claims (other than De Minimis Litigation Claims) are Disputed General Unsecured Claims. Any personal injury Tort Claim as to which a proof of claim was timely filed in the Chapter 11 Cases shall be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction, or in accordance with any alternative dispute resolution or similar proceeding as the same may be approved by order of the Bankruptcy Court. Any personal injury Tort Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with Section 5.6(b) of the Plan and applicable non-bankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as the same may be approved by order of the Bankruptcy Court, shall be deemed a Disputed Claim in such liquidated amount and satisfied in accordance with the Plan (provided, that, to the extent an Allowed Tort Claim is a Claim covered by an insurance policy, such claim shall be paid from the insurance proceeds available to satisfy such liquidated amount). Nothing contained in Section 5.6(b) of the Plan shall impair the Debtors' or Reorganized Debtors' right to seek estimation of any and all personal injury Tort Claims in a court or courts of competent jurisdiction or constitute or be deemed a waiver of any Cause of Action that the Debtors, Reorganized Debtors, or Recovery Trust Trustee may hold against any entity, including, without limitation, in connection with or arising out of any personal injury Tort Claim.

(c) No Distribution Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of the Plan, and no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim (in whole or in part).

(d) Disallowed Claims

All Claims held by Persons against whom any Debtor, Reorganized Debtor or the Recovery Trust Trustee has filed a proceeding with the Bankruptcy Court asserting a cause of action under Chapter 5 of the Bankruptcy Code, including sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code, shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan of Reorganization. Claims that are deemed disallowed pursuant to Section 5.6(d) of the Plan shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors, the Reorganized Debtors, the Unsecured Claims Trust Trustee or the Recovery Trust Trustee from such party have been paid.

**6. Disbursing Agents**

The Reorganized Debtors, or such Person(s) as the Reorganized Debtors may designate, and the Trustees and the Sinosure Group Agent (solely in its capacity as agent for members of the Sinosure Group) will act as Disbursing Agent under the Plan with respect to all distributions to holders of Claims, and will make all distributions required to be distributed under the applicable provisions of the Plan; provided, however, that all distributions to the DIP Loan Agent

and DIP Lenders shall be made by the Reorganized Debtors to the DIP Loan Agent for disbursement to the DIP Lenders. Each Disbursing Agent will serve without bond. The Reorganized Debtors shall hold all reserves and accounts pursuant to the Plan, including the Professional Fee Reserve Account; provided, however, that the Disputed Claims Reserves shall be held by the Unsecured Claims Trust and the Recovery Trust.

**7. Setoffs and Recoupment**

The Debtors may, but shall not be required to, set off (pursuant to the provisions of sections 553 and 362 of the Bankruptcy Code or other applicable law) against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any setoff or recoupment right it may have against the holder of such Claim.

**8. Allocation of Plan Distributions Between Principal and Interest**

Other than in respect of the distributions to be made to the DIP Loan Agent and DIP Lenders under the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**9. Estimations of Claims**

The Debtors, the Reorganized Debtors, and the Trustees may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code or otherwise regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning such objection to any claim, including without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Bankruptcy Court. If the estimated amount, as determined by the Bankruptcy Court, constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors or the Trustees may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**10. No Recourse**

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of

Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, any Trustee, the Sinosure Group Agent, the Debtors, the Reorganized Debtors, the Creditors' Committee (or any member thereof), the Sinosure Group (or any member thereof), the DIP Lenders, or any of their respective professionals, consultants, officers, employees, directors or Affiliates or their respective successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

**11. Amendments to Claims**

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtors and the holder of such Claim, or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law. After the Confirmation Date, a Claim may not be amended without the authorization of the Bankruptcy Court. Any amended Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors, the Reorganized Debtors or the Estates, unless the Claim holder has obtained prior Bankruptcy Court authorization for the filing of such amendment.

**12. Postpetition Interest on Claims**

Unless expressly provided in the Plan, the Confirmation Order, the DIP Financing Order and the DIP Credit Facility, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan or required by applicable law, postpetition interest shall not accrue on or after the Commencement Date on account of any Claim.

**13. Recovery Trust**

(a) Execution of Recovery Trust Agreement. On the Effective Date, the Recovery Trust Trustee and Reorganized Parent shall execute the Recovery Trust Agreement, which shall in form and substance be acceptable to the Creditors' Committee and the Sinosure Group. The Recovery Trust Agreement shall be filed as part of the Plan Supplement, which shall be filed with the Court within ten (10) days of the Balloting Deadline.

(b) Standing of Recovery Trust Trustee. The Recovery Trust Trustee, pursuant to the terms of the Plan and the Recovery Trust Agreement, is authorized to investigate, prosecute and litigate the Recovery Trust Claims. The Recovery Trust Trustee shall have standing to pursue the Recovery Trust Claims and shall be deemed the representative of the Estates pursuant to section 1123(b)(3) of the Bankruptcy Code for these purposes only.

(c) Duties and Responsibilities of Recovery Trust Trustee. The powers, authority, responsibilities and duties of the Recovery Trust Trustee are set forth in and shall be governed by the Recovery Trust Agreement.

(d) Transfer of Assets to Recovery Trust. On the Effective Date, the Reorganized Parent shall transfer and assign to the Recovery Trust (i) the Recovery Trust Causes of Action

and (ii) the Recovery Trust Funds. The Recovery Trust Causes of Action shall be held in the Recovery Trust by the Recovery Trust Trustee. Any collections on the Recovery Trust Causes of Action shall be made into the Recovery Trust. The Recovery Trust Trustee will make distributions of net cash proceeds of the Recovery Trust Causes of Action (if any) on the Class 5 Distribution Date and Subsequent Distribution Dates to holders of Allowed Class 4 and Allowed Class 5 Claims. Beneficial interests in the Recovery Trust Causes of Action (i.e., the right to receive a share of net cash proceeds of the Recovery Trust Causes of Action) shall not be transferable.

**14. Sinosure Group Agent**

On the Effective Date, the Reorganized Parent shall transfer to the Sinosure Group Agent (i) the New Class A Common Stock Shares and (ii) Distribution Notes A.

**15. Unsecured Claims Trust**

(a) Execution of Unsecured Claims Trust Agreement. On the Effective Date, the Unsecured Claims Trust Trustee and Reorganized Parent shall execute the Unsecured Claims Trust Agreement, which shall be in form and substance acceptable to the Creditors' Committee. The Unsecured Claims Trust Agreement shall be filed as part of the Plan Supplement, which shall be filed with the Court within ten (10) days of the Balloting Deadline.

(b) Duties and Responsibilities of Unsecured Claims Trust Trustee. The powers, authority, responsibilities and duties of the Unsecured Claims Trust Trustee are set forth in and shall be governed by the Unsecured Claims Trust Agreement.

c) Transfer of Assets to Unsecured Claims Trust. On the Effective Date, the Reorganized Parent shall transfer to the Unsecured Claims Trust (i) the New Class B Common Stock shares and (ii) Distribution Note B. Distribution Note B shall be held in the Unsecured Claims Trust by the Unsecured Claims Trust Trustee and shall provide that payments made by the Reorganized Debtors under Distribution Note B shall be made into the Unsecured Claims Trust. The Unsecured Claims Trust Trustee will make distributions of cash proceeds of Distribution Note B on the Class 5 Distribution Date and Subsequent Distribution Dates to holders of Allowed Class 5 Claims. Beneficial interests in Distribution Note B (i.e., the right to receive a share of cash proceeds of Distribution Note B) shall not be transferable.

**16. Sinosure Performance Shares**

Holders of Allowed Sinosure Group Claims shall earn additional shares of New Class A Common Stock (the "Sinosure Performance Shares") for each of five (5) successive one-year periods from the Effective Date (the first such period ending on, and the second such period commencing immediately following, the last day of the month in which the anniversary of the Effective Date falls). It is anticipated that the first such period will begin on the Effective Date and end on September 30, 2006. For each such period and within thirty (30) days of the end of such period, the Reorganized Parent shall issue additional shares of New Class A Common Stock to the Sinosure Group Agent in an amount equal to 4.2% of the aggregate number of New Class A and Class B Common Stock, provided that, in respect of such period, ninety-day trade credit terms have been provided to the Reorganized Parent or its subsidiaries in accordance with the

Supply Principles by Sinosure Group suppliers (with or without the benefit of Sinosure export credit insurance) or by suppliers not included in Class 4 with the benefit of Sinosure export credit insurance, which trade credit covers 100% of Huffy's orders for bicycles and golf products sourced in Greater China, but not greater than the projected requirements set forth in Huffy's 2005-2010 financial projections set forth as Exhibit B to this Disclosure Statement.

In the event that the trade credit so provided in respect of any such period is greater than 100% of such projected requirements, then the excess shall carry over towards calculation of the Sinosure Group's performance in the next succeeding annual period. In respect of any such annual period, to the extent that the ninety-day trade credit so provided is more than 75% (but less than 100%) of Reorganized Parent's and its subsidiaries' orders for bicycles and golf products sourced in Greater China (other than by operation of the limitation based on projected requirements set forth above), the amount of Sinosure Performance Shares to be issued in respect of such period shall be proportionately reduced. The proration as set forth herein assumes that Reorganized Parent and its subsidiaries are acting in good faith in accordance with the Supply Principles, failing which there shall be no reduction in the Sinosure Performance Shares to be issued hereunder to the extent the failure of the Sinosure Group to provide the anticipated levels of trade credit hereunder results directly from Reorganized Parent's or its subsidiaries' failure to act in good faith in accordance with the Supply Principles. For the avoidance of doubt, in the event that the Sinosure Group fully performs under the Supply Principles, its ownership will be 34.2%, 38.4%, 42.6%, 46.8% and 51% of the aggregate New Class A and Class B Common Stock (all in New Class A shares) then outstanding at end of October 2006, 2007, 2008, 2009 and 2010, respectively. The allocation of Sinosure Performance Shares among members of the Sinosure Group shall be determined by the Sinosure Group. In the event that the Sinosure Group fully performs under the Supply Principles, New Class B Stock ownership will be diluted from 70% as of the Effective Date to 65.8%, 61.6%, 57.4%, 53.2% and 49% of the aggregate New Class A and Class B Common Stock then outstanding at the end of October 2006, 2007, 2008, 2009 and 2010, respectively.

In the event that at the end of the fifth annual period the Sinosure Group holding of New Class A shares is less than 51% of the aggregate number of New Class A and Class B Common Stock then outstanding, the Sinosure Group may elect to extend the supply arrangements hereunder to obtain issuance of additional Sinosure Performance Shares until its New Class A Common Stock holdings aggregate 51% (but not more than 51%) of such New Class A and Class B Common Stock.

To the extent the members of the Sinosure Group perform as contemplated by the Supply Principles, such performance shall be deemed to be fair and adequate consideration for any Sinosure Performance Shares issued pursuant to the Plan.

Sinosure shall be under no legal obligation hereunder, or under any agreement, document or instrument to be executed pursuant to this Plan, to provide export credit insurance to the other members of the Sinosure Group or any third party in respect of their sales to any of the Debtors or the Reorganized Debtors. None of the other members of the Sinosure Group shall be under any legal obligation hereunder, or under any agreement, document or instrument to be executed pursuant to this Plan, to sell product or provide trade credit to any of the Debtors or the Reorganized Debtors. To the extent that Sinosure provides such export credit insurance and the

other members of the Sinosure Group provide such trade credit on the terms contemplated in the Supply Principles and Section 5.17 of the Plan, they shall be entitled to the issuance of Sinosure Performance Shares as herein provided.

## D. Treatment of Executory Contracts and Unexpired Leases Under the Plan

### 1. Assumption or Rejection of Executory Contracts and Unexpired Leases

(a) Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases between the Debtors and any Person shall be deemed rejected by the Reorganized Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) which previously has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (iii) which is listed in Schedule 6.1(a)(x) (executory contracts) or Schedule 6.1(a)(y) (unexpired leases), which schedules shall be filed with the Bankruptcy Court and served on the affected parties by no later than ten (10) days prior to the Balloting Deadline; provided, however, that the Debtors or Reorganized Debtors, with the consent of the Creditors' Committee and the Sinosure Group, shall have the right, on or prior to the Confirmation Date, to amend Schedules 6.1(a)(x) or 6.1(a)(y) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed, respectively, assumed or rejected. The Debtors or Reorganized Debtors, with the consent of the Creditors' Committee and the Sinosure Group, shall provide notice of any amendments to Schedules 6.1(a)(x) or 6.1(a)(y) to the non-debtor parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedules 6.1(a)(x) and 6.1(a)(y) shall not constitute an admission by the Debtors or Reorganized Debtors that such document is an executory contract or an unexpired lease or that the Debtors or Reorganized Debtors have any liability thereunder.

(b) Schedules of Assumed Executory Contracts and Unexpired Leases; Inclusiveness.

Each executory contract and unexpired lease listed or to be listed on Schedules 6.1(a)(x) or 6.1(a)(y) that relates to the use or occupancy of real property shall be deemed to include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 6.1(a)(x) or 6.1(a)(y) and (ii) all executory contracts or unexpired leases appurtenant to the premises listed on Schedules 6.1(a)(x) or 6.1(a)(y),

including, without limitation, all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vault, tunnel or bridge agreements or franchises, and any other interests in real estate or rights in rem relating to such premises, unless any of the foregoing agreements previously has been assumed.

(c) Insurance Policies

With the exception of the workers compensation policies and other insurance policies set forth on Schedule 6.1(c) which shall be deemed rejected by the Reorganized Debtors as of the Effective Date pursuant to section 365(a) of the Bankruptcy Code, each of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, including without limitation, any retrospective premium rating plans relating to such policies, shall be treated as executory contracts under the Plan and shall be deemed assumed by the Reorganized Debtors on the Effective Date. Notwithstanding the foregoing, distributions under the Plan to any holder of a Claim covered by any insurance policies and related agreements, documents or instruments that are assumed hereunder, shall comply with the treatment provided under Article IV of the Plan. Nothing contained in Section 6.1(c) of the Plan shall be deemed as an assumption by the Reorganized Debtors to pay any third-party claimant other than in accordance with distributions to holders of Claims as allowed under the Plan. Nothing contained in this Section 6.1(c) shall constitute or be deemed a waiver or release of any Cause of Action that the Debtors, Reorganized Debtors, or the Recovery Trustee may hold against any entity, including, without limitation, the insurers under any of the Debtors' policies of insurance. With respect to any rejected insurance policy or workers compensation policy set forth on Schedule 6.1(c), the Reorganized Debtors shall retain the right to take appropriate action to recover any excess Collateral serving as security in connection with such policies.

(d) Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases unless specifically assumed pursuant to Section 6.1(a) of the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases specifically assumed pursuant to Section 6.1(a) of the Plan.

(e) Cure of Defaults

To the extent that cure payments are due with respect to an executory contract or unexpired lease to be assumed pursuant to Section 6.1(a) the Plan the amount of such cure payment shall be listed in the Plan Supplement. To the extent that the non-debtor party to any executory contract or unexpired lease disagrees with the cure amount listed on Schedule 6.1(e) in the Plan Supplement, such party must file a notice of dispute stating the reasons for such dispute with the Bankruptcy Court and serve such notice on the Debtors, the Creditors' Committee and the Sinosure Group by no later than five (5) days prior to the Confirmation Hearing. If a non-debtor party to an executory contract or lease fails to timely file a notice of dispute of any cure amount listed on Schedule 6.1(e), it shall be forever barred from asserting any Claim for a cure

amount or otherwise. Except as may otherwise be agreed by the parties, within sixty (60) days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtors' or Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. If there are any objections filed, the Bankruptcy Court shall hold a hearing. In the event the Bankruptcy Court determines that the cure amount is greater than the cure amount listed by the Debtors, the Debtors or the Reorganized Debtors may elect to reject the contract or unexpired lease and not pay such greater cure amount.

(f) <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 6.1(a) of the Plan must be filed with the Bankruptcy Court and/or served upon the Debtors or Reorganized Debtors or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order and (iii) notice of an amendment to Schedule 6.1(a)(x) or 6.1(a)(y). Any Claim not filed within such time will be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors and their property. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan.

**2. Indemnification Obligations**

For purposes of the Plan, the obligations of the Debtors to defend, indemnify, reimburse, or limit the liability relating to any claims or obligations against their present and former directors, officers or employees who served as directors, officers and employees, respectively, on or after the Commencement Date, pursuant to the Debtors' certificates of incorporation or bylaws, applicable state law, or any combination of the foregoing with respect solely to the employees identified in the Management Indemnification Agreements, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Commencement Date.

**3. Compensation and Benefit Programs**

Except as provided in Section 6.1(a) of the Plan and unless specifically provided for otherwise in the Plan, and other than stock option or similar plans which will be cancelled as part of the treatment of any Class of Claims under the Plan, all current employment and severance practices and policies, and all current compensation and benefit plans, policies, and programs of the Debtors applicable to their current directors, officers, and employees who served as directors, officers and employees, respectively, on or after the Commencement Date, including, without limitation, all savings plans, retirement plans (excluding defined benefit plans), health care plans, severance benefit plans, incentive plans, workers' compensation programs and life, disability and

other insurance plans, including the Key Employee Retention Plan (the "KERP") approved by the Bankruptcy Court by an order, dated January 27, 2005, as amended by the Agreed Amended Order re the Key Employee Retention Plan, dated January 27, 2005, and the Amended Order re the Key Employee Retention Plan, dated June 15, 2005, are treated as executory contracts under the Plan and are hereby assumed pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code; provided, however, that the Reorganized Debtors reserve the right to modify any and all such compensation and benefit practices, plans, policies, and programs in accordance with the terms thereof.

#### 4. Defined Benefit Plan

On July 1, 2005 the Debtors filed a motion in the Bankruptcy Court pursuant to section 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b), and Section 4041 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1341, for an order determining that Debtors meet the requirements for a voluntary distress termination of the Pension Plan under 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), and approving termination of same. The entry of an order by the Bankruptcy Court terminating the Pension Plan and the execution of an agreement between the plan administrator of the Pension Plan and the PBGC terminating the Pension Plan, are conditions precedent to the Effective Date of the Plan.

#### 5. Retiree Benefits

Pursuant to section 1114 of the Bankruptcy Code, payments, if any, due to any person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability or death under any plan, fund or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the Debtors prior to the Commencement Date shall be continued for the duration of the period the Debtors have obligated themselves to provide such benefits; provided, however, that the Reorganized Debtors reserve the right to modify any and all such plans, funds and programs in accordance with the terms thereof and applicable law.

### E. Consolidation of Huffy and the Subsidiaries

#### 1. Substantive Consolidation Treatment

Substantive consolidation is an equitable remedy which a bankruptcy court may be asked to apply in Chapter 11 cases involving affiliated debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors. All of the debtors in a substantively consolidated group are treated as if they were a single corporate and economic entity. Consequently, a creditor of one substantively consolidated debtor is treated as a creditor of a substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of such debtors, multiple and duplicative creditor claims, joint and several liability claims and guarantees, and the payment of allowed claims from a common fund.

The entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for all purposes related to the Plan, including for purposes of voting, confirmation and distribution, but the Debtors shall not be substantively consolidated for other purposes. Pursuant to such order, (i) any claim against any Debtor (other than Intercomany Claims) and any guarantee thereof by any other Debtor and any joint or several liability of any of the Debtors shall be deemed one obligation of the consolidated Debtors, (ii) each and every Claim filed or to be filed in the Chapter 11 Case of any Debtor shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against and obligation of the consolidated Debtors, and (iii) all duplicative claims (identical in both amount and subject matter) filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives against the consolidated Debtors but in no way should such Claim be deemed Allowed by reason of Section 7.1 of the Plan. Such substantive consolidation treatment shall not affect (i) the separate legal status and corporate structures of the Reorganized Debtors to effect restructurings as provided in this Plan, (ii) Subsidiary Equity Interests, (iii) Intercompany Claims, and, (iv) any defenses to any Causes of Action or requirements for any third party to establish mutuality in order to assert a right of setoff.

### 2. Merger or Dissolution of Corporate Entities

On or as of the Effective Date, as determined by the New Board of Directors and the applicable Reorganized Debtor, each Subsidiary may be merged into another of the Debtors or Reorganized Debtors or dissolved. Upon the occurrence of any such merger, all assets of the merged entities shall be transferred to and become the assets of the surviving corporation, and all liabilities of the merged entities, except to the extent discharged, released or extinguished pursuant to the Plan and the Confirmation Order, shall be assumed by and shall become the liabilities of the surviving corporation. All mergers and dissolutions on or prior to the Effective Date shall be effective as of the Effective Date pursuant to the Confirmation Order, without the taking of any further action by the stockholders or directors of any of the Debtors, the Debtors in Possession or the Reorganized Debtors.

## F. Provisions Regarding Corporate Governance and Management of the Reorganized Debtors

On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the respective boards of directors of the Reorganized Debtors. The Sinosure Group has advised the Reorganized Debtors of its intention to enter into an agency and voting agreement among its members regarding the voting of its members' shareholdings in the Reorganized Parent and regarding other decisions in respect of the Reorganized Debtors.

### 1. Meetings of Stockholders

In accordance with the Amended Reorganized Parent Articles of Incorporation and the Amended Reorganized Parent Bylaws, as the same may be amended from time to time, the first annual meeting of the stockholders of Reorganized Parent shall be held on a date in 2006 selected by the New Board of Directors.

### 2. Bylaws and Certificates of Incorporation

On the Effective Date, the adoption of the Amended Reorganized Parent Articles of Incorporation, the Amended Reorganized Parent Bylaws, Amended Reorganized Subsidiaries Certificates of Incorporation, and the Amended Reorganized Subsidiaries Bylaws shall be authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, and including without any further action by the stockholders or directors of the Debtors, the Debtors in Possession or the Reorganized Debtors. The Amended Reorganized Parent Articles of Incorporation and the Amended Reorganized Subsidiaries Certificates of Incorporation shall prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such certificates of incorporation as permitted by applicable law and the applicable organizational documents. The Amended Reorganized Parent Bylaws shall include the corporate governance provisions set forth in Section 8.4 of the Plan, and the Amended Reorganized Subsidiaries Bylaws shall include provisions enabling the application of the corporate governance provisions set forth in Section 8.4 of the Plan to such Reorganized Debtors. In addition, the Amended Reorganized Parent Bylaws shall include provisions to permit the terminations as described in Section 8.5 of the Plan of officers under certain circumstances, including the termination of officers of the Reorganized Subsidiaries. Any amendments, modifications or supplements to the bylaws, code of regulations, or articles of incorporation of any Reorganized Debtor shall be subject to a Supermajority Vote.

### 3. Boards of Directors

(a) Selection of Board Members

In accordance with the Reorganized Parent Articles of Incorporation as of the Effective Date, the New Board of Directors shall be comprised of seven (7) members, four (4) of whom shall be elected by New Class A Common Stock shareholders, two (2) of whom shall be elected by the New Class B Common Stock shareholders, and one (1) of whom shall be the chief executive officer of the Reorganized Parent, elected by the New Class A Common Stock shareholders, the New Class B Common Stock shareholders, and the new Class C Common Stock shareholders voting together. A schedule setting forth the identities of the New Board of Directors members as of the Effective Date shall be filed on or before the date of the Confirmation Hearing. The chairman of the Board of Directors shall be designated by the members of the New Board of Directors elected by the New Class A Common Stock shareholders. The New Board of Directors shall, and shall cause each of the Reorganized Subsidiaries to, comply with the corporate governance provisions set forth in Section 8.4 of the Plan. Elections, removal and terms of directors will be in accordance with the Amended Reorganized Parent Articles of Incorporation and the Amended Reorganized Parent Bylaws, provided that only the class of stock that elected particular directors will be entitled to remove and replace their successors.

Because it is impossible to predict the holders of the New Class B Common Stock until after the claims administration process is concluded, the Creditors' Committee has selected two candidates for the role of the initial Class B directors. The identity and qualifications of the proposed candidates will be included in the ballot for voting on the Plan remitted to holders of

Class 5 Claims entitled to vote on the Plan. By voting for the Plan, holders of Class 5 Claims will be voting to elect the two candidates as the initial representatives of holders of New Class B Common Stock on the New Board of Directors. All holders of New Class B Common Stock will have an opportunity to vote for a slate of director candidates at the next appropriate date pursuant to the Amended Reorganized Parent Articles of Incorporation.

(b) Reorganized Subsidiaries

The initial boards of directors for each of the Reorganized Subsidiaries shall be set forth on Schedule 8.4(b) of the Plan.

(c) Corporate Governance

Certain aspects of the business and affairs of Reorganized Parent and the other Reorganized Debtors shall be subject to a Supermajority Vote:

- a merger of the Reorganized Debtors with a third party;
- a change in the structure of the Board of Directors;
- a change in the equity capital structure of the Reorganized Debtors;
- a sale of substantially all of the Reorganized Debtors' assets; and
- any change of these provisions.

These matters of corporate governance shall be included in the Amended Reorganized Parent Articles of Incorporation.

**4. Officers**

The officers of the respective Debtors named in the Management Agreements, namely, John Muskovich, President and Chief Executive Officer, Nancy Michaud, Senior Vice President, General Counsel and Secretary, Steve Lipton, Senior Vice President of Finance and Chief Financial Officer, Robert Diekman, Senior Vice President of Operations, and William Smith, Senior Vice President, Chief Merchandising Officer, shall serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date and in accordance with the Management Agreements with the Reorganized Debtors, the applicable organizational documents and applicable non-bankruptcy law. After the Effective Date, the officers of the respective Reorganized Debtors shall be determined by their respective new boards of directors, in each case until their respective resignations or removal in accordance with applicable law and the applicable organizational documents.

**5. Authorization of New Securities**

Without the need for any further corporate action and pursuant to Chapter 1701 of the Ohio General Corporation Law and the Reorganized Parent's Articles of Incorporation, on the Effective Date the authorized share capital of the Reorganized Parent shall consist of. 20,400,000

shares of the New Class A Common Stock, 19,600,000 shares of New Class B Common Stock, and 4,440,000 shares of New Class C Common Stock. In addition, the authorized share capital of the Reorganized Parent shall include 16,560,000 shares available for issuance on terms which may be designated from time to time by its New Board of Directors in accordance with the Ohio General Corporation Law and the Amended Reorganized Parent Articles of Incorporation.

**6. Issuance of New Securities**

(a) Issuance - Generally

The issuance and distribution of .8,400,000 shares of New Class A Common Stock to the Sinosure Group Agent and 19,600,000 shares of New Class B Common Stock to the Unsecured Claims Trust by the Reorganized Parent on the Effective Date is hereby authorized and directed without the need for any further corporate act or action under applicable law, regulation, order or rule, and without any further action by the shareholders or directors of the Debtors, the Debtors in Possession or the Reorganized Debtors. The Confirmation Order shall provide that the issuance of New Common Stock on account of Claims shall be exempt from the registration requirements of the Securities Act to the extent provided by section 1145 of the Bankruptcy Code. Notwithstanding the actual date of distributions to creditors, the New Class A Common Stock and the New Class B Common Stock shall be deemed to be issued to Creditors on the Effective Date.

Because the holders of Sinosure Group Claims and General Unsecured Claims in classes 4 and 5, respectively, will receive New Common Stock pursuant to the Plan, you should be aware that section 1145 of the Bankruptcy Code provides certain exemptions from the securities registration requirements of federal and state securities laws with respect to the distribution of securities under a Plan.

(b) Issuance and Resale of Plan Securities.

Under section 1145(a) of the Bankruptcy Code, the issuance of the New Common Stock and the subsequent resale of such securities by entities which are not "underwriters" (as defined in section 1145(b) of the Bankruptcy Code), are not subject to the registration requirements of section 5 of the Securities Act. In addition, such securities generally may be resold in the United States without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (A) purchases a claim against, equity interest in, or claim for an administrative expense, with a view to distribution of any security to be received in exchange for the claim or equity interest, or (B) offers to sell securities issued under a plan to the holders of such securities, or (C) offers to buy securities issued under a plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in

connection with the plan, the consummation of the plan, or the offer or sale of securities under the plan, or (D) is an issuer of the securities within the meaning of section 2(11) of the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a Plan may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Common Stock pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be "underwriters" for purposes of section 1145 of the Bankruptcy Code may, however, be able to sell securities pursuant to a registration statement (see discussion of registration rights below) or, under certain conditions described below, without registration pursuant to the resale provisions of Rule 144 under the Securities Act or any other exemption from registration requirements.

Pursuant to Rule 144 under the Securities Act, "affiliates" of the issuer who resell securities which are not restricted, will be deemed not to be engaged in a distribution of such securities and therefore not to be "underwriters" of such securities as defined in Section 2(11) of the Securities Act, if they comply with certain conditions including, in general terms: (a) the availability of adequate current public information with respect to the issuer, (b) limiting the amount of securities sold within any three-month period to the greater of one percent of the shares outstanding or the average weekly trading volume and (c) selling the securities only through "brokers' transactions."

Certificates evidencing shares of the New Common Stock will bear a legend substantially in the form below:



**THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [__________], 2005 PURSUANT TO THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF HUFFY CORPORATION (THE "COMPANY") AND CERTAIN OF ITS SUBSIDIARIES, DATED AS OF [__________], 2005 AND CONFIRMED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION, ON [__________], 2005. THESE SECURITIES WERE ISSUED PURSUANT**

**TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED, (THE "ACT") PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1145, AND HAVE NOT BEEN REGISTERED UNDER THE ACT, AND TO THE EXTENT THAT THE HOLDER OF THESE SECURITIES IS AN "UNDERWRITER" AS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE, THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.**

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO OTHER RESTRICTIONS ON SALE OR TRANSFER AND ARE SUBJECT TO OTHER RIGHTS AND OBLIGATIONS SET FORTH IN THE AMENDED REORGANIZED COMPANY'S ARTICLES OF INCORPORATION AND BY-LAWS AND THE PLAN.**

(c) Shareholder Sale Rights.

In the event that the holders of New Class A Common Stock, individually or collectively, agree to sell in the aggregate fifteen percent (15%) or more of the then outstanding New Class A Common Stock, as a condition to such sale, such seller(s) of New Class A Common Stock must require that the offer to purchase such shares be extended by such purchaser on the same terms and conditions for an equal percentage of the New Class B Common Stock shares. In the case that any such sale which would result in any Person, other than the members of the Sinosure Group, holding more than 50% of the New Class A Common Stock, then the seller(s) of New Class A Common Stock, as a condition to such sale, must require the offer be extended by such purchaser on the same terms and conditions to acquire all outstanding New Common Stock and in such circumstances, the other holders of New Common Stock shall be obligated to sell such shares provided that such sale is an arms-length transaction between non-interested third parties.

Holders of New Class B Common Stock (subject to applicable requirements of law including those described above) may sell any of their New Class B Common Stock to any third party at any time without restriction. Holders of New Class A Common Stock (subject to applicable requirements of law including those described above) may sell any of their New Class A Common Stock to other members of the Sinosure Group at any time without restriction (including, in the case of Sinosure, the right to transfer any New Class A Common Stock held by it to any reinsurer which shared risk with Sinosure in respect of the Allowed Sinosure Claims). If any purchaser of either New Class A or New Class B Common Stock is deemed to be a competitor of Reorganized Parent or any of its subsidiaries, such purchaser's access to non-public corporate and financial information of Reorganized Parent will be restricted.

Holders of New Class B Common Stock shall have usual and customary "piggyback" rights to register their shares if Reorganized Parent proposes to file a registration statement under the Securities Act. A registration rights agreement describing such "piggyback" rights will be filed with the Plan Supplement.

(d) Subsequent Transfers Under State Law.

The state securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for his or her own account and subsequent transfers to institutional or accredited investors. Such exemptions are generally expected to be available for subsequent transfers of New Common Stock.

Any person intending to rely on these exemptions is urged to consult his or her own counsel as to their applicability to his or her circumstances.

(e) Dividends.

Reorganized Parent shall pay a dividend to the holders of New Common Stock for the years ending 2007, 2008, 2009, and 2010; such dividend shall be payable on April 30th following such year-end subject to the Dividend Payment Test as set forth in Section 8.9 of the Plan. The Dividend Payment Test requires that (i) after giving pro forma effect to the payment of a dividend, average availability under Reorganized Parent's revolving credit borrowing base measured from January 1 through March 31 (on a daily basis) be greater than $15 million and (ii) after giving effect to the payment of such dividend, (the ratio of) Reorganized Parent's total funded debt to EBITDA shall not exceed 3.0. For the purposes of this calculation, EBITDA shall be measured on a trailing twelve-month basis from March 31 and total funded debt (excluding trade credit) shall be measured based on the average monthly debt balances for the trailing twelve-month period ended March 31. Provided the Dividend Payment Test is met, Reorganized Parent shall pay 50% multiplied by, if a positive number, actual EBITDA for the respective previous twelve month period ending December 31 less projected EBITDA as detailed in the Debtors' approved Disclosure Statement for that same twelve month period ended December 31 to the holders of New Common Stock, subject to a minimum dividend payment of $500,000.

(f) Class B Put.

New Class B Common Stock shareholders shall have the right to put (the "Class B Put") their shares to Huffy for purchase in cash on June 15, 2011 at a purchase price equal to the percentage of equity owned by New Class B Common Stock shareholders as of March 31, 2011 multiplied by five times the greater of average annual EBITDA for years 2008, 2009 and 2010 less average funded debt (excluding trade credit) minus cash and cash equivalents for that same period for those years calculated on a monthly basis or total EBITDA during the trailing 12 month period ended December 31, 2010 less average funded debt (excluding trade credit) minus cash and cash equivalents for that same period on a monthly basis, such calculation in each such case shall be calculated on a consolidated basis for the Reorganized Parent and its direct and indirect subsidiaries.

Huffy will have the obligation to pay the Class B Put in cash if: (1) Reorganized Parent and its direct and indirect subsidiaries have cash, liquidity, or ability to raise debt sufficient to fund the Class B Put; and (2) after payment of the Class B Put Reorganized Parent and its direct and indirect subsidiaries shall have less than a 3X ratio of net funded debt to EBITDA measured for the 12 month period ended December 31, 2010; and (3) after taking such actions Reorganized

Parent and its direct and indirect subsidiaries would have at least $10 million in cash and/or availability. If these tests are not met, Huffy may satisfy the Class B Put in a Put Note(s). The Put Note(s) shall bear an annual interest rate of 10%. Four equal semi-annual installment payments will be made on June 30, 2011, December 31, 2011, June 30, 2012, and December 31, 2012.

### 8. Management Incentive Plan

The Management Incentive Plan will become effective on the Effective Date or as soon thereafter as is reasonably practicable and shall be in substantially in the form of the version of same included in the Plan Supplement (which shall be filed ten (10) days before the Balloting Deadline), which shall be in form and substance acceptable to the Sinosure Group and the Creditors' Committee. Entry of the Confirmation Order shall constitute approval of the Management Incentive Plan.

## G. Implementation and Effect of Confirmation of the Plan

Upon confirmation of the Plan, in accordance with the Confirmation Order, the Debtors or Reorganized Debtors, the Trustees, or the Sinosure Group Agent, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

### 1. Effectiveness of Securities, Instruments and Agreements

On the Effective Date, all documents described in the Plan Supplement and all other agreements entered into or documents issued pursuant to the Plan, including, without limitation, the New Loan Facility, the Intercreditor Agreement, the New Common Stock, the Distribution Note A Facility and Security Agreement, the Distribution Note B Facility and Security Agreement, the New Trade Credit Facility and Security Agreement, the Recovery Trust Agreement, the Unsecured Claims Trust Agreement, the Management Agreements, the Management Incentive Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

### 2. Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors or members of one or more of the Debtors or Reorganized Debtors or their successors in interest under the Plan, including, without limitation, the authorization to issue or cause to be issued the New Common Stock and documents relating thereto, the New Loan Facility and documents relating thereto, the Distribution Note A Facility and Security Agreement, the Distribution Note B Facility and Security Agreement, and the New Trade Credit Facility and Security Agreement and documents relating thereto, the Recovery Trust Agreement, the Sinosure Group Trust Agreement, the Unsecured Claims Trust Agreement, and documents relating thereto, the adoption of the Amended Reorganized Parent Articles of

Incorporation, the Amended Reorganized Parent Bylaws, the Amended Reorganized Subsidiaries Certificates of Incorporation and the Amended Reorganized Subsidiaries Bylaws, corporate mergers or dissolutions effectuated pursuant to the Plan, and the election or appointment, as the case may be, of directors and officers of the Debtors pursuant to the Plan, shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to Chapter 1701 of the Ohio Revised Code and other applicable general corporation law of the jurisdictions in which the Reorganized Subsidiaries are incorporated, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors. On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended certificates of incorporation with the secretary of state of the state in which each Reorganized Debtor is incorporated, in accordance with the applicable general corporation law of such states.

**3. Approval of Agreements**

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated by the Plan. Entry of the Confirmation Order shall constitute approval of the Plan Documents and all such transactions, subject to the occurrence of the Effective Date.

**4. Cancellation of Existing Securities and Agreements**

On the Effective Date, all authorized and or issued Old Parent Equity Interests, including any warrants and stock options shall be canceled and extinguished, and the holders thereof shall not retain any rights thereunder and such instruments shall evidence no rights.

**5. No Change of Control**

Any acceleration, vesting or similar change of control rights of any Person under employment, benefit or other arrangements with the Debtors that could otherwise be triggered by the entry of the Confirmation Order or the consummation of the Plan or any of the transactions contemplated thereby shall be deemed to be waived and of no force or effect.

**6. Restructuring Transactions**

On and after the Effective Date, the applicable Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Reorganized Subsidiaries under the laws of jurisdictions other than the laws of which the applicable Reorganized Subsidiaries are presently incorporated, in each case only to the extent such actions are not inconsistent with the Plan and subject to the terms, conditions and restrictions set forth in the Bylaws of, or otherwise applicable to, each of the Reorganized Debtors and subject to the approval of the New Board of Directors and other applicable corporate and legal approvals. Such restructuring may include one or more mergers, consolidations, recapitalizations, restructures, acquisitions or dispositions of assets, liquidations, dissolutions or other extraordinary transactions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate (collectively, the "Restructuring Transactions"). The actions to effect the Restructuring Transactions may include:

(i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, recapitalizations, restructuring, acquisitions or disposition of assets, liquidation, dissolution or other extraordinary transactions containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting, or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting, or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations. Notwithstanding anything herein to the contrary, any Restructuring Transaction as contemplated hereunder shall be subject to the restrictions and/or the provisions in Section 8.4 of the Plan.

**7. Termination of DIP Agreements**

On the Effective Date, upon the indefeasible payment and satisfaction in full of all Obligations (as defined in the DIP Financing Order) incurred under or pursuant to the DIP Credit Facility and the DIP Financing Order in accordance with the terms and conditions thereof, as provided in Section 2.1, the DIP Credit Facility shall be deemed terminated. Upon indefeasible payment and satisfaction in full of all such Obligations pursuant to the DIP Credit Facility and the DIP Financing Order, all Liens and security interests granted in the Collateral to secure such obligations shall be deemed terminated and of no further force or effect.

**8. New Common Stock**

The New Common Stock shall have such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable non-bankruptcy law or in the Amended Reorganized Parent Articles of Incorporation or Amended Reorganized Parent Bylaws and as set forth in Sections 8.4, 8.8, 8.9, and 8.10 of the Plan

### 9. Operations of the Debtors in Possession Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as debtors in possession in the ordinary course consistent with past practice, subject to the supervision of the Bankruptcy Court and pursuant to the Bankruptcy Code and the Bankruptcy Rules during the period from the Confirmation Date through and until the Effective Date (the "Pre-Effective Date Period"), and any obligation incurred by the Debtors in Possession during such period shall constitute an Administrative Expense Claim, provided that no such operations shall be inconsistent with the Plan. At all times during the Pre-Effective Date Period, all loans and other credit and financial accommodations made by DIP Loan Agent and DIP Lenders to the Debtors in accordance with the DIP Credit Facility and the DIP Financing Order, as well as all Obligations incurred by Debtors in connection therewith, shall constitute Administrative Expense Claims and be afforded all of the rights, liens, claims, protections and remedies under the DIP Credit Facility and DIP Financing Order.

### 10. Administration After the Effective Date

After the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of their property, free of any restrictions of the Bankruptcy Code and Bankruptcy Rules, subject to the terms of the Plan.

### 11. Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through the Effective Date.

### 12. Revesting of Assets

The property of the Estate of each of the Debtors, including, without limitation, the Reorganized Debtors Retained Causes of Action listed on Schedule 9.15(a) of the Plan (other than the Recovery Trust Assets), shall revest in the respective Reorganized Debtor on the Effective Date.

As of the Effective Date, pursuant to section 1141 of the Bankruptcy Code, all property of the Debtors and Reorganized Debtors shall be free and clear of all Liens, Claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan or the Confirmation Order.

### 13. Causes of Action

(a) Reorganized Debtors' Retained Causes of Action

As of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any and all Reorganized Debtors' Retained Causes of Action shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such Reorganized Debtors' Retained Causes of Action for the benefit of the Reorganized Debtors;

provided however, that the Debtors and the Reorganized Debtors shall be deemed to have waived and released, and hereby waive, any such causes of action, liabilities, obligations, rights to legal or equitable remedies, suits, debts, sums of money, damages, judgments, claims and demands whatsoever whether known or unknown, matured or unmatured, disputed or undisputed, and whether asserted or assertable directly or derivatively in law, equity or otherwise arising, (including, without limitation, preference or other avoidance or recovery actions) against (i) each member of the Sinosure Group and its Affiliates (the "Sinosure Group Waiver"), (ii) the funding of the Directors and Officers Trust Account (the "Trust Account Waiver") and (iii) each member of the BPOU CR Group (the "BPOU CR Waiver), to the extent that the BPOU CR Group Settlement Agreement has been approved by a Final Order of the Bankruptcy Court. The waiver granted to the Sinosure Group is partially in consideration of the favorable trade credit terms being afforded to the Reorganized Debtors pursuant to the Supply Principles. The Creditors' Committee has conducted a preference analysis and has determined that the release to the Sinosure Group is fair and equitable when analyzed in conjunction with the terms of the Plan as a whole. The Trust Account Waiver in no way releases any officer or director from any avoidance actions related to pre-petition actions. Further, the BPOU CR Waiver was given as part of the consideration for the BPOU CR Group Settlement Agreement, which is subject to review by parties in interest and approval of the Bankruptcy Court. After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such remaining Reorganized Debtors' Retained Causes of Action without approval of the Bankruptcy Court. Certain of the Reorganized Debtors' Retained Causes of Action are described on Schedule 9.15(a) of the Plan.

(b) Recovery Trust Causes of Action

As of the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, any and all Recovery Trust Causes of Action shall become assets of the Recovery Trust, and the Recovery Trust Trustee shall have the authority to commence and prosecute such Recovery Trust Causes of Action for the benefit of the Recovery Trust; provided however, that the Recovery Trust shall be deemed to have waived any such actions as described above, (including, without limitation, avoidance or recovery actions) against (i) each member of the Sinosure Group and its Affiliates, (ii) the funding of the Directors and Officers Trust Account and (iii) each member of the BPOU CR Group, to the extent that the BPOU CR Group Settlement Agreement has been approved by a Final Order of the Bankruptcy Court.. After the Effective Date, the Recovery Trust Trustee shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such remaining Recovery Trust Causes of Action without approval of the Bankruptcy Court. Certain of the Recovery Trust Retained Causes of Action are described on Schedule 9.15(b) of the Plan.

**14. Discharge of Debtors**

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors and the Debtors in Possession, their Estates, or any of their assets or properties under the Plan. Except as otherwise provided herein, (a) on the Effective Date, all such Claims against and Equity Interests in the Debtors shall be satisfied,

discharged and released in full, and (b) all Persons shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors, or their assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest and whether or not such holder has voted to accept or reject the Plan. Notwithstanding the foregoing, nothing herein shall release, discharge, enjoin or preclude any Claim that has not arisen as of the Effective Date that any governmental unit may have against the Debtors and nothing herein shall release, nullify or enjoin the enforcement of any liability to a governmental unit under environmental statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of the Confirmation Order or any liability to Debtors' defined benefit plan for violation of Title I of ERISA.

### 15. Injunction Related to Discharge

Except as otherwise expressly provided in the Plan, the Confirmation Order, the DIP Financing Order, or a separate order of the Bankruptcy Court, all Persons who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors on account of any such Claim or Equity Interest, (c) creating, perfecting or enforcing any Lien or asserting control of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest and (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Equity Interest. Such injunctions shall extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.

### 16. Injunction Against Interference with the Plan

Upon the entry of a Confirmation Order with respect to the Plan, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except with respect to (i) actions any such entity may take in connection with the pursuit of appellate rights, and (ii) any actions taken by DIP Loan Agent and/or DIP Lenders in connection with administering the DIP Credit Facility and preserving and protecting their respective rights, liens and claims thereunder.

### 17. New Loan Facility

On the Effective Date, the transactions contemplated by the New Loan Facility shall be consummated and thereupon become effective.

### 18. Distribution Note Facility

On the Effective Date, the transactions contemplated by the Distribution Note Facility shall be consummated and thereupon become effective.

### 19. New Trade Credit Facility

On the Effective Date, the transactions contemplated by the New Trade Credit Facility shall be consummated and thereupon become effective.

### 20. Supply Principles

On the Effective Date, the Supply Principles shall have been implemented.

### 21. Termination of Pension Plan

On or before the Effective Date, the Bankruptcy Court shall have entered a Final Order terminating the Pension Plan and the plan administrator of the Pension Plan and the PBGC shall have executed an agreement terminating the Pension Plan. The proposed date of plan termination for the Pension Plan is August 31, 2005. A hearing on the motion is scheduled for August 16, 2005. If the motion is granted, the court should determine that unless the Pension Plan is terminated, each of the Debtors will be unable to pay its debts when due and each of the Debtors will be unable to continue in business outside the Chapter 11 process. The court's determination is one element in the "reorganization test" for distress terminations, as set forth in 29 U.S.C. § 1341(c)(2)(B)(ii). Pursuant to 29 U.S.C. § 1341(c), the PBGC must determine that the plan sponsor and each "controlled group member" (as defined in 29 U.S.C. § 1301(a)(14)) satisfies each element of at least one of the four "distress tests" set forth in 29 U.S.C. § 1341(c)(2)(B), and approve the distress termination of the Pension Plan.

## H. Confirmation and Effectiveness of the Plan

### 1. Conditions Precedent to Confirmation

The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 10.4 of the Plan:

(a) The proposed Confirmation Order shall (i) be in form and substance reasonably acceptable to the Debtors, the Sinosure Group, the Creditors’ Committee and the DIP Loan Agent, to the extent the Confirmation Order affects the DIP Credit Facility, and (ii) include, among other things, a finding of fact that the Debtors and the Reorganized Debtors, (and the Sinosure Group and the Creditors' Committee, to the extent they are determined to have participated in the solicitation of the Plan), and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are therefore not liable for the violation of any applicable law, rule or regulation governing such actions;

(b) All exhibits to the Plan and those to be contained in the Plan Supplement, shall be in form and substance reasonably acceptable to the Debtors, Sinosure Group and the Creditors' Committee;

(c) The Debtors shall have received a commitment for the New Loan Facility, subject to customary closing conditions, including, without limitation, the occurrence of the Effective Date, from a financial institution, and in form and substance, reasonably acceptable to the Debtors, Sinosure Group and the Creditors' Committee;

(d) A Final Order terminating the Pension Plan shall have been entered by the Bankruptcy Court; and

(e) An agreement terminating the Pension Plan shall have been executed by the plan administrator of the Pension Plan and the PBGC.

### 2. Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to Section 10.4 of the Plan:

(a) The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date; and shall be in form and substance acceptable to the Creditors' Committee and the Sinosure Group;

(b) The CCAA Ratification Order shall have been issued and entered and shall be a Final Order; and shall be in form and substance acceptable to the Creditors' Committee and the Sinosure Group;

(c) The statutory fees owing to the United States Trustee shall have been paid in full;

(d) All Plan Documents and exhibits to the Plan, including those to be contained in the Plan Supplement, shall be in form and substance satisfactory to the Debtors, the Sinosure Group and the Creditors' Committee;

(e) Each of the Amended Reorganized Parent Articles of Incorporation, the Amended Reorganized Subsidiaries Certificates of Incorporation, the Amended Reorganized Parent Bylaws, and the Amended Reorganized Subsidiaries Bylaws, shall have been filed, effected, or executed, as required, in form and substance satisfactory to the Debtors, the Sinosure Group and the Creditors' Committee;

(f) All other actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtors and remain in full force and effect or, if waivable, waived by the Person or Persons entitled to the benefit thereof;

(g) (i) All amounts owed under the DIP Credit Facility shall have been indefeasibly paid in full in Cash by wire transfer of immediately available funds and the commitments, Liens and security interests granted thereunder terminated in accordance with the terms of the DIP Financing Order and DIP Credit Facility; and (ii) any contingent liabilities for charges in excess of the face amount of any DIP Letters of Credit issued under the DIP Credit Facility shall have been fully collateralized.

(h) The New Loan Facility shall have been entered into by all parties thereto and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof such that the Reorganized Debtors shall have credit available to them to provide financing sufficient to meet their Cash obligations under the Plan and have sufficient borrowing capacity to satisfy their working capital requirements as of and after the Effective Date;

(i) The trustee for the Recovery Trust shall have been selected.

(j) The trustee for the Unsecured Claims Trust shall have been selected.

(k) The total number of registered owners entitled to issuance of New Common Stock on the Effective Date shall be no greater than 250.

(l) The Distribution Note Facility shall have been entered into by all parties thereto;

(m) The New Trade Credit Facility shall have been entered into by all parties thereto; and

(n) The Intercreditor Agreement shall have been entered into by all parties thereto.

**3. Effect of Failure of Conditions**

If each condition to the Effective Date specified in Section 10.2 of the Plan has not been satisfied or duly waived in accordance with Section 10.4 of the Plan within thirty (30) days after the Confirmation Date, then (unless the period for waiver or satisfaction of such conditions has been extended with the consent of the Debtors, the Sinosure Group and the Creditors' Committee), upon the filing of a motion by the Debtors at the request of the Sinosure Group and the Creditors' Committee, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date set forth in Section 10.2 of the Plan is either satisfied or duly waived in accordance with Section 10.4 of the Plan before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 10.3 of the Plan, then, upon the motion of the Debtors (to be filed at the request of the Creditors' Committee and the Sinosure Group) the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to section 1141 of the Bankruptcy Code and the assumptions or rejections of executory contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (1) constitute a

waiver or release of any Causes of Action by, or Claims against, the Debtors or (2) prejudice in any manner the rights of the Debtors.

### 4. Waiver of Conditions

With the exception of the condition precedent set forth in Section 10.2(g) of the Plan which may only be waived with the prior written consent of DIP Loan Agent, the Debtors may, with the prior written consent of the Sinosure Group and the Creditors' Committee, waive one or more of the conditions precedent to confirmation of the Plan set forth in Section 10.1 or conditions precedent to the effectiveness of the Plan set forth in Section 10.2.

## I. Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

### 1. Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: (a) to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom; (b) to determine any and all adversary proceedings, motions, applications and contested matters, and other litigated matters pending on the Confirmation Date; (c) to hear and determine all actions commenced or to be commenced by the Debtors or any other party in interest with standing to do so, pursuant to sections 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, collection matters related thereto, and settlements thereof; (d) to hear and determine any objections to or the allowance, classification, priority, compromise, estimation or payment of any Administrative Expense Claims, Claims or Equity Interests; (e) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (f) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (g) to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (h) to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan, the Plan Documents, or any order of the Bankruptcy Court, including, without limitation, the Confirmation Order; (i) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Bankruptcy Code; (j) to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, including but not limited to Section 5.17 of the Plan; (k) to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; (l) to determine any Claim of or any liability to a governmental unit that may be asserted as a result of the transactions contemplated herein; (m) to enforce the Plan, the Confirmation Order and any other order, judgment, injunction or ruling entered or made in the Chapter 11 Cases, including, without limitation, the discharge, injunction, exculpation and releases provided for in the Plan; (n) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to

maintain the integrity of the Plan following consummation; (o) to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, but not limited to, an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods through the Effective Date, and in the event the Restructuring Transactions described in Section 9.7 of the Plan are implemented, for all taxable periods of Huffy through the liquidation and dissolution of such entity); (p) to hear any other matter not inconsistent with the Bankruptcy Code; and (q) to enter a final decree closing the Chapter 11 Cases. Notwithstanding the foregoing, nothing herein shall divest or deprive any other court or agency of any jurisdiction it may have over the Reorganized Debtors under applicable environmental laws. All releases granted to the DIP Loan Agent and DIP Loan Lenders under the Plan are not exclusive but are cumulative to the releases previously afforded to the DIP Loan Agent and DIP Lenders under the DIP Credit Facility and DIP Financing Order.

**2. Effectuating Documents and Further Transactions**

Each of the Debtors or Reorganized Debtors, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

**3. Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**4. Authorization to Request Prompt Tax Determinations**

Reorganized Parent is authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors, for all taxable periods through the Effective Date.

**5. Exculpation**

Subject to the occurrence of the Effective Date, neither the Debtors nor the Reorganized Debtors, the Creditors' Committee, the Sinosure Group, the DIP Lenders, the DIP Loan Agent, or any of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, Affiliates and representatives, acting in such capacity (the "Exculpated Parties") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases and the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the

administration of the Plan or the property to be distributed under the Plan, and, with respect to the DIP Lenders, the DIP Loan Agent (and their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, Affiliates and representatives), any act or omission related to the Debtors and any extensions of credit or other financial services or accommodations made or not made to the Debtors prior to the Effective Date; provided, that the foregoing shall not operate as a waiver or release for (i) any express contractual obligation owing by any such Person; (ii) willful misconduct or gross negligence, or (iii) liability under Title I of ERISA with respect to the Pension Plan, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan shall, or shall be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

**6. Releases**

Subject to the occurrence of the Effective Date, on and as of the Effective Date, and in consideration of: (a) the services provided by the present and former directors, officers, employees, Affiliates, agents, financial advisors, attorneys, and representatives of the Debtors to the Debtors who acted in such capacities after the Commencement Date; and (b) the services of the Creditors' Committee, the Sinosure Group, the DIP Lenders, the DIP Loan Agent, and their respective professionals in connection with the Chapter 11 Cases; the Debtors and the Reorganized Debtors shall release unconditionally and forever each present or former director, officer, or employee of the Debtors, who acted in such capacities on or after the Commencement Date, each member of the Creditors' Committee, the Sinosure Group, the DIP Lenders, the DIP Loan Agent, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, Affiliates and representatives from any and all Causes of Action whatsoever but solely with respect to actions taken on or after the Commencement Date; provided, however, that the foregoing shall not operate as a waiver of or release from any Causes of Action arising out of (i) any express contractual obligation owing by any such Person or (ii) the willful misconduct or gross negligence of any such Person or (iii) any liability to Debtors' Pension Plan for violations of Title I of ERISA. For avoidance of doubt, Section 12.5 of the Plan shall not be deemed to release any Person from any Cause of Action whatsoever with respect to actions taken prior to the Commencement Date. All releases granted to the DIP Loan Agent and DIP Loan Lenders under this Plan are not exclusive but are cumulative to the releases previously afforded to the DIP Loan Agent and DIP Lenders under the DIP Credit Facility and DIP Financing Order.

**7. Injunction Relating to Exculpation and Release**

The Confirmation Order will contain an injunction, effective as of and on the Effective Date, permanently enjoining the commencement or prosecution by the Debtors, the Reorganized Debtors and any other Person, whether derivatively or otherwise, of any Cause of Action exculpated, released or discharged pursuant to the Plan against the released and Exculpated Parties.

**8. Termination of Creditors' Committee**

The appointment of the Creditors' Committee and its professionals shall terminate on the Effective Date.

**9. Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professional persons thereafter incurred by the Reorganized Debtors.

**10. Payment of Statutory Fees**

The Reorganized Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). After confirmation, the Reorganized Debtors shall file with the Bankruptcy Court and serve on the U.S. Trustee a quarterly financial report regarding all income and disbursements, including all plan payments, for each quarter (or portion thereof) the cases remain open.

**11. Amendment or Modification of Plan**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors, with the consent of the Creditors' Committee, the Sinosure Group and the DIP Loan Agent, which consents shall not be unreasonably withheld, at any time prior to the Confirmation Date in conformity with section 1127(a) of the Bankruptcy Code, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122, 1123 and 1129 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified by the Debtors, with the consent of the Creditors' Committee, the Sinosure Group and the DIP Loan Agent, which consents shall not be unreasonably withheld, at any time after the Confirmation Date in conformity with section 1127(b) of the Bankruptcy Code, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that any such adjustments or modifications are consented to by the Creditors' Committee and the Sinosure Group.

**12. Severability**

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. If the Bankruptcy Court makes any such determination that any provision of the Plan is invalid, void or unenforceable, and such determination has a materially adverse effect on the holders of General Unsecured Claims or the Sinosure Group, the Plan, as modified by the Debtors or the Bankruptcy Court, shall be deemed withdrawn upon the filing of a notice from either the Creditors' Committee or the Sinosure Group, as applicable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13. Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person, an admission against interests of the Debtors, the Creditors' Committee and the Sinosure Group, nor shall it prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

**14. Binding Effect Notices**

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

**15. Notices**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors, to:

Huffy Corporation
225 Byers Road
Miamisburg, OH 45342
Attn: Nancy A. Michaud, Esq., General Counsel
Telephone: (937) 865-2800
Facsimile: (937) 865-5484

with copies to:

Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Attn: Kim Martin Lewis, Esq.
Attn: Donald W. Mallory, Esq.
Telephone: (513) 977-8200
Facsimile: (513) 977-8141

if to the Sinosure Group to:

China Export Credit Insurance Corporation
Rongjin Building
No. 5 Fuchengmen North Street
Xicheng District
Beijing 100037, China
Attn: Zhidong Liang
Attn: Xiaowei Chen
Telephone: +(8610) 6835-9192
Facsimile: +(8610) 8838-9773
Email: 'chenxw@sinosure.com.cn'

with a copy to:

Coudert Brothers LLP
1114 Avenue of the Americas
New York, New York 10036
Attn: Barry Metzger, Esq.
Attn: Edward H. Tillinghast III, Esq.
Telephone: (212) 626-4400
Facsimile: (212) 626-4120

if to Wachovia, to:

Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY 10169
Attn: Daniel F. Fiorillo
Telephone: (202) 661-9100
Facsimile: (202) 682-6104

if to Creditors' Committee, to:

McDonald Hopkins Co., LPA
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114
Attn: Sean Malloy, Esq.
Telephone: (216) 348-5400
Facsimile: (216) 348-5474

**16. Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan or any agreement entered into pursuant to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Ohio, without giving effect to the principles of conflicts of law of such jurisdiction.

**17. Withholding and Reporting Requirements**

In connection with the consummation of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

**18. Plan Supplement**

In addition to Schedule 6.1(e) (cure amounts) and Schedules 9.15(a) and 9.15(b) (Causes of Action), the forms of the Amended Reorganized Parent Articles of Incorporation, the Amended Reorganized Subsidiaries Certificates of Incorporation, Amended Reorganized Parent Bylaws, the Amended Reorganized Subsidiaries Bylaws, the Management Agreements, the Management Incentive Plan, the Management Indemnification Agreements, the Exit Financing Commitment Letter, the Supply Principles, the Unsecured Claims Trust Documents, the Recovery Trust Documents, the Designation of Trustee for all trusts, the Distribution Notes A, the Distribution Note B, the Term Sheet for such notes, and the Intercreditor Agreement shall be contained in the Plan Supplement, filed with the Clerk of the Bankruptcy Court and served upon the Office of the United States Trustee, the Creditors' Committee, Sinosure Group and the DIP Loan Agent, at least ten (10) days prior to the Balloting Deadline. Upon filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the

Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement by written request to Huffy at the address provided in Section 12.13 of the Plan.

**19. Section 1125(e) of the Bankruptcy Code**

As of the Confirmation Date, the Debtors, and to the extent deemed to have participated in the solicitation of the Plan, the Creditors' Committee and the Sinosure Group, shall be deemed to have solicited acceptances hereof in good faith and in compliance with the applicable provisions of the Bankruptcy Code. As of the Confirmation Date, the Creditors' Committee, and the Sinosure Group and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, Affiliates and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the new securities hereunder, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections hereof or other offer and issuance of new securities hereunder.

**20. Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**21. Bar Date for Administrative Expense Claims.**

The Confirmation Order will establish an Administrative Expense Claims Bar Date for filing Administrative Claims (except for the (i) Administrative Expense Claims of Professionals, (ii) obligations incurred as ordinary course business expenses and (iii) obligations under the KERP); such date shall be thirty (30) days after the Effective Date. Such Administrative Claims must be filed by this date with The Trumbull Group and a copy served on the Debtors. Holders of Administrative Expense Claims not paid prior to the Effective Date shall submit proofs of Claim on or before such Administrative Expense Claims Bar Date or forever be barred from doing so. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 2030(c) and 2002(f) will set forth such date and constitute notice of this Administrative Expense Claims Bar Date. The Debtors and Reorganized Parent shall have ninety (90) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Expense Claims Bar Date to review and object to such Administrative Expense Claims (the "Administrative Claim Objections Deadline").

**22. No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth herein until the Effective Date at which time the Plan shall be binding on the Debtors, all creditors and all parties-in-interest.

**23. Inconsistency**

In the event of any inconsistency between the Plan and the Disclosure Statement, any Exhibit to the Plan or the Disclosure Statement or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern. In the event of any inconsistency between the Plan and any Plan Document or the New Loan Facility, the Plan Document or the New Loan Facility, as applicable, shall govern (unless such inconsistency is the result of any amendment or modification not otherwise permitted or authorized by the Plan). In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**24. Waiver of Bankruptcy Rule 3020(e) and 7062**

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rules 3020(e) and 7062 shall not apply to the Confirmation Order; and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**25. Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**26. Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated as to each Subsidiary under sections 1101 and 1127(b) of the Bankruptcy Code. Huffy shall file a motion with the Bankruptcy Court and seek a finding of substantial consummation under sections 1101 and 1127(b) of the Bankruptcy Code at such time as Huffy determines that same has occurred.

**27. Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Cases under section 1112(b)(7) of the Bankruptcy Code after entry of the Confirmation Order if there is a default in performing the conditions to effectiveness of the Plan. If the Bankruptcy Court orders the Chapter 11 Cases converted to Chapter 7 after the entry of the Confirmation Order, the Plan provides that property of the Debtors' estates that have not been disbursed pursuant to the provisions herein will revest in the Chapter 7 estate and that the automatic stay will be reimposed upon the revested property to the extent that relief from the stay was not previously authorized by the Bankruptcy Court during the pendency of the Chapter 11 Cases. The Confirmation Order may also be revoked under certain limited circumstances. The Bankruptcy Court may revoke the Confirmation Order if and only if such order was procured by fraud and if a party in interest brings a motion to revoke such Confirmation Order within 180 days after the entry of the Confirmation Order.

### 28. Final Decree

After Substantial Consummation of the Plan, the Reorganized Debtors may at any time, with notice and an opportunity to object to the Recovery Trustee, file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Cases.

## VI.
## IMPORTANT CONSIDERATIONS AND CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A. The Debtors Have No Duty To Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Court.

### B. No Representations Outside The Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court of the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to Debtors' counsel, Committee counsel, and the Office of the United States Trustee.

### C. Information Presented Is Based On The Debtors' Books And Records, And No Audit Was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, unless otherwise indicated, is unaudited.

**D. All Information Was Provided By Debtors And Was Relied Upon By Professionals**

Dinsmore & Shohl LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Petition Date as bankruptcy counsel. All counsel and other professionals for the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not independently verified the information contained herein, except as required under Bankruptcy Rule 9011.

**E. This Disclosure Statement Was Not Approved By The Securities And Exchange Commission**

Although a copy of this Disclosure Statement was served on the SEC and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement was not registered under the Securities Act or applicable state laws. Neither the SEC nor any state regulatory authority or Canadian Securities Administrator has passed upon the adequacy of this Disclosure Statement or the exhibits or statements contained herein, and any representation to the contrary is unlawful.

**F. No Legal Or Tax Advice Is Provided To You By This Disclosure Statement**

The contents of this Disclosure statement should not be construed as legal, business or tax advice. Each creditor or holder of an equity interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or equity interest.

**G. No Admission Made**

Nothing contained herein shall constitute an admission of any fact or liability by any party (including without limitation, the Debtors) or be deemed evidence of the tax or legal effects of the Plan on the Debtors or on holders of Claims or equity interests.

**H. Risk That Distributions Will Be Less Than Estimated By The Debtors And/Or That Notes Will Be Uncollectible**

The ultimate recoveries under the Plan to holders of Claims (other than those holders who are paid solely in Cash under the Plan) depend upon the realizable value of the New Common Stock. The New Common Stock to be issued pursuant to the Plan is subject to a number of material risks, including, but not limited to, those specified below. The factors specified below assume that the Plan is approved by the Bankruptcy Court and that the Effective Date occurs on or prior to September 30, 2005.

To the extent that Administrative Expense Claims, DIP Lender Claims, Priority Tax Claims, Other Priority Claims, DIP Lender Claims, Convenience Claims, De Minimis Litigation Claims, Other Secured Claims or other Claims entitled to be paid in Cash in full under the Plan materially exceed the Debtors' estimates, this would have a negative impact on the value of the New Common Stock, and thereby adversely impact creditors' recoveries. In addition, if the

Allowed amount of General Unsecured Claims is ultimately higher than the Debtors' estimates set forth herein, the percentage recoveries of the Allowed General Unsecured Claims described herein could be lower, and possibly materially lower.

The Debtors reserve the right to object to the amount or classification of any Claim or Interest. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim or Interest is subject to a successful objection. Any holder of such Claim or Interest may not receive the estimated Distributions set forth herein.

A further risk to the ultimate recoveries under the Plan to holders of Claims (other than those holders who are paid solely in Cash under the Plan) is that Distribution Notes A and Distribution Note B may be uncollectible. While the Reorganized Debtors anticipate their ability to meet their requirements under the terms of the respective notes, there can be no assurance that the notes will be paid on their respective maturity dates. Likewise, there can be no assurance that the Reorganized Debtors will be able to pay the interest accruing on Distribution Notes A and Distribution Note B.

Further, in the event the Reorganized Debtors issue notes to satisfy the Class B Common Stock Put, there can be no assurance that such notes will be paid on their maturity date or that the interest accumulating thereon will be collectible.

## I. Reorganized Debtors May Not Have Sufficient Resources To Satisfy The New Class B Common Stock "Put" In Cash

New Class B Common Stockholder have the Class B Put right to "put" their shares to the Reorganized Debtors for purchase in cash on March 31, 2011 (the "Put Date"). The Reorganized Debtors' obligation to pay the Class B Put in cash is subject to certain financial conditions as set forth in detail in the Plan. In the event that the Reorganized Debtors' financial condition on the Put Date fails to satisfy the financial requirements, the Reorganized Debtors may satisfy the Class B Put with notes which shall bear interest at a rate of 10% and are payable in four equal installments. Further, there can be no assurance that any notes issued to satisfy the Class B Put will be collectible as to principal and/or interest.

## J. Additional Risks Related To The New Common Stock

### 1. No Anticipated Payment Of Dividends

Pursuant to Section 8.9 of the Plan, dividends may be payable on the New Common Stock. However, payment of the dividends is subject to the requirement that the Reorganized Debtors' financial condition satisfy the requirements of the Dividend Payment Test set forth in the Plan. In addition, the covenants in certain debt instruments to which the Reorganized Debtors will be a party may limit the ability of the Reorganized Parent to pay dividends. While the possibility to pay dividends exists, the Debtors' financial projections attached hereto indicate that a payment of dividends will not be possible.

#### 2. No Assurance That A Public Market For The New Common Stock Will Develop

The Debtors have analyzed the costs and benefits associated with becoming a reporting company under the Securities Act of 1934 and has determined that the costs would be excessive and would not provide the Debtors or other parties in interest with any benefits that cannot be realized through other means. The New Common Stock will not be registered under the Securities Act or under any other securities laws. The Debtors do not intend to apply for registration of the New Common Stock. Additionally, the Debtors do not intend to apply for listing of the New Common Stock on any national securities exchange or for quotation on any automated quotation system. Accordingly, in the absence of such registration, the New Common Stock may be offered or sold only pursuant to an exemption from the registration requirements of the Securities Act and similar provisions of applicable state securities laws or pursuant to an effective registration statement. Further, shares of New Common Stock will be subject to certain potential resale restrictions (see Section X "Certain Security Law Considerations"). As a result, there will not be an established market for the New Common Stock and one is not likely to develop. Therefore, it may be difficult to quickly sell or otherwise dispose of the New Common Stock.

### K. Risk That Recovery Trust Causes Of Action And Retained Causes Of Action Will Not Lead To Recovery

Pursuant to the terms of the Plan, the Recovery Trust Causes of Action have been transferred to the Recovery Trust as a potential source of asset recovery. Further, the Debtors have retained the Retained Causes of Action as a potential source of asset recovery. In both cases, due to inherent litigation risks, there can be no assurances that the Recovery Trust Causes of Action or the Retained Causes of Action will generate any recovery.

### L. Industry Conditions And Financial Condition Of Reorganized Debtors

#### 1. Operating Losses

The Debtors incurred net losses of approximately $8.5 million in 2001, $1.4 million in 2002, $7.5 million in 2003 and over $100 million in 2004. The Debtors are projected to achieve operating income (prior to restructuring and non-reoccurring charges) beginning in 2005; however, turnaround in financial results cannot be assured and the Debtors may continue to incur losses in the future, which may limit their ability to execute their business strategy, satisfy their debt obligations and meet their other financial obligations.

#### 2. Indebtedness

The degree to which the Reorganized Debtors are leveraged could have important consequences to holders of the New Common Stock, including the following:

(i) the Reorganized Debtors' ability to obtain additional financing in the future for working capital, capital expenditures, general corporate purposes or other purposes may be impaired or such financing may not be available on favorable terms;

(ii) a substantial portion of the Reorganized Debtors' cash flow from operations may be dedicated to the payment of principal and interest on indebtedness, thereby reducing the funds available to them for their operations;

(iii) without an improvement in the Reorganized Debtors' net operating cash flows, the Reorganized Debtors may experience some difficulty in meeting their debt service requirements as they become due and force the Reorganized Debtors to modify their operations;

(iv) the Reorganized Debtors may be restricted in their ability to utilize asset sales as a means to create liquidity as, with certain exceptions, the proceeds of asset sales may be required to be utilized for the re-payment of debt under the New Loan Facility;

(v) the Reorganized Debtors may be more highly leveraged than certain of their competitors, which may place them at a competitive disadvantage; and

(vi) the Reorganized Debtors may be more vulnerable to a further downturn in general economic conditions or their business.

Even if the Plan is consummated, the Reorganized Debtors' business may not be able to generate sufficient cash flow from operations in the future to service their debt, including principal and interest payments on the New Loan Facility, make necessary capital expenditures or meet other cash needs. If the Reorganized Debtors are unable to service their indebtedness or to obtain additional financing, as needed, it would have a material adverse effect on their business and financial condition.

**3. Business Factors And Competitive Conditions**

(a) General Economic Conditions

In their financial projections, the Debtors assume a steady economic condition of the United States economy over the next several years. Economic conditions are subject to many factors outside of the Debtors' control, including interest rates, exchange rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors. There is no guarantee that economic conditions will remain steady in the future.

(b) Business Factors

The Debtors believe that they will succeed in implementing and executing their operational restructuring for the benefit of all constituencies. However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved. In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings. Because the Claims of substantially all creditors will be converted into equity in Reorganized Debtors under the Plan, in the event of further restructuring

or insolvency proceedings of Reorganized Debtors, the equity interests of such persons could be substantially diluted or canceled.

(c) Competitive Conditions

In addition to uncertain economic and business conditions, Reorganized Debtors will likely continue to face pressures and other third party actions, including pressures from pricing and other promotional activities of competitors as well as new competition. Reorganized Debtors' anticipated operating performance will be impacted by these and other unpredictable activities by competitors.

(d) Liquidity and Capital Resources

Under the DIP Credit Facility, Huffy can borrow up to $50 million, subject to a computation of collateral availability based upon percentages of eligible accounts receivable and inventory. As of July 15, 2005, Huffy had excess availability of $0.9 million under the DIP Credit Facility. While the Plan assumes significant additional liquidity from supplier trade credit and the New Loan Facility, there can be no assurance that such additional liquidity will be realized. Further, there can be no assurance that the existing DIP Credit Facility will provide sufficient liquidity to operate the business through the Plan Effective Date.

(e) Concentration of Sales

Huffy has two customers that individually represent in excess of 10% of total estimated 2005 sales and in aggregate represent over 50% of total estimated 2005 sales. There can be no assurance that Huffy will continue to maintain those customers at the current sales levels or at the current profitability levels.

Huffy is the licensee of the right to distribute a product that represents in excess of 10% of total estimated 2005 sales. Such license is subject to periodic renewal and there can be no assurance that Huffy will continue to have the right to license this product.

(f) Other Factors

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtor's business. Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

**4. Access To Financing And Trade Terms**

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage of or increased cost of such financing and trade vendor support. The Debtors' postpetition operations have been financed from supplier trade terms, operating cash flows and borrowings pursuant to the DIP Credit Facility. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing

will be met by projected operating cash flow, the New Loan Facility and trade terms supplied by vendors. However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors. The Debtors believe that it is important to their going-forward business plan that their performance meet projected results in order to ensure continued support from vendors and factors. Further, while the Debtors believe that there are sufficient incentives to the Sinosure Group to provide significant trade terms to the Debtors as set forth in the Supply Principles, the Sinosure Group is under no legal obligation to do so and may cease providing trade terms at any time.

**5. Limited Net Operating Loss Carry-Forwards**

The Debtors currently have significant net operating loss tax carry-forwards. As a consequence of a successful consummation of the Plan, the Debtors will utilize all or substantially all of their net operating loss tax carry-forwards to offset cancellation of indebtedness income. In addition, the Debtors will undergo a stock ownership change, and therefore the use of any remaining net operating loss tax carry-forwards to offset any income generated in years following the year of the Restructuring may be limited. Although it is uncertain whether losses will be limited, it is certain that the contemplated emergence transactions will result in an ownership change. See Article X., entitled “Certain Federal Income Tax Consequences of Plan.”

**6. Key Personnel**

The success of the Debtors depends in large part upon the abilities and continued service of the Debtors’ executive officers and other key employees. There can be no assurance that the Reorganized Debtors will be able to retain the services of such officers and employees, including substantially all of their salaried work force. The Reorganized Debtors’ failure to retain the services of other key personnel could have a material adverse effect. In connection with the consummation of the Plan, certain key executives identified by Sinosure Group will execute an employment agreements with the Reorganized Debtors, copies of which will be included in the Plan Supplement and will be in form and substance satisfactory to the Creditors' Committee and the Sinosure Group.

**M. Bankruptcy Risks**

**1. Objections To Classifications**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2. Risk Of Nonconfirmation Of The Plan**

Even if all Voting Classes accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for the confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity holders would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied. See Article VIII., entitled "Confirmation of the Plan."

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article IX. Section A., entitled "Liquidation Under Chapter 7", for a discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims and interests. The Debtors believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time, (ii) the additional administrative expenses involved in the appointment of a trustee, and (iii) the additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

**3. The Plan May Be Confirmed Without The Approval Of All Creditors Through The So-Called "Cramdown" Provisions Of The Bankruptcy Code**

If one or more of the Classes of Claims does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan at the Debtors' request, if all other conditions for Confirmation have been met and at least one Impaired Class of Claims has accepted the Plan (without including the vote of any insider in the Class) and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable.

The votes of holders of Claims and Equity Interests in Class 8 (Subordinated Claims) and Class 10 (Old Parent Equity Interests) are not being solicited because such holders are not entitled to receive distributions under the Plan. Such Classes are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation pursuant to the Plan as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Classes, the Debtors believe that Classes 8 and 10 are being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe that the Plan may be confirmed despite the deemed rejection of Classes 8 and 10.

Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), Class 9 (Subsidiary Equity Interests), Allowed Administrative Claims, Professional Fee and Expense Claims, and Priority Tax Claims are not Impaired under the Plan and thus holders of Claims in such Classes and categories are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote.

### 4. Potential Effect Of Bankruptcy On Certain Relationships

The effect, if any, which the Chapter 11 Cases may have upon the operations of the Reorganized Debtors cannot be accurately predicted or quantified. The Debtors believe the Chapter 11 Cases and consummation of the Plan will have a minimal future effect on relationships with their customers, employees and suppliers. If confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, suppliers and employees, resulting in a material adverse impact on the operations of the Debtors. Moreover, even the expedited Chapter 11 Cases could have a detrimental impact on future sales and patronage due to the possibility that the Chapter 11 Cases may have created a negative image of the Debtors in the eyes of their customers.

### 5. The Effective Date Might Be Delayed Or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order. In that event, no Distributions would be made, and the holders of Claims or Equity Interests would be restored to their previous position as to the moment before Confirmation, and the Debtors' obligations for Claims and the Equity Interests would remain unchanged.

## N. Ability To Refinance Certain Indebtedness

Following the Effective Date of the Plan, the Reorganized Debtors' seasonal working capital borrowings and letters of credit requirements are anticipated to be funded under the New Loan Facility. There can be no assurance that the Reorganized Debtors, upon expiration of the New Loan Facility, will be able to obtain replacement financing to fund future seasonal borrowings and letters of credit, or that such replacement financing, if obtained, would be on terms equally favorable to the Reorganized Debtors.

## O. Significant Holders

Upon the consummation of the Plan, certain holders of Claims, including the Sinosure Group and holders of General Unsecured Claims, will receive distributions of shares of the New Common Stock. Furthermore, as of the Effective Date, the Sinosure Group will individually own one hundred percent (100%) of the issued New Class A Common Stock of Reorganized Parent which is equivalent to thirty percent (30%) of the aggregate New Class A Common Stock and New Class B Common Stock, subject to dilution by New Class C Common Stock to be issued in connection with the Management Incentive Plan and will be entitled to appoint four of the seven members of the board of directors. In addition, the Sinosure Group will have the opportunity to earn through the issuance of Sinosure Performance Shares, up to 51% of the

Reorganized Debtors' New Common Stock, which shall be deemed to be issued for fair and equitable consideration. As such, the Sinosure Group will be in a position to significantly affect the outcome of actions requiring board of directors and/or stockholder approval. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock, including the value of New Class B Common Stock.

Furthermore, all members of the Sinosure Group are non-United States entities and Sinosure itself is a government agency of the People's Republic of China, which means that internal decisions by these entities may be subject to different factual circumstances and considerations than those of United States owners of the New Common Stock. Finally, as most of the Sinosure Group will be providing trade credit to the Reorganized Debtors, the Reorganized Debtors will be doing business with parties who exercise control over the election of a majority of the board of directors of the Reorganized Parent, which may give rise to conflicts of interest.

**P. Litigation Risks**

Other than the claim made by the PBGC in relation to the termination of the Pension Plan, and certain environmental and product liability issues as previously set forth in Article III, Section A(11) hereof, the Debtors do not believe there are any other litigation risks which would significantly or materially impact the Plan other than with respect to the allowance or disallowance of Claims or Equity Interests.

**Q. Restrictive Covenants Contained In The New Loan Facility**

The terms of any of the Reorganized Debtors' future indebtedness may contain, certain covenants that limit the discretion of the Reorganized Debtors' management with respect to certain business, financial and operational matters. In addition, the Reorganized Debtors may be required to comply with certain financial covenants and, under the terms of any future indebtedness, may be required to comply with other financial covenants.

The Reorganized Debtors' ability to comply with any such provisions may be affected by changes in economic or business conditions or other events beyond the Reorganized Debtors' control. A failure to comply with such obligations could result in an event of default, which could result in acceleration of the related debt and the acceleration of debt under other instruments evidencing indebtedness that may contain cross-acceleration or cross-default provisions. If the indebtedness under any loan facility were to be accelerated, the Reorganized Debtors' assets may not be sufficient to repay in full such indebtedness. Also, if the Reorganized Debtors were unable to borrow due to a default or failure to meet certain specified borrowing base prerequisites for borrowing, they could be left without sufficient liquidity to conduct their business.

**R. Projections And Other Forward Looking Statements Are Not Assured, And Actual Results May Vary**

The financial projections included as Exhibit B to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other