assumptions contained therein. The projections were not prepared with a view towards compliance with guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or the rules and regulations of the SEC or any securities law requirements of the provinces and territories of Canada. Furthermore, the projections have not been audited or reviewed by the Debtors' independent accountants. These projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, certain assumptions with respect to the Debtors' competitors, general business and economic conditions and other matters, many of which are beyond the control of the Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors. Although the Debtors believe that the projections are attainable, variations between the actual financial results and those projected may occur and be material.

**S.      Current License Agreements May Not Be Renewed**

The Debtors are a party to certain key license agreements which permit the Debtors to utilize certain key registered trademarks on their products. There can be no assurance that such license agreements will be renewed with the Reorganized Debtors.

**T.      SEC May Not Waive Reporting Requirements**

The projections do not include expenses for the Reorganized Parent to (i) restate its previously-filed audited fiscal year 2003 financial statements and/or to file an amended Annual Report on Form 10-K for the year ended December 31, 2003, or any prior fiscal year or quarterly period(s), and (ii) to file an Annual Report on Form 10-K, including audited financial statements, for 2004 or any subsequent fiscal year or to file Quarterly Reports on Form 10-Q for any fiscal quarters of 2004 or any subsequent fiscal years, as a condition to the Reorganized Parent's ability to file a Form 15 with the SEC terminating its future obligation to file periodic reports with the SEC. There can be no assurance that the SEC will waive such reporting requirements. In the event that SEC does not make such a waiver, there will be significant costs to the Reorganized Parent.

**U.      Tax Considerations**

There are significant tax consequences to holders of Claims and Equity Interests. These are discussed below in the Sections Entitled "Certain Federal U.S. Income Tax Consequences of the Plan" and "Certain Canadian Federal Income Tax Consequences of the Plan." You should consult your tax advisor about your particular circumstances.

**V.      No Waiver Of Right To Object Or To Recover Transfers And Estate Assets**

Unless otherwise indicated in the Plan, a creditor's vote for or against this Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to the creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate asset, regardless of whether any Claims of the Debtors or their respective Estates specifically or generally defined herein.

# VII.
## VALUATION OF REORGANIZED DEBTORS AS OF SEPTEMBER 30, 2005

THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.

(i)      Overview

The Debtors have been advised by Lazard Freres & Co. LLC ("Lazard"), its financial advisor, with respect to the consolidated Enterprise Value (as hereinafter defined) of the Reorganized Debtors on a going-concern basis. Lazard undertook this valuation analysis for the purpose of determining value available for distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such Holders thereunder.

Based in part on information provided by the Debtors, Lazard has concluded solely for purposes of the Plan that the Enterprise Value of the Reorganized Debtors ranges from approximately $54 to $64 million, with a midpoint of approximately $59 million as of an assumed Effective Date of September 30, 2005. Based on an estimated pro forma debt balance of approximately $39 million, Lazard's mid-point estimated Enterprise Value implies a value for the New Huffy Common Stock of $20 million. Assuming for illustrative purposes approximately 1,000,000 shares of New Huffy Common Stock are distributed to the Holders of Allowed Claims pursuant to the Plan, the value of New Huffy Common Stock would be equal to $20.00 per share. The share value does not give effect to the potentially dilutive impact of any shares that may be granted to management of the Reorganized Debtors or the issuance of the Sinosure Performance Shares. These values do not assume any value for potential net operating losses ("NOL's") that may be available to Huffy upon emergence. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ASSUMED DISTRIBUTABLE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 30, 2005, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY EFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE COMPANY HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

With respect to the Financial Projections prepared by the management of the Debtors and included in this Disclosure Statement, Lazard assumed that such Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's Enterprise Value range assumes the Reorganized Debtors will achieve their Financial Projections in all material respects. If the business performs at levels below those set forth in the Financial Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value and equity value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections as described in this Disclosure Statement, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with members of senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Debtors; (e) reviewed publicly available financial data for, and considered the transaction value of, mergers and acquisitions of companies Lazard deemed generally comparable to the operating business of the Debtors; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Lazard did not independently verify management's Financial Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder.

Lazard's analysis addresses the estimated going concern Enterprise Value of the Debtors. It does not address other aspects of the proposed reorganization, the Plan or any other transactions, and it does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Lazard's estimated Enterprise Value of the Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to nor did Lazard express any view as to what the value of the Debtors' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Such estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject

to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of securities.

(ii)    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed with the management of the Debtors the assumptions on which such analyses were based. Lazard's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value. Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values assuming the Reorganized Debtors are a full taxpayer.

(a)    Comparable Company Analysis

Comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, observed Enterprise Values and equity values for selected public companies are commonly expressed as multiples of various measures of earnings, most commonly earnings before interest, taxes, depreciation and amortization ("EBITDA"), earnings before interest and taxes ("EBIT") and net income. In addition, each company's operational performance, operating margins, profitability, leverage and business trends are examined. Based on these analyses, financial multiples and ratios are calculated to measure each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, product mix, distribution channels, supplier base, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining Enterprise Value.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Debtors in one or more of the factors described above: Accell Group, Adams Golf Inc., Amer Group, Callaway Golf Company, Dorel Industries, Inc., Escalade, Inc., Head NV, K2 Inc., Mizuno Corporation and Russell Corporation.

In developing multiples for the Peer Group, Lazard relied primarily on multiples of EBITDA. Lazard calculated EBITDA multiples for the Peer Group by dividing the Enterprise Values of each comparable company by their projected 2005 and 2006 EBITDA, as estimated in current equity and fixed income research. This analysis produced representative EBITDA multiples based on estimated 2005 EBITDA ranging from 6.4x to 14.1x, with a mean of 8.7x and representative EBITDA multiples based on estimated 2006 EBITDA ranging from 6.0x to 9.9x with a mean of 7.5x.

Having calculated these statistics, Lazard then applied a range of multiples that Lazard deemed appropriate to the Debtors' forecasted Pro Forma 2005 EBITDA and Pro Forma 2006 EBITDA to determine a range of Enterprise Values. To calculate Pro Forma EBITDA, Lazard adjusted the Debtors' projected 2005 and 2006 EBITDA to exclude forecasted non-recurring expenses/charges, restructuring fees, losses from discontinued or inactive operations, pension and other deferred compensation payments and KERP payments.

(b)     Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining public merger and acquisition transactions. An analysis of a company's transaction value as a multiple of various operating statistics provides industry-wide valuation multiples for companies in similar lines of business to the Debtors. Transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Lazard specifically focused on prices paid as a multiple of EBITDA in determining a range of values for the Debtors. The derived multiples are then applied to the Debtors' key operating statistics to determine the Enterprise Value or value to a potential strategic buyer.

Unlike the comparable public company analysis, the valuation in this methodology reflects a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that are manifest in a precedent transaction analysis include the following: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in a case of a competitive bidding contest); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable public company analysis, because no acquisition used in any analysis is identical to a potential target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Because the

precedent transaction analysis explains other aspects of value besides the inherent value of a company, there are limitations as to its use in the valuation of the Debtors.

In deriving a range of Enterprise Values for Huffy under this methodology, Lazard calculated multiples of total transaction value ("Transaction Value") to the latest twelve months ("LTM") EBITDA of the acquired companies and applied these multiples to Huffy's Pro Forma 2005 EBITDA. Lazard used the Company's 2005 pro forma EBITDA estimates as a proxy for latest twelve months results given the assumed September 30, 2005 valuation date and the fact that results for the fourth quarter of 2004 were impacted by Huffy's liquidity issues and bankruptcy filing and are not generally representative of current operating conditions.

Lazard evaluated various merger and acquisition transactions that have occurred in the consumer and sporting goods industry within the last three years. Lazard calculated multiples of Transaction Value to LTM EBITDA of the target companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction, by disclosed LTM EBITDA. This analysis produced multiples of Transaction Value to LTM EBITDA ranging from 5.6x to 13.0x, with a mean of approximately 7.7x. Lazard then applied a range of multiples that it deemed appropriate to the Debtors' 2005 Pro Forma EBITDA estimates to determine a range of Enterprise Values.

(c)     Discounted Cash Flow Analysis

The Discounted Cash Flow ("DCF") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm (or Enterprise Value) is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on its business plan plus an estimate for the value of the firm beyond the period of 2005 to 2010 (the "Projection Period") known as the terminal value. Lazard calculated a range of terminal values under two approaches. The terminal value range was first derived by applying a range of multiples to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate. Lazard used an EBITDA multiple range of 5.5x to 6.5x to calculate the terminal value range. Lazard also derived a range of terminal values by applying an assumed growth rate to the Reorganized Debtors' projected cash flow in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate. Lazard assumed growth rates ranging from 1.0% to 3.0% under this approach.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a range of debt to capital of 20% to 40%. Lazard calculated the cost of equity based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard considered the debt financing costs for comparable companies with leverage similar

to the target capital structure.  Based on this analysis, Lazard derived Discount Rates ranging from 13.0% to 15.0%.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized management's Financial Projections for the period beginning October 1, 2005 and ending December 31, 2010 to derive unlevered after-tax free cash flows.  Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures.  For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers.  These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD.  THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## VIII.
## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

### A.      The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed.  The Confirmation Hearing in respect of the Plan has been scheduled for _____, 2005 at ___ p.m. (Eastern Daylight Time), before the Honorable Lawrence S. Walter, United States Bankruptcy Judge, at the United States Bankruptcy Court, Southern District of Ohio, Western Division, United States Courthouse, 120 West Third Street, Dayton, Ohio, 45402.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number and type of shares of Equity Interest held by the objector.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before _____, 2005 at ____ p.m. (Eastern Daylight Time) by  (i) Dinsmore & Shohl LLP, 255 E. 5th Street, Suite 1900, Cincinnati, Ohio 45202,

attention: Kim Martin Lewis, Esq., and Donald W. Mallory, Esq., counsel for the Debtors, (ii) McDonald Hopkins Co., LPA, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114, attention: Sean Malloy, Esq., counsel for the Official Committee of Unsecured Creditors, (iii) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, attention: Daniel F. Fiorillo, Esq., counsel to the DIP Loan Agent, (iv) Coudert Brothers LLP, 1114 Avenue of the Americas, New York, New York 10036, attention: Barry Metzger, Esq. and Edward H. Tillinghast, III., Esq., counsel for the Sinosure Group, and (v) the United States Trustee for this district, MaryAnne Wilsbacher, Office of the United States Trustee, Region 9, 170 North High Street, Suite 200, Columbus, Ohio 43215.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or any adjourned Confirmation Hearing. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

## B.      Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are (i) that the plan is accepted by at least one impaired class of claims and equity interests entitled to vote on the plan, (ii) as to those impaired classes that reject the plan, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (iii) that the plan is in the "best interests" of creditors and stockholders that are impaired under the plan and (iv) that the plan is "feasible."

### 1.      Acceptance by at Least one Impaired Class

Pursuant to the Bankruptcy Code, if any class of Claims is Impaired under the Plan, at least one class of Claims that is Impaired under the Plan must have accepted the Plan.  In making this determination, acceptances by any insiders are excluded.

### 2.      Unfair Discrimination and Fair and Equitable Tests

To obtain non-consensual confirmation of the Plan through the "cramdown" provision of the Bankruptcy Code, the Bankruptcy Court must determine that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and includes the following requirements as to certain types of Claims:

(a)      Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) of this subparagraph.

(b)    Unsecured Creditors.  Either (i) each non-accepting impaired unsecured creditor class receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.  Further, senior creditors cannot be paid more than their full amount owed.

(c)    Equity Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

**3.    Best Interests Test**

With respect to each impaired class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.  To determine what holders of Claims and Equity Interests of each Impaired class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a hypothetical Chapter 7 liquidation case.  The cash amount which would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the hypothetical liquidation case.  Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that might result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee might engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 case.  The foregoing types of claims and other claims which might arise in a liquidation case or result from the pending Chapter 11 case, including any unpaid expenses incurred by the Debtors during the Chapter 11 cases such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay General Unsecured Claims.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amount attributable to the foregoing Claims, are then compared with the value of the property offered to such classes of Claims and Equity Interests under the Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under Chapter 7.

The Debtors also believe that the value of any distributions to each class of Allowed Claims in a Chapter 7 case, including all Other Secured Claims, would be less than the value of distribution under the Plan because such distributions in a Chapter 7 case would not occur for a substantial period of time after such cases were to begin. It is likely that distribution of the proceeds of the liquidation could be delayed after the completion of such liquidation in order to resolve Claims and prepare for distributions. In the likely event litigation was necessary to resolve Claims asserted in the Chapter 7 case, the delay could be prolonged.

The Debtors' Liquidation Analysis is attached hereto as <u>Exhibit C</u>. The information set forth in <u>Exhibit C</u> provides a summary of the liquidation values of the Debtors' assets assuming a Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' Estates. Reference should be made to the Liquidation Analysis for a complete discussion of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The Chapter 7 liquidation period is assumed to be more than one year, allowing for, among other things, the discontinuation of operations, selling of assets and collection of receivables.

## 4.    Feasibility

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for the period 2005 through 2010 (the "Projection Period"). These projections, and the assumptions on which they are based, are included in the Projected Financial Information annexed hereto as <u>Exhibit B</u>. Based upon such projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization. The Debtors further believe that they will be able to repay or refinance all of the then-outstanding indebtedness under the Plan at or prior to the maturity of such indebtedness.

# IX.
# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated alternatives to the Plan, including the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by parties in interest, assuming confirmation of the Plan. The following discussion provides a summary of the Debtors' analysis leading to its conclusion that a liquidation or alternative plan of reorganization would not provide the highest value to parties in interest.

## A.    Equity Sponsorship

In March 2005, the Debtors, after consultation with and the support of the Creditors' Committee, asked Lazard, its investment banker, to market the company to potential interested equity sponsors as a potential alternative to the currently proposed Plan. Under this alternative structure, equity sponsors were asked to act as a plan sponsor whereby such sponsors would purchase a controlling interest in the equity of the reorganized Huffy (51% or more of the stock). The consideration to be paid for this controlling interest plus a minority stake (49% or less of the equity of Huffy) would be used to provide a recovery to creditors.

Lazard, with the assistance of the Debtors, prepared materials in support of the equity sponsor process including confidentiality agreements, an offering memorandum, and a management presentation. Lazard, with the input and assistance of the Debtors and the Creditors' Committee, identified a list of equity sponsors to contact. Lazard contacted more than a dozen potential equity sponsors. Eight sponsors signed confidentiality agreements and received confidential information pertaining to the Debtors. A select number of these sponsors also participated in management presentations. The Debtors received a number of indicative bids of interest. These indicative bids were reviewed by Lazard and the Debtors and the terms of the bids were shared with the Creditors' Committee.

All of the bids were based on the Debtors meeting their projected earnings forecast, assumed the termination of the Debtors' Pension Plan, and assumed that the equity sponsor would be able to secure 90 day trade credit terms. These bids were determined to provide less recovery to creditors than recoveries under this Plan. In addition, these bids remain subject to significant closing risk since none of such equity sponsors, to the Debtors' knowledge, have made arrangements with suppliers to provide the 90 day trade credit terms assumed by such indicative bids. While Lazard continues to have a dialogue with certain equity sponsors, the offers to date do not provide superior recovery to the creditors of the Estates.

## B.    Liquidation Under Chapter 7

If no plan of reorganization can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code in which one or more trustees would be elected or appointed to liquidate the assets of the Debtors for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a Chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Allowed Equity Interests is set forth in Article VIII, Section B. 3., entitled "Best Interests Test."

The Debtors believe that liquidation under Chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan, and (ii) the failure to realize the greater going concern value of the Debtors' assets.

## C.   Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets. The Debtors believe that the Plan, as described herein, enables holders of Claims to realize the greatest recovery under the circumstances. In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, resulting in greater proceeds than under Chapter 7. Further, if a trustee were not appointed, because one is not required in Chapter 11 cases, the expenses for professional fees would most likely be lower than in Chapter 7 cases. Although preferable to a Chapter 7 liquidation, the Debtors believe that a liquidation under Chapter 11 is a much less attractive alternative to holders of Claims than the Plan because the return to holders of Claims and Equity Interests provided for in the Plan is likely to be greater than the returns under a Chapter 11 liquidation.

**X.**
**CERTAIN SECURITIES LAW CONSIDERATIONS**

A.   Exemptions from Registration under Securities Act

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold Claims against or interests in the debtor; and (iii) the securities must be issued in exchange (or principally in exchange) for the recipient's Claims against or interests in the debtor. The Debtors believe that the offer and sale of the New Common Stock under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and the New Common Stock is, therefore, exempt from registration under the Securities Act and state securities law.

To the extent that the New Common Stock is issued under the Plan and is covered by section 1145(a)(1) of the Bankruptcy Code, it may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a Claim against, an interest in, or a Claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received in exchange for such a Claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. To the extent that Persons who receive New Common Stock pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such Persons would be required to comply with the provision of Rule 144 under the Securities Act. These rules permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, however, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock under the Plan would be an "underwriter" with respect to such New Common Stock.

**Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any Person to trade in the New Common Stock. The Debtors recommend that potential recipients of the New Common Stock consult their own counsel concerning whether they may freely trade the New Common Stock without compliance with the Securities Act, the Securities and Exchange Act of 1934 or similar state and federal laws.**

B.     Applicability of Certain Canadian Securities Laws

The following trades of securities contemplated under the Plan will be subject to the securities laws of the provinces and territories of Canada in which Persons entitled to receive such securities reside:

- the issuance of New Common Stock and Distribution Note B;

- the distribution by the Disbursing Agent of New Common Stock and interests in Distribution Note B pursuant to section 4.5(c) of the Plan; and

- subsequent transfers made by the recipients of New Common Stock and interests in Distribution Note B.

The issuance and distribution of New Common Stock and interests in Distribution Note B will be made pursuant to exemptions from the applicable dealer registration and prospectus requirements of the securities laws of the provinces and territories of Canada. Persons resident in Canada who are entitled to receive New Common Stock or interests in Distribution Note B

pursuant to such exemptions are advised that they will not be entitled to the statutory rights that would have been available to them had such securities been distributed pursuant to a prospectus, including rights of rescission and damages.

Holders of New Class B Common Stock or interests in Distribution Note B will not be able to re-sell these securities to Persons resident in Canada without complying with the prospectus and registration requirements contained in the securities laws of the provinces and territories of Canada. As a result, it may not be practical for holders of New Class B Common Stock or interests in Distribution Note B to sell these securities to Persons who are residents of Canada. However, the resale restrictions imposed by the securities laws of the provinces and territories of Canada will not restrict a holder's ability to re-sell New Class B Common Stock or interests in Distribution Note B to Persons who are not residents of Canada. These sales will be subject to the securities laws of the jurisdiction in which the purchasers reside.

## XI.
## CERTAIN FEDERAL U.S. INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. The following summary does not address the federal income tax consequences to holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan (e.g., holders of Administrative Expense Claims, Other Priority Claims, Other Secured Claims, DIP Lender Claims, Priority Tax Claims, Intercompany Claims and Subsidiary Equity Interests) or holders of Old Parent Equity Interests, or Subordinated Claims.

**THE FOLLOWING SUMMARY DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. RESIDENTS OR ENTITIES UNDER THE PLAN. NON-U.S. RESIDENTS OR ENTITIES ARE ADVISED TO CONSULT THEIR OWN TAX AND LEGAL ADVISORS IN RELATION TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF A DISTRIBUTION OR OTHER MATTER UNDER THE PLAN.**

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business

investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

This discussion assumes that the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### B.    Consequences to the Debtors

### 1.    Cancellation of Debt

The Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes - such as net operating loss ("NOL") carryforwards, current year NOLs, tax credits and tax basis in assets --by the amount of any cancellation-of-indebtedness income ("COD") realized by such debtor in connection with the bankruptcy case.  COD is the amount by which the adjusted issue price of the indebtedness discharged (reduced by any unamortized discount) exceeds the fair market value of any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).  On August 29, 2003, the IRS issued final regulations addressing the method for applying the attribute reduction described above to an affiliated group filing a consolidated federal income tax return.  The regulations are effective with respect to COD occurring after August 29, 2003.  Under these regulations, the attributes of the debtor member are first subject to reduction.  These attributes include: (1) current year NOLs and loss carryforwards attributable to the debtor member, and (2) primarily its tax basis in its directly-held assets including the tax basis of stock that it owns.  To the extent that the excluded COD exceeds the attributes of the debtor member, the regulations generally require the reduction of attributes of other members other than the tax basis of the other members' assets.  If the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that corresponding adjustments be made to the attributes of the lower-tier member.  The Debtors do not know at this time whether there will be any material NOLs that will survive this reduction.

As a result of the discharge of Claims pursuant to the Plan, the Debtors will realize COD.  The extent of such COD and resulting tax attribute reduction will depend, in part, on the value of the New Common Stock distributed.  Based on the estimated reorganization value of the Reorganized Debtors, it is anticipated that the Reorganized Debtors will realize a significant amount of COD.  Consequently, there will be material reductions in the attributes (including consolidated NOL carryforwards and current year NOLs (if any) of the Debtors.  Other tax attributes may also be reduced.  To the extent that asset basis is reduced, depreciation or

amortization of assets would also be reduced, and gain recognized (and therefore tax imposed) in connection with the disposition of such assets may be increased.

## 2.      Limitation on NOL Carryforwards and Other Tax Attributes

The Debtors may report consolidated NOL carryforwards for federal income tax purposes for the taxable year ending December 31, 2004.  In addition, the Debtors may incur additional losses during the taxable year ending December 31, 2005.  The existence and amount of the Debtors' losses and NOL carryforwards remain subject to additional work by the Debtors' tax advisers and, ultimately, to adjustment by the IRS.  Additionally, if there has been a change of ownership already under Section 382, the then-existing NOLs and built-in losses of the Debtors would already be subject to limitation.  The Debtors have not yet determined whether any prior ownership change has occurred.

Following the implementation of the Plan, any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the change in ownership of the Reorganized Debtors.  Section 383 imposes similar limitations on tax credit carryovers.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the "bankruptcy exception" discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized.

In order to apply the "bankruptcy exception," the loss corporation must have been under court jurisdiction in a Title 11 case and the continuing shareholders and "qualified creditors" of the loss corporation must own at least 50% of the total voting power and total value of the loss corporation's stock immediately after the ownership change as a result of being shareholders or creditors immediately before the ownership change.  Under Section 382(l)(5), a "qualified creditor" is a creditor who held the indebtedness for at least 18 months before the date of the filing of the Title 11 or similar case, or (2) whose indebtedness arose in the ordinary course of the trade or business of the old loss corporation and is held by the person who at all times held the beneficial interest in such indebtedness.  If the loss corporation meets the requirements of the bankruptcy exception and it does not elect out of the bankruptcy exception, the change in shareholders caused by bankruptcy will not result in a limitation under Section 382.  However, if a second ownership change occurs within 2 years of the ownership change to which the bankruptcy exception applied, the Section 382 limitation will be zero.  The Plan does not contemplate any shareholder restrictions on the sale or transfer of New Common Stock.

If Huffy does not meet the requirements of the bankruptcy exception or elects out of the bankruptcy exception, the issuance of the New Common Stock under the Plan will constitute an ownership change under section 382.  At a later date, Huffy will determine (1) whether it qualifies for the bankruptcy exception, and (2) whether it is advisable to elect out of the bankruptcy exception if Huffy qualifies for the bankruptcy exception.

<u>General Section 382 Annual Limitation</u>

In general, the amount of the annual limitation to which a corporation (or a consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the parent corporation) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.  The "long-term tax-exempt rate" is published by the Treasury Department and is intended to reflect the yield that Treasury bonds would produce if they were tax-exempt (the rate is 4.20% for ownership changes occurring in August of 2005).  If a loss corporation does not qualify for the bankruptcy exception or elects out of the bankruptcy exception a special rule applicable to corporations under the jurisdiction of a bankruptcy court will apply in calculating the Section 382 limitation.  Under this special rule, the limitation is calculated by reference to the lesser of (i) the value of the loss corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change as is the rule in cases where a loss corporation is not in bankruptcy), or (b) the value of the loss corporation's assets determined without regard to liabilities immediately before the ownership change.  Huffy has controlled subsidiaries that are not members of the consolidated group.  As such, an election under Treasury Regulation Section 1.382-8(h) will need to be made with a timely-filed Huffy's tax return for the year of emergence so that the value of such subsidiaries is treated as included in the value of the consolidated group.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  However, if the corporation (or the consolidated group) does not continue its historic business, or use a significant portion of its historic assets in a business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

In addition, any annual limitation resulting from the implementation of the Plan is in addition to, and not in lieu of, any limitations due to prior ownership changes.  Accordingly, were the Debtors to undergo an ownership change in advance of the consummation of the Plan at a time when Huffy is still insolvent, all NOL carryforwards incurred through the date of such change would be subject to an annual limitation of zero, eliminating the general ability of the Debtors to utilize such NOL carryforwards against future operating income.  Under section 382, if a shareholder treats the loss corporation's stock as becoming worthless and as of the end of the taxable year for which the deduction is claimed, such shareholder owns over 50-percent of the corporation's stock, the loss corporation will be treated as undergoing an automatic ownership change, effective the first day of the shareholder's following taxable year.  It is the Debtors' belief that the automatic stay precludes a "50-percent shareholder" from claiming a worthless stock deduction (absent Bankruptcy Court approval) during the pendency of the Chapter 11 cases.  To the best of the Debtors' knowledge, there has not been a "50-percent" shareholder during the pendency of these Chapter 11 Cases.

As indicated above, section 382 can operate to limit built-in losses recognized subsequent to the date of the ownership change.  In general, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the

following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.  In general, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.  Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the previous five years may not be able to be taken into account in the group's computation of net unrealized built-in loss.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors do not currently know whether it will be in a net unrealized built-in gain position or a net unrealized built-in loss position on the Effective Date.

### 3. Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).  However, recent legislation provides for a temporary waiver of this limitation for AMT NOL carrybacks or carryforwards originating in years ending in 2003, 2004, or 2005.

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets would be reduced permanently for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when and to the extent the corporation's regular tax liability exceeds its AMT liability.

### C. Consequences to Holders of Certain Claims

### 1. Consequences to Holders of Sinosure Group Claims and General Unsecured Claims with Residence in the United States

Pursuant to the Plan, holders of Sinosure Group Claims and General Unsecured Claims will receive, in satisfaction and discharge of their Claims, New Common Stock, Distribution Notes A, Distribution Note B or Cash.  The federal income tax consequences to holders of

General Unsecured Claims of receiving New Common Stock depend, in part, on whether such Claims constitute "securities" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. The Debtors believe, and the following discussion assumes, that the Sinosure Group Claims and General Unsecured Claims, for U.S. federal income tax purposes, do not constitute "securities," and thus that the exchange of such Claims for New Common Stock will not constitute a "recapitalization" for federal income tax purposes. To the extent that a holder of a Claim believes the Claim is a security, such holder should consult with its own tax and/or legal advisors.

Accordingly, in general, each holder of a Sinosure Group Claim or General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash, the issue price of Distribution Notes A and Distribution Note B, and the fair market value of any New Common Stock and other property (including, as discussed below, their undivided interest in the Recovery Trust) received or deemed received, by the holder in satisfaction of its claim, and (ii) the holder's adjusted tax basis in its Claim (other than any claim for accrued but unpaid interest).

For all federal income tax purposes, the Debtors, the Unsecured Claims Trust Trustee, and the Holders of Allowed General Unsecured Claims shall treat the transfer of Unsecured Claims Trust Assets to the Unsecured Claims Trust for the benefit of the beneficiaries of such trust as (i) a transfer of the Unsecured Claims Trust Assets directly to such beneficiaries followed by (ii) the transfer by such beneficiaries to the Unsecured Claims Trust in exchange for a beneficial interest in such trust. Accordingly, the beneficiaries of the Unsecured Claims Trust shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Unsecured Claims Trust Assets, excluding the Disputed Claims Reserve. As grantors of such grantor trusts, the beneficiaries of the Unsecured Claims Trust shall report their proportionate interests of all items of taxable income, gains, and losses of the Unsecured Claims Trust on their federal income tax returns and pay any resulting tax liability. All holders of Allowed General Unsecured Claims should consult their own tax advisors for information that might be relevant to their particular situations and circumstances and the particular tax consequences to them as a result of the transfer to the Unsecured Claims Trust of the Unsecured Claims Trust Assets.

For all federal income tax purposes, the Debtors, the Recovery Trust Trustee, and the Holders of Allowed General Unsecured Claims and Allowed Sinosure Group Claims shall treat the transfer of Recovery Trust Assets to the Recovery Trust for the benefit of the beneficiaries of such trust as (i) a transfer of the Recovery Trust Assets directly to such beneficiaries followed by (ii) the transfer by such beneficiaries to the Recovery Trust in exchange for a beneficial interest in such trust. Accordingly, the beneficiaries of the Recovery Trust shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Recovery Trust Assets, excluding the Disputed Claims Reserve. As grantors of such grantor trusts, the

beneficiaries of the Recovery Trust shall, to the extent required (i) report their proportionate interests of all items of taxable income, gains, and losses of the Recovery Trust on their federal income tax returns and (ii) pay any resulting tax liability.  All holders of Allowed General Unsecured Claims and Allowed Sinosure Group Claims should consult their own tax advisors for information that might be relevant to their particular situations and circumstances and the particular tax consequences to them as a result of the transfer to the Recovery Trust of the Recovery Trust Assets.

For a discussion of the tax consequences of Claims for accrued interest, see Article X, Section C.2., entitled "Distributions of Accrued but Unpaid Interest."

Where gain or loss is recognized by a holder in respect of its claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.  A holder which purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such claim (subject to the de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

In general, the holder's tax basis in the Distribution Notes A or Distribution Note B will equal the issue price of such notes and a holder's tax basis in any New Common Shares or any assets received (including the holder's undivided interest in the Recovery Trust Assets) will equal the fair market value of such stock or assets, and the holding period for such notes, stock or assets generally will begin the day following the Effective Date.

The issue price of Distribution Notes A and Distribution Note B will depend upon whether Distribution Notes A or Distribution Note B are traded on an "established securities market" within thirty days before or after the Effective Date, or a substantial portion of Distribution Notes A or Distribution Note B are issued for Claims that are traded on an established securities market.  Pursuant to applicable Treasury Regulations, an "established securities market" includes, among other things, (i) a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, or (ii) that price quotations for such notes are readily available from dealers, brokers or traders.

If either the Distribution Notes A or Distribution Note B (within thirty days of the Effective Date) or a substantial portion of the Claims are traded on an established securities market, the issue price will be equal to (or approximate) the fair market value of the Distribution Notes A or Distribution Note B at issuance.  If not, the issue price of the Distribution Notes A or Distribution Note B will be their stated principal amount.

### 2.    Distributions in Discharge of Accrued but Unpaid Interest

In general, to the extent that any amount received by a holder of a Claim (including in the form of New Common Stock) is received in satisfaction of accrued interest, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim with previously included OID that is not paid in full would be required to recognize a capital loss rather than an ordinary loss.

Pursuant to the Plan, all distributions in respect of Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such claim, if any representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest or amortized OID for tax purposes.

### 3.    Information Reporting and Withholding

All distributions to holders of Claims under the Plan are subject to any applicable withholding (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" (at the then applicable rate). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### D.    Tax Treatment of Unsecured Claims Trust and Recovery Trust

### 1.    Tax Treatment of Unsecured Claims Trust

The Unsecured Claims Trust generally is intended to be treated for federal income tax purposes as a liquidating trust for the benefit of creditors within the meaning of Treasury Regulations section 301.7701-4(d) and in accordance with IRS Revenue Procedure 94-45. The Unsecured Claims Trust Agreement will provide that the Unsecured Claims Trustee may pay taxes from the Unsecured Claims Trust Assets as appropriate. In addition, the Unsecured Claims Trust Agreement will require consistent valuation by the Unsecured Claims Trustee and the beneficiaries-creditors for all federal income tax purposes of the property contributed to the trust.

The Unsecured Claims Trust Agreement will provide that the sole purposes of the Unsecured Claims Trust will be to (i) collect and maintain any Unsecured Claims Trust Assets for the benefit of beneficiaries-creditors, (ii) liquidate (including objecting to Claims pursuant to the provisions of the Plan and determining the proper recipients and amounts of distributions to be made from the Unsecured Claims Trust) and distribute the assets transferred to it for the benefit of the beneficiaries-creditors who are determined to hold Allowed Unsecured Claims as expeditiously as reasonably possible, (iii) not engage in any trade or business, and (iv) terminate upon the completion of such liquidation and distribution. The Unsecured Claims Trust Agreement shall provide that termination of the trust shall occur no later than five (5) years after the Effective Date, unless the Bankruptcy Court shall approve an extension based upon a finding that such an extension is necessary for the Unsecured Claims Trust to complete its claims resolution and liquidating purpose. The Unsecured Claims Trust Agreement shall also limit the investment powers of the Unsecured Claims Trust Trustee in accordance with IRS Revenue Procedure 94-45 and shall require the Unsecured Claims Trust to distribute at least annually to the beneficiary-creditors (as such may have been determined at such time) its net income (net of taxes paid, if any), except for amounts retained as reasonably necessary to maintain the value of the Unsecured Claims Trust Assets or to meet claims and contingent liabilities.

Subject to definitive guidance from the IRS or a court of competent jurisdiction, the Unsecured Claims Trust Trustee shall file returns for the Disputed Claims Reserve (to the extent it applies to the Unsecured Claims Trust) as a disputed ownership fund under Proposed Treasury Regulations Section 1.468B-9, of which the Unsecured Claims Trust Trustee is the "administrator" as defined in such Regulations, and the Unsecured Claims Trust Trustee shall be responsible for payments, out of the Disputed Claims Reserve (to the extent if applies to the Unsecured Claims Trust), of any taxes imposed on such reserve.

## 2.      Tax Treatment of Recovery Trust

The Recovery Trust generally is intended to be treated for federal income tax purposes as a liquidating trust for the benefit of creditors within the meaning of Treasury Regulations section 301.7701-4(d) and in accordance with IRS Revenue Procedure 94-45. The Recovery Trust Agreement will provide that the Recovery Trust Trustee may pay taxes from the Recovery Trust Assets as appropriate. In addition, the Recovery Trust Agreement will require consistent valuation by the Recovery Trust Trustee and the beneficiaries-creditors for all federal income tax purposes of the property contributed to the trust. The Recovery Trust Agreement will provide that the sole purposes of the Recovery Trust will be to (i) collect and maintain any assets for the benefit of its beneficiaries, (ii) liquidate and distribute the assets transferred to it for the benefit of its beneficiaries-creditors as expeditiously as reasonably possible, (iii) not engage in any trade or business, and (iv) terminate upon the completion of such liquidation and distribution. The Recovery Trust Agreement shall provide that termination of the trust shall occur no later than five (5) years after the Effective Date, unless the Bankruptcy Court shall approve an extension based upon a finding that such an extension is necessary for the Recovery Trust to complete its claims resolution and liquidating purpose. The Recovery Trust Agreement shall also limit the investment powers of the Recovery Trust Trustee in accordance with IRS Revenue Procedure 94-45 and shall require the Recovery Trust to distribute at least annually to its beneficiary-creditors (as such may have been determined at such time) its net income (net of

taxes paid, if any), except for amounts retained as reasonably necessary to maintain the value of the Recovery Trust Assets or to meet claims and contingent liabilities.  The transfer of the Recovery Trust Assets into the Recovery Trust will constitute a taxable transfer.

Subject to definitive guidance from the IRS or a court of competent jurisdiction, the Recovery Trust Trustee shall file returns for the Disputed Claims Reserve (to the extent it applies to the Unsecured Claims Trust) as a disputed ownership fund under Proposed Treasury Regulations Section 1.468B-9, of which the Recovery Trust Trustee is the "administrator" as defined in such regulations, and the Recovery Trust Trustee shall be responsible for payments, out of the Disputed Claims Reserve (to the extent it applies to the Recovery Trust), of any taxes imposed on such reserve.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XII.

### CERTAIN CANADIAN INCOME TAX CONSEQUENCES OF THE PLAN

#### A.  Introduction

The following discussion summarizes certain Canadian federal income tax consequences of the implementation of the Plan to the Debtors resident in Canada and certain holders of Claims. The following summary does not address the Canadian federal income tax consequences to holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan (e.g. holders of Administrative Expense Claims, Other Priority Claims, Other Secured Claims, DIP Lender Claims, Priority Tax Claims, Intercompany Claims, Subsidiary Equity Interests) or holders of Old Parent Equity Interests and Subordinated Claims.  The following discussion of certain Canadian federal income tax considerations is generally applicable in respect to (i) a holder of a Claim who, for the purposes of the Income Tax Act (Canada) (the "Tax Act") and at all relevant times, deals at arm's length with, and is not affiliated with, the Debtors and (ii) holds its Claim as capital property.  Claims will generally be considered to be capital property, unless such Claims are held or are deemed to be held in the course of carrying on a business of trading or dealing in property similar to the Claims or the Claims were acquired as part of a venture or concern in the nature of trade.  Holders resident or deemed to be resident in Canada who hold Claims owing by a Debtor resident or deemed to be resident in Canada, whose Claims might not otherwise qualify as capital property, may be entitled to elect to have such Claims treated as capital property by making the irrevocable election provided by subsection 39(4) of the Tax Act.

The Tax Act contains certain provisions relating to securities held by certain financial institutions.  This summary does not take into account those provisions.  This summary also does not apply to a holder of Claims an interest in which would be a "tax shelter investment" as defined in the Tax Act.  Holders of Claims that are "financial institutions" for the purposes of the Tax Act or an interest in which would be a tax shelter investment should consult their own tax

advisers. This summary also does not apply to a holder of a Claim who is exempt from tax imposed under Part I of the Tax Act.

This discussion is based on the current provisions of the Tax Act and the regulations thereunder, all specific proposals to amend the Tax Act and those regulations publicly announced by, or on behalf of, the Minister of Finance (Canada) prior to the date hereof (the "Tax Proposals"), and our understanding of the current published administrative and assessing practices of the Canada Revenue Agency ("CRA"). No assurance can be provided that the Tax Proposals will be enacted as proposed, if at all. No advance income tax ruling has been requested from the CRA, no legal opinion has been requested from counsel concerning any tax consequences of the Plan and no tax opinion is given by this discussion.

This summary is not exhaustive of all Canadian federal income tax considerations that may be relevant to Debtors or holders of Claims or Equity Interests and, except for the Tax Proposals, does not take into account or anticipate any changes in law or CRA administrative or assessing practices, whether by judicial, governmental or legislative decision or action or otherwise, nor does it take into account Canadian provincial or territorial or foreign tax considerations, which may vary from Canadian federal income tax considerations.

**THIS SUMMARY IS OF A GENERAL NATURE ONLY AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER OF A CLAIM AND NO REPRESENTATION WITH RESPECT TO INCOME TAX CONSEQUENCES TO ANY PARTICULAR HOLDER OF A CLAIM IS MADE. ACCORDINGLY, YOU SHOULD CONSULT YOUR OWN TAX ADVISORS WITH RESPECT TO YOUR PARTICULAR CIRCUMSTANCES.**

For Canadian tax purposes, all amounts, including proceeds of disposition, cost, interest and dividends, must be reported in Canadian currency based on the applicable exchange rate in effect at the time of relevant events.

### B.  Consequences to Certain Debtors

The settlement of the Commercial Debt Obligations (as defined in the Tax Act, which do not include debt obligations arising from guarantees in respect of another party's debt) of Debtors resident in Canada or carrying on business in Canada will result in the application of the Canadian debt forgiveness rules. Under these rules, the Forgiven Amount (as defined in the Tax Act) will reduce certain tax attributes of such Debtors in a prescribed order, including such Debtors' loss carryforwards. The Forgiven Amount is the lesser of the amount for which the obligation was issued and the unpaid principal amount, less the amounts paid in satisfaction of the debt and certain other adjustments.

### C.  Consequences to Holders Not Resident in Canada

The following portion of this discussion is applicable to a holder of a Claim who, for the purposes of the Tax Act and at all relevant times, is not resident or deemed to be resident in Canada and does not use or hold, and is not deemed to use or hold, a Claim in carrying on

business in Canada.  Special rules, which are not discussed below, may apply to a holder of a Claim who is a non-resident insurer which carries on business in Canada and elsewhere.

A non-resident holder of a Claim will not be subject to tax under the Tax Act in respect of any capital gain realized by it on the settlement of such Claim pursuant to the Plan.

### D.  Consequences to Holders Resident in Canada

The following portion of this discussion is applicable to holder who, for the purposes of the Tax Act and at all relevant times, is resident or deemed to be resident in Canada.  For the purposes of this portion of the discussion, it is assumed that Huffy Corporation would not be a foreign affiliate, as defined in the Tax Act, of a holder of a Claim receiving New Class B Common Stock on settlement of such Claim and that such shares would not constitute a participating interest in a foreign investment entity, as defined in certain proposed amendments to the Tax Act.  Holders are urged to consult their own tax advisors regarding whether (and the relating Canadian tax consequences if) Huffy Corporation may qualify as a foreign affiliate and a New Class B share received on the cancellation of a Claim may constitute a participating interest in a foreign investment entity.

#### 1.      Cancellation of Claims

The cancellation of a Claim will constitute a disposition by the holder thereof.  Such holder will realize a capital gain (or a capital loss) equal to the amount by which the aggregate of the cash and the fair market value of each of the New Class B Common Stock and the Distribution Note B received as consideration for the cancellation, net of any reasonable costs of disposition, exceeds (or is exceeded by) the holder's adjusted cost base of the Claim immediately before the cancellation.

One-half of any capital gain (the "taxable capital gain") realized by a holder in a taxation year will be included in computing such holder's income for such taxation year.  One-half of any capital loss (the "allowable capital loss") realized by a holder in a taxation year may be deducted by such holder against taxable capital gains realized by such holder in such taxation year and, to the extent undeducted in the year realized, against net taxable capital gains for the three preceding or any subsequent taxation year, subject to and in accordance with the rules contained in the Tax Act.

Loss limitation rules in the Tax Act may limit the loss realized on a disposition of a Claim to, if applicable, a formula amount equal to the loss otherwise determined multiplied by a fraction, the numerator of which is the cash and fair market value of new Class B Common Stock received on cancellation of the Claim, and the denominator of which is the total of the cash, the fair market value of the New Class B Common Stock and the fair market value of the Distribution Note B received on cancellation of the Claim.

A holder that is a "Canadian-controlled private corporation" (as defined in the Tax Act) may be liable for an additional refundable tax of 6 2/3% on investment income.  For this purpose, investment income will generally include taxable capital gains.

A capital gain realized by an individual may give rise to a liability for alternative minimum tax.

A holder in receipt of New Class B Common Stock on the cancellation of a Claim will be considered to have acquired such New Class B Common Stock at a cost equal to their fair market value on the date of the cancellation.

A holder may also be required to include in income interest accrued on the Claim to the date of cancellation.

The income tax consequences arising as a result of the non-payment of interest owing to a holder of a Claim will depend upon the particular circumstances of the holder, including the method followed in computing its income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such interest.

      2.       <u>Interest on Distribution Note B</u>

A corporation, partnership, unit trust or trust of which a corporation or a partnership is a beneficiary that holds a Distribution Note B will be required to include in computing its income for a taxation year all interest on a Distribution Note B that accrued to such holder to the end of that taxation year or that becomes receivable or is received before the end of the taxation year, to the extent that such amount was not included in computing its income for a preceding year.

All other holders of a Distribution Note B, including individuals, will be required to include in computing their income for a taxation year any interest on a Distribution Note B that is received or receivable in that year (depending on the method regularly followed by the holder in computing income), to the extent that such amount was not included in computing income for a preceding taxation year. In addition, if a Distribution Note B is held on an "anniversary day", as defined in the Tax Act, the holder will be required to include in computing income for the year interest that has accrued to it to the end of that day, to the extent that the interest was not otherwise included in computing income for the year or a preceding taxation year.

A holder that is a "Canadian-controlled private corporation", as defined in the Tax Act, may be liable for an additional refundable tax of 6 2/3% on investment income. For this purpose, investment income will generally include interest income.

Interest for these purposes is the gross amount of interest, including the amount withheld, if any, on account of U.S. withholding tax. A foreign tax credit may be available in respect of U.S. withholding tax paid, in the circumstances and to the extent permitted under the detailed provisions of the Tax Act.

3.     Disposition of Distribution Note B

On a disposition or deemed disposition of a Distribution Note B, a holder will generally be required to include in income the amount of interest accrued to the date of disposition, to the extent that such amount has not otherwise been included in the holder's income for a previous taxation year.

In general, on a disposition or deemed disposition, the holder will realize a capital gain (or capital loss) to the extent that the proceeds of disposition, net of any accrued interest or deemed interest and any reasonable costs of disposition, exceed (or are exceeded by) the adjusted cost base of the Distribution Note B to the holder immediately before the disposition. See "Consequences to Holders Resident in Canada - 1. Cancellation of Claims" for a discussion of the tax treatment of capital gains and losses.

4.     Dividends on New Class B Common Stock

Dividends received or deemed to be received by a holder of New Class B Common Stock acquired upon the cancellation of a Claim will be included in computing the holder's income for the purposes of the Tax Act. Such dividends will not be eligible, in the case of holders who are individuals, for the gross-up and dividend tax credit treatment and, in the case of holders that are corporations, for the inter-corporate dividend deduction, that are each normally applicable to dividends received from taxable Canadian corporations. Subject to the detailed provisions of the Tax Act and the tax treaty between Canada and the United States, a holder may be entitled to a foreign tax credit in respect of United States withholding tax applicable to dividends received on the New Class B Common Stock.

5.     Disposition of New Class B Common Stock

In general, a disposition or deemed disposition of New Class B Common Stock acquired upon the cancellation of a Claim will give rise to a capital gain (or a capital loss) equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are exceeded by) the holder's adjusted cost base of such Class B shares immediately before the disposition. See "Consequences to Holders Resident in Canada - Cancellation of Claims" for a discussion of the tax treatment of capital gains and losses.

# XIII.
# CONCLUSIONS AND RECOMMENDATIONS

Based upon the foregoing, the Debtors believe that confirmation of the Plan will provide the greatest recovery for all holders of Allowed Claims against the Debtors, and recommend that all holders of Allowed Claims in Classes that are Impaired and entitled to vote on the Plan vote to accept the Plan.

**HUFFY CORPORATION**
(for itself and on behalf of each of the other Debtors and Debtors In Possession)

By:     /s/ John A. Muskovich
        President and Chief Executive Officer

**DINSMORE & SHOHL LLP**
/s/ Kim Martin Lewis
/s/ Donald W. Mallory
Kim Martin Lewis, Esq.
John B. Persiani, Esq
Donald W. Mallory, Esq.
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
513-977-8200
kim.lewis@dinslaw.com
donald.mallory@dinslaw.com
Attorneys for Debtors and Debtors in Possession